MICHELE PIZZUTI (IN PROPRIA PERSONA)
Federal Register No.: 50189-054
Federal Correctional Institution - Danbury
33 1/2 Pembroke Road
Danbury, CT 06811
E-mail: mpizzuti9054@emailinterface.org
(NO ATTACHMENTS - TEXT ONLY)

**FILED**

2019 JAN 11  P 12: 22

US DISTRICT COURT
BRIDGEPORT CT

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| MICHELE PIZZUTI (a/k/a Michael Pizzuti) (PLAINTIFF)<br><br>vs.<br><br>ANNE J. PENACHIO, ESQUIRE<br>PENACHIO MALARA, LLP<br>(Defendants) | NO.: 3:19 cv 59 (AVC) |

## COMPLAINT FOR MONETARY DAMAGES FOR
## LEGAL MALPRACTICE, BREACH
## OF CONTRACT AND FRAUD

# I
## INTRODUCTION

1.   This is a civil action, filed in diversity, seeking monetary damages for, _inter alia_, legal malpractice, breach of contract, and fraud and misrepresentation, arising from the negligent and willful acts an omissions of Anne J. Penachio, Esquire - a partner in the New York Limited Liability Partnership registered with the New York Secretary of State as PENACHIO MALARA, LLP.

. . . . . . . . . . .

## II
## JURISDICTION AND VENUE

### A
### SUBJECT MATTER JURISDICTION

2. This Court has subject matter jurisdiction over the claims raised herein pursuant to 28 U.S.C. § 1332, insofar as the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and cost, and is between citizens of different states.

### B
### VENUE

3. Venue is proper in this District, insofar as the Plaintiff resides herein, and a certain number of the acts alleged in this Complaint were committed in this District.

4. RESERVED.

. . . . . . . . . .

## III
## THE PLAINTIFF

### A
### IDENTIFICATION

5.  The Plaintiff, MICHELE PIZZUTI, is a native of Italy and a naturalized citizen of the United States.

6.  The Plaintiff is also known by the name and more common spelling "Michael" Pizzuti.

7.  The Plaintiff is currently incarcerated in the Federal Bureau of Prisons, at FCI DANBURY, Connecticut, serving a sentence of 219 months on indictment number 02-CR-1237, imposed by Mrs. Justice Kram, in and for the Southern District of New York.

8.  English is the Plaintiff's second language and he is the holder of a General Equivalency Diploma (GED),]

9.  The Plaintiff is legally married to Michelle Pizzuti (hereinafter referred to as Mrs. Pizzuti).

### B
### ORIGIN OF THE PLAINTIFF'S KNOWLEDGE

10.  Unless specifically stated otherwise, the Plaintiff's knowledge of the facts and substantive allegations raised in this Complaint are derived from, and premised upon, information received from PENACHIO, loan servicing documents, county and state recordings, foreclosure notices, suits in foreclosure, pleadings filed in the United States Bankruptcy Court, for the Southern District of New York, and documents filed with the Westchester Supreme Court, and/or the New York Secretary of State.

. . . . . . . . . .

## IV
## THE DEFENDANTS

### A
### ANNE PENACHIO, ESQUIRE

11. Anne Penachio is a person over the age of eighteen (18) years of age.

12. Anne Penachio is an attorney licensed to practice law in the State of New York, and shall, hereinafter, be referred to as "PENACHIO".

13. The Plaintiff is reliably informed and believes, and thereon alleges, that PENACHIO is admitted to practice before the United States Bankruptcy Court, in and for the Southern District of New York.

### B
### PENACHIO MALARA, LLP

14. PENACHIO MALARA, LLP, in a New York Limited Partnership, whose address as designated with the New York Secretary of State is 235 Main Street, 6th Floor, White Planes, New York, 10601.

15. Upon information and belief, PENACHIO is a member of the PENACHIO MALARA Limited Liability Partnership (hereinafter referred to as "PENACHIO MALARA").

16.-24.  RESERVED.

. . . . . . . . . . .

## V
## FACTUAL ALLEGATIONS

### A
### REAL ESTATE SUBJECT TO THE PRESENT COMPLAINT

#### 1
#### 46 GLEN ROAD, EASTCHESTER, NEW YORK

25.  On or about September 20, 2004 (prior to his incarceration), the PLAINTIFF refinanced a parcel of real estate located at 46 Glen Road, Eastchester, New York (GLEN ROAD PROPERTY).

26.  In order to fund the refinancing of the GLEN ROAD PROPERTY, the PLAINTIFF executed a note in favor of Washington Mutual Bank, FA, in the amount of $840,000 (GLEN ROAD NOTE) (EXHIBIT - 1).

27.  Contemporaneously with the recording of the Deed to the GLEN ROAD PROPERTY, the PLAINTIFF executed a Quit Claim Deed of that property from "Michele Pizzuti" and to "Michele Pizzuti and Michelle Pizzuti" (EXHIBIT - 2).

28.  Also contemporaneously with the filing of the aforementioned Note and Quit Claim Deed, the PLAINTIFF and Mrs. Pizzuti granted a mortgage against the GLEN ROAD PROPERTY in favor of Washington Mutual Bank, FA, as security for the repayment of the GLEN ROAD NOTE (GLEN ROAD MORTGAGE) (EXHIBIT -3).

29.  The GLEN ROAD NOTE was recorded in the land records of Westchester County on February 22, 2005.

30.  The GLEN ROAD MORTGAGE was recorded in the land records of Westchester County on Febuary 22, 2005.

<u>2</u>

<u>267 DANTE AVENUE, TUCKAHOE, NEW YORK.</u>

31.   On or about February 09, 2005 (prior to his incarceration), the PLAINTIFF and Mrs. Pizzuti purchased a second parcel of real estate at 267 Dante Avenue, in Tuckahoe, New York (DANTE AVENUE PROPERTY).

32.   In order to fund the purchase of the DANTE AVENUE PROPERTY, the PLAINTIFF and Mrs. Pizzuti executed and delivered a note in favor of INDYMAC, FSB, in the amount of $920,250.00 (DANTE AVENUE NOTE) (EXHIBIT - 4).

33.   In order to secure repayment of the DATE AVENUE NOTE, the PLAINTIFF and Mrs. Pizzuti executed and delivered a mortgage against the DANTE AVENUE PROPERTY in favor of INDYMAC, FSB (DANTE AVENUE MORTGAGE) (EXHIBIT - 5).

34.   The DANTE AVENUE NOTE was recorded in the land records of Westchester County on April 07, 2005.

<u>B</u>

<u>THE PLAINTIFF'S PREPARATION FOR INCARCERATION IN 2005</u>

35.   As noted above, the PLAINTIFF was sentenced to 219 months in federal prison in 2006.

36.   In anticipation of his incarceration, the PLAINTIFF began to make expansions and improvements to his real estate in order to create rental units from which his wife and children would derive support during the period of time he might become incarcerated.

37.   While those efforts began prior to his incarceration, they continued after he started serving his prison sentence,

resulting in a combined configuration of five rental units, while Mrs. Pizzuti occupies a finished basement apartment in the DANTE AVENUE PROPERTY.

## C
## FINANCIAL REVERSALS BEGINNING IN 2011

38.   In late 2010 and early 2011, the PLAINTIFF began to experience financial reversals which included, inter alia, tenant vacancies for a prolonged period of time, increased property taxes, and elevating insurance premiums which - taken together and in sequence - worked financial hardship that inhibited the ability to make timely payment of all outstanding obligations related to both of his properties.

39.   At the time his financial reversals began to occur, Mrs. Pizzuti was residing in a portion of the GLEN ROAD PROPERTY with her three children, all of whom were under the age of eighteen and fully dependant.

## D
## RETENTION OF ATTORNEY ANNE PENACHIO

40.   In approximately March of 2011, the PLAINTIFF located Attorney Penachio, with the aid of a third party who searched the internet and provided contact information of several bankruptcy attorneys to the PLAINTIFF.

41.   After reaching out to Attorney Penachio (hereinafter referred to as PENACHIO) and establishing a line of communication (at that time, through the Bureau of Prisons limited inmate email service known as CORRLINKS), the PLAINTIFF made the decision to retain PENACHIO for the purposes of

pursuing reorganization of the Dante Avenue and Glen Road Mortgages, and PENACHIO advised the PLAINTIFF that he would need to proceed under Chapter 11.

42.   The PLAINTIFF officially engaged PENACHIO on April 19, 2011, and that contract was reduced to the execution of an "ENGAGEMENT LETTER" (EXHIBIT - 6).

43.   The Aforementioned engagement required the PLAINTIFF to pay a retainer fee in the amount of $7,500, against a fee amount of $15,000-$20,000. The PLAINTIFF fulfilled the retainer requirement by making three installment payments of $2,500 each.

44.   On May 26, 2015 PENACHIO filed a certification of Attorney's Fees in the U.S. Bankruptcy Court falsely claiming only $7,000 in fees (EXHIBIT - 7).

45.   When the PLAINTIFF hired PENACHIO in April of 2011, he was three to four months behind on mortgage and real estate tax payments on both properties.

46.   PENACHIO did not immediately file a Chapter 11 Petition and instead advised the PLAINTIFF that he should NOT file until such time as one or both of the mortgage companies initiated foreclosure proceedings against the PLAINTIFF.

<u>E</u>
**<u>FORECLOSURE PROCEEDINGS FILED AGAINST THE PLAINTIFF</u>**

<u>1</u>
**<u>267 DANTE AVENUE</u>**

47.   On February 26, 2013 (two years after retaining PENACHIO) a foreclosure proceeding was filed against the PLAINTIFF's interest in the DANTE AVENUE PROPERTY in the New

York Supreme Court - Westchester County - under index number 52519-13, by Deutsche National Bank Trust Company (DEUTSCHE), who purports to be the owner in due course of the DANTE AVENUE NOTE and the DANTE AVENUE MORTGAGE (DANTE FORECLOSURE ACTION).

48.   To the best of the PLAINTIFF's recollection, immediately upon receiving the DANTE AVENUE foreclosure documents (via the US MAIL), the PLAINTIFF promptly forwarded those papers to PENACHIO.

49.   According to the docket listing for Index Number 52519-13, PENACHIO entered an appearance in the DANTE FORECLOSURE ACTION and filed a verified answer to the Complaint in that matter on April 01, 2013 (EXHIBIT - 8).

50.   On May 31, 2013, Judge Alan D. Scheinkman, ordered PENACHIO to appear for a conference in the DANTE AVENUE FORECLOSURE matter on July 26, 2013, at 9:30am.

51.   Upon information and belief, PENACHIO did not attend the July 26, 2013 conference, as ordered.

52.   Thereafter, on October 15, 2013, Judge Scheinkman issued a "NOTICE TO RESUME PROSECUTION OF ACTION AND TO FILE NOTICE OF ISSUE" in the DANTE AVENUE FORECLOSURE ACTION.

53.   DEUTSCHE filed the Notice of Issue on 10/24/2013, and the Court ordered a settlement conference for March 03, 2014.

54.   The Notice to Resume Prosecution and the Notice of Issue were certified to PENACHIO in due course.

55.   On November 20, 2013, the attorney for DEUTSCHE filed a "NOTICE OF MOTION FOR SUMMARY JUDGEMENT & APPOINTMENT OF REFEREE" in the DANTE AVENUE FORECLOSURE ACTION.

56.    RESERVED.

57.    Further review of the docket listing for Index Number 52519-13 reveals that PENACHIO failed to respond to, or otherwise defend against DEUTSCHE's motion for summary judgement and the court ultimately entered an order striking the aforementioned verified answer and entered a judgement of foreclosure and power of sale on November 20, 2013.

58.    Court appointed referee Mr. Mark Golab, submitted his final report on November 20, 2013.

## F
## FILING OF CHAPTER 11 PETITION

59.    On March 13, 2015 (four years after the Plaintiff retained her), PENACHIO filed the instant Chapter 11 proceedings.

## G
## DANTE AVENUE FORECLOSURE JUDGEMENT

60.    The Westchester Supreme Court entered a judgement of foreclosure in the amount of $1,239,000.00, plus accruing interest and costs, and granted the power to sell the DANTE AVENUE PROPERTY, on March 24, 2015 (EXHIBIT 9).

## H
## ERRORS AND OMISSION IN PENACHIO'S FILINGS

## A
## 1
## INCORRECT STREET ADDRESS OF THE PLAINTIFF

61.    Attached hereto and incorporated by reference as EXHIBIT - 10 is the Chapter 11 petition (PETITION) PENACHIO

filed on behalf of the PLAINTIFF on March 13, 2015.

62.   On page 1 of the "Main Document" PENACHIO listed 46 Glen Road, Eastchester, NY 10709, as the street address of the PLAINTIFF.

63.   On March 13, 2015, the date on which the PETITION was filed, the PLAINTIFF was incarcerated in the Federal Bureau of Prisons, in White Deer, Pennsylvania, and the PLAINTIFF's family had vacated the GLEN ROAD PROPERTY in August 2012.

64.   On March 13, 2015, the date on which the PETITION was filed, NO MEMBER of the PLAINTIFF's immediate and dependent family resided at 46 Glen Road; and, more specifically, the PLAINTIFF's family had vacated the GLEN ROAD PROPERTY in August of 2012.

65.   Upon information and belief, when filing the PETITION, PENACHIO utilized the address which the PLAINTIFF's family was residing at when she was initially retained in April of 2011, notwithstanding the fact that the PLAINTIFF had previously informed PENACHIO that his family relocated to the DANTE AVENUE PROPERTY well in advance of the filing date.

<u>2</u>

<u>SECURED CREDITORS LISTED AS UNSECURED CREDITORS</u>

66.   When filing the PETITION, PENACHIO incorrectly listed claims secured by either a first or second mortgage executed by the PLAINTIFF on the standard form entitled "LIST OF CREDITORS HOLDING 20 LARGEST UNSECURED CLAIMS".

<u>3</u>

<u>IMPROPERLY LISTED AND/OR NAMED CREDITORS</u>

67.   PENACHIO improperly listed BAC HOME LOAN SERVICING, LP with a claim amount of $120,000.00 when, in fact, that debt had already been discharged at least two years prior to the PETITION filing date.

68.   PENACHIO improperly listed Chase Home Loan Finance, LLC, with a claim amount of $115,000.00 when no such debt existed.

69.   The PLAINTIFF never provided PENACHIO with any documents or other information demonstrating a $115,000.00 debt owed to Chase Home Loan Finance, LLC, and is completely unaware of where PENACHIO got the idea that such a debt existed.

70.   PENACHIO improperly listed Chase Home Loan Finance, LLC, with a claim amount of $850,000.00, when no such claim existed (presumably relating to the GLEN ROAD NOTE AND MORTGAGE).

71.   Upon Information and belief, when listing the $850,000.00 Chase claim, PENACHIO was relying on documents provided to her by the PLAINTIFF upon her retention, nearly four years earlier. However, Chase purports to have assigned its note to DEUTSCHE in approximately October of 2012. As such, upon filing of the PETITION, Chase held no claim, or right to a claim against the PLAINTIFF, and the PLAINTIFF provided notice to PENACHIO well in advance of the filing of the PETITION that Chase was no longer sending him mortgage statements.

72.   PENACHIO improperly listed INDYMAC Federal Bank, with a claim amount of $965,000.00 when no such claim existed (presumably relating to the DANTE AVENUE NOTE AND MORTGAGE).

73.   Upon   Information   and   belief,   when   listing   the $965,000.00 INDYMAC claim, PENACHIO was relying on documents provided by the PLAINTIFF upon her retention, nearly four years earlier. However, INDYMAC purports to have assigned its note to DEUTSCHE in June of 2011. As such, upon filing of the PETITION, INDYMAC held no claim, or right to a claim, against the PLAINTIFF, and the PLAINTIFF provided notice to PENACHIO well in advance of the filing of the PETITION that INDYMAC was no longer sending him mortgage statements.

74.   In   addition   to   sending   PENACHIO   information   and notifications that his mortgages were no longer held or serviced by Chase and INDYMAC, respectively, the PLAINTIFF also provided PENACHIO with newspaper articles regarding litigation and complaints filed against DEUTSCHE with regard to illegal mortgage practices (including improper foreclosure proceedings) and requested that PENACHIO investigate whether or not the PLAINTIFF had any potential claims or defenses against DEUTSCHE regarding the purported assignment and transfer of the GLEN ROAD NOTE and MORTGAGE and the DANTE AVENUE NOTE and MORTGAGE.

75.   PENACHIO **never** responded to PLAINTIFF's request for information about the DEUTSCHE issues and failed to provide the PLAINTIFF with an analysis of whether or not he possessed any credible claims against DEUTSCHE regarding their attempts to foreclose both of his mortgages (which, as it turns out, the PLAINTIFF actually has). However, when filing the verified answer to the Complaint for Foreclosure (as set forth in paragraph 32, above) PENACHIO set forth the following

offensively vague Fourth Affirmative Defense: "The Plaintiff does not hold a valid claim against the Defendants or Defendant's property".

76.   PENACHIO improperly listed the Town of Eastchester with a claim amount of $12,000.00 when no such claim has ever existed.

## B
## PENACHIO'S LOCAL RULE 1007-2 AFFIRMATION

77.   On March 17, 2015 - two days after filing the PETITION, PENACHIO filed an affirmation as required by Local Rule 1007-2 (March 2017 AFFIRMATION).

78.   In paragraph 3 of the March 2017 AFFIRMATION, PENACHIO swears that the PLAINTIFF's family resides in the DANTE AVENUE PROPERTY along with the tenants, and that the GLEN ROAD PROPERTY is occupied solely by tenants.

79.   PENACHIO's affirmation set forth in paragraph 61, above, demonstrates that the PLAINTIFF provided her adequate notice as to which of his two properties his wife and children were residing in.

## C
## SUMMARY OF SCHEDULES - SCHEDULE D

80.   On May 26, 2015, PENACHIO filed the required summary of schedules, and, in schedule D she again listed BAC HOME LOANS SERVICING, LP, Chase Home Loan Finance, LLC and INDYMAC claims against the PLAINTIFF - WHEN NO SUCH CLAIMS EXISTED, either because the claim was already discharged or was no longer owned or possessed by the Claimant.

81.   In Schedule D, PENACHIO also again erroneously listed the Town of Eastchester as a claimant, when no such claim existed.

## D
## LOSS MITIGATION REQUEST - BY THE PLAINTIFF (GLEN ROAD)

82.   On May 27, 2015, PENACHIO requested loss mitigation proceedings regarding the GLEN ROAD PROPERTY.

83.   At the time PENACHIO requested loss mitigation proceedings regarding the GLEN ROAD PROPERTY (i) the PLAINTIFF's family was NOT residing at 46 Glen Road and (ii) PENACHIO had already filed a Local Rule 1007-2 Affirmation informing the Court that the PLAINTIFF's family actually lived at the DANTE AVENUE PROPERTY.

84.   In filing out the loss mitigation request referred to in paragraphs 65-66, above, PENACHIO listed the loan account number for the GLEN ROAD NOTE, and the loan servicing company (e.g. Ocwen Loan Servicing, LLC) for the DANTE AVENUE NOTE.

85.   Also, on May 27, 2015, PENACHIO filed an affidavit of service of the loss mitigation request for the GLEN ROAD PROPERTY, to the loan servicer for the DANTE AVENUE PROPERTY (OCWEN).

86.   Notwithstanding the fact that PENACHIO requested loss mitigation procedures regarding the wrong address (Glen Road instead of Dante Avenue), on August 20, 2015, counsel for DEUTSCHE penned a letter to the Honorable Robert D. Drain complaining that "our office has not received an initial financial package from the Debtor even after several attempts

were made requesting it."

87.    Thereafter, on September 11, 2015, PENACHIO filed a WITHDRAWAL OF LOSS MITIGATION REQUEST for the GLEN ROAD PROPERTY, on the basis that "[t]he Debtor's family has relocated to their other property located at 267 Dante Avenue, Tuckahoe, NY 10707".

88.    During the entire time which PENACHIO was requesting loss mitigation procedures with respect to the GLEN ROAD PROPERTY, the PLAINTIFF's family **NEVER** lived in the GLEN ROAD PROPERTY: and, in fact, had relocated to the DANTE AVENUE PROPERTY in August of 2012, nearly three years prior to the filing of the PETITION.

89.    On September 11, 2015, relying upon the affirmation and representation by PENACHIO that the PLAINTIFF's "family has relocated to their other residence at 267 Dante Avenue **** and this is now their primary residence", Judge Drain issued an "Order terminating Loss Mitigation and Financial Report".

### E
### LOSS MITIGATION REQUEST - BY THE DEBTOR (DANTE AVENUE)

90.    On September 11, 2015, PENACHIO filed a second loss mitigation request, this time for the DANTE AVENUE PROPERTY.

### F
### SEPTEMBER 13, 2016, LOSS MITIGATION STATUS REPORT

91.    On September 13, 2016, Attorney Penachio filed a letter addressed to Judge Drain informing the Court, in connection with the loss mitigation efforts on DANTE AVENUE, that "Mrs. Pizzuti has been making adequate protection payments

to the senior mortgage holders".

92.   As of September of 2016, Mrs Pizzuti had long since stopped making such protection payments. In fact, with the exception of one payment made in February of 2016, Mrs. Pizzuti has not submitted any payments since October of 2015.

93.   On October 10, 2016, the Court issued an order terminating loss mitigation as to DANTE AVENUE on the basis that "no agreement has been reached".

94.   PENACHIO never informed the PLAINTIFF that the Court terminated loss mitigation efforts as to DANTE AVENUE.

## G
## MOTION FOR RELIEF FROM AUTOMATIC STAY - GLEN ROAD

95.   On October 11, 2016, DEUTSCHE filed a Motion for Relief From the Automatic Stay with respect to the GLEN ROAD PROPERTY.

96.   PENACHIO failed to object to, or otherwise defend against the aforementioned Motion for Relief From the Automatic Stay and, on that basis, the Court granted same on November 11, 2016.

97.   PENACHIO never informed the PLAINTIFF that the Automatic Stay was lifted with respect to the GLEN ROAD PROPERTY.

## H
## MOTION TO DISMISS OR CONVERT THE PETITION TO CHAPTER 7

98.   On January 24, 2017, the United States Trustee (UST) filed a Motion to Convert or Dismiss, with a hearing date of February 17, 2017.

99. As "cause" for the requested conversion, the UST informed the Court that the PLAINTIFF had failed to file operating statements and was noncompliant with payments to the UST.

100. Attached to the UST's Motion to Dismiss or Convert was an affirmation of the Trustee and copies of the PLAINTIFF's statement indicating the missed payments to the UST as well as a copy of an email to PENACHIO informing her that no operating statements had been filed in this case.

101. The Clerk of Court notified PENACHIO of the Motion on the same day it was filed.

102. On February 17, 2017, the day of the hearing on the Motion to Dismiss or Convert, PENACHIO secured an adjournment until May 09, 2017.

103. PENACHIO never informed the PLAINTIFF of the UST's motion and NEVER made any effort to inform the PLAINTIFF of the alleged deficiencies (i.e. missed payments and operating statements).

104. On May 08, 2017 - day before the hearing - PENACHIO filed "THE DEBTOR'S OPPOSITION TO MOTION OF THE UNITED STATES TRUSTEE TO DISMISS HIS CASE OR CONVERT IT TO A CHAPTER 7 PROCEEDING" (the OPPOSITION).

105. The OPPOSITION is rife with inaccuracies and outright falsehoods, including, inter alia:

   a. In paragraph 4, PENACHIO informs the Court that the "Debtor's wife has made adequate protection payment to the mortgage holders", when, in fact, Mrs. Pizzuti had made only a total of eight monthly payments to the secured creditors, and only two of those

payments were made in the one year period
leading up to the filing of the OPPOSITION.
At the time PENACHIO filed the OPPOSITION
she had not filed a single operating
statement in this matter (addressed more
fully, infra), which was commenced on March
13, 2015 - over two years earlier.
Similarly, PENACHIO had been made aware that
one bank was refusing mortgage payments and
both were applying the payments
contractually; an option which the PLAINTIFF
did not understand, and sought PENACHIO's
advice. Both of these creditor-decisions
could have and should have been brought to
the Court's attention in the OPPOSITION - as
they certainly go to the issue of "cause".

b. In paragraph 5, PENACHIO informed the Court
that the PLAINTIFF wished to keep his
primary residence and sell the other. On the
contrary, although the PLAINTIFF explored
short sale possibilities, from the inception
of his relationship with PENACHIO (and
routinely throughout same) the PLAINTIFF
stressed his desire, intention and goal to
retain both of his properties.

c. In paragraph 6, PENACHIO informed the Court
that "Counsel has drafted the outline of a
Chapter 11 Plan" and that rather than
executing same, the "Debtor has vacillated
as to what course of action (i.e. sale or
plan) to undertake." This assertion is
absolutely false. PENACHIO never showed the
PLAINTIFF a Plan of any kind, nor did she
ever discuss the outline or draft of such
Plan. In fact, as will be explored more
fully below, the PLAINTIFF was rarely able
to communicate with PENACHIO, and when such
communication did occur, it was confusing
and PENACHIO often contradicted previous
assertions of how to proceed, how a "strip
down may occur or benefit the Debtor" or on
other integral facets such as (a) keeping
his properties intact and (b) developing and
executing a viable exit strategy. Likewise,
contributing largely to the aforementioned
confusion was PENACHIO's incoherent
explanation or instructions regarding the
difference between unsecured and secured
claims; and, more importantly, how portions
of a claim previously considered "secured"
could/would be recategorized as "unsecured"
and later reduced to ten cents on the dollar

(or less).

d. In paragraph 7, PENACHIO informed the Court that "[C]ounsel is committed to visiting the Debtor again [having visited only one previous time, on March 31, 2017 - six years AFTER being retained] to review it [the phantom plan] with him". Since submitting the OPPOSITION, PENACHIO has never visited the PLAINTIFF, or otherwise engaged the PLAINTIFF in any meaningful conversation of any kind - let alone a discussion of an exit strategy. Again, PENACHIO never even told the PLAINTIFF that the UST had moved to dismantle or dismiss his Chapter 11 case.

e. In paragraph 9, PENACHIO informs the Court that the "Debtor has no income other than the rents collected by his wife which are paid to the mortgage holders." As noted above, as of the filing of the OPPOSITION, Mrs. Pizzuti was not making any payments to the mortgage holders because PENACHIO had not resolved the issue(s) of the misapplied and returned mortgage payments.

## I
## OPERATING STATEMENTS

### 1
### 2016 OPERATING STATEMENTS - FILED MAY 30, 2017

106.   Despite the fact that the PETITION was filed on March 13, 2015, a review of the docket listing reveals that PENACHIO did not submit any operating statements unitl May 30, 2017, on which date she filed Documents 61 through 71, consisting of operating statements for the months of January through November of 2016.

### 2
### 2015 OPERATING STATEMENTS - FILED ON JUNE 02, 2017

107.   Three days later, on June 02, 2017, PENACHIO filed

Documents 72 through 80, representing the operating statements for the months of April through December of 2015.

### 3
### 2017 OPERATING STATEMENTS - FILED ON JUNE 02, 2017

108. Also on June 02, 2017, PENACHIO filed Documents 81 through 83, which comprised the operating statements for the months of February of 2017 through April of 2017.

### 4
### 2017 OPERATING STATEMENTS - FILED ON DECEMBER 07, 2018

109. On December 07, 2018, PENACHIO filed the operating statements for July 2017 through November of 2017, which were docketed as Document numbers 89 through 93.

### 5
### OPERATING STATEMENTS - FILED ON AUGUST 21, 2018

110. On August 21, 2018, PENACHIO filed Document numbers 98 through 110, which represented (i) operating statements for the months of July through November of 2017 (98 - 103, respectively) and (ii) operating statements for the months of January 2018 through July 2018 (104 - 100 respectively).

111. Document numbers 98 - 103 represent filings of the operating statements for July through November of 2017; and, more importantly, these filings contained a completely different set of figures than the previous filings.

112. The PLAINTIFF is unaware of why PENACHIO duplicated the July through November filings, or why the figures are different.

6

## INACCURATE FIGURES CONTAINED IN THE OPERATING STATEMENTS

113.   In addition to filing late and duplicate operating statements, PENACHIO also failed to include payments made to OCWEN Loan Servicing, LLC (DANTE AVENUE MORTGAGE) on the operating statements for the months of May 2015 (Document Number 73), and July of 2015 through October of 2015 (Documents 75 -78).

114.   PENACHIO failed to include the OCWEN mortgage payments notwithstanding the fact that she was provided with bank statements for the operative periods, and actually submitted those statements in support of the erroneous operating reports.

7

## FAILURE TO INCLUDE SIGNIFICANT EXPENSES

115.   A review of the operating reports (and bank statements) submitted by PENACHIO reveals that she also failed to itemize several significant expenses related to the maintenence and rental continuity of the GLEN ROAD and DANTE AVENUE properties, including, but not limited to repair costs, appliances, legal fees, carpeting, deposit returns, real estate agent fees and other property related expenses.

116.   The omissions referred to in paragraph 96, above, resulted in the under-reporting of over $50,000 of expenses which could and should have been included on the PLAINTIFF's application(s) for loan modification and/or other forms of loss mitigation.

117 - 124 Reserved.

VI
# FIRST CAUSE OF ACTION
## LEGAL MALPRACTICE AS TO DEFENDANT ANNE J. PENACHIO

### COUNT ONE

125.   The Plaintiff repeats and realleges each of the paragraphs, above, with full force and effect, as though fuly set forth herein.

A
### THE ELEMENTS OF LEGAL MALPRACTICE

The elements of a claim of legal malpractice under New York law are: (1) an attorney-client relationship at the time of the alleged malpractice, (2) attorney negligence and (3) actual damage to the client that is proximately caused by the attorney's negligence. Kirk v. Heppt., 532 F. Supp. 2d 586, 591 (S.D.N.Y. 2008)(Sweet, D.J.) (citations omitted); see also O'Callaghan v. Brunelle, 84 A.D. 3d 581, 582, 923 N.Y.S.2d 89, 90 (Ist Dep't 2011); Parola, Gross & Marino, P.C. v. Susskind, 43 A.D. 3d 1020, 1022, 843 N.Y.S.2d 104, 105-06 (2d Dep't 2007). An attorney is negligent if he or she fails to exercise that degree of care, skill and diligence commonly possessed and exercised by ordinary members of the legal community. Rudolf v. Shavne, Dachs, Stanisci, Corker & Sauer, 8 N.Y. 3d. 438, 442, 867 N.E.2d 385, 387, 835 N.Y.S. 534, 536 (2007). (See, Bryant v. Monaghan, 2018 U.S. Dist. LEXIS 130146).

(1)
### AN ATTORNEY—CLIENT RELATIONSHIP EXISTED

126.   At all times relevant, there existed an attorney client relationship between the Plaintiff, Defendant Penachio Malara, LLP and Defendant Penachio, specifically between April 19, 2011 up to and including the date on which the United States Bankruptcy Court rules (or ruled) upon the Plaintiff's motion to hold his Chapter 11 proceeding in abeyance in order to allow him the opportunity to retain new consel.

(2)

## DEFENDANT PENACHIO FAILED TO EXERCISE THE DEGREE OF CARE, SKILL AND DILIGENCE COMMONLY POSSESSED AND EXERCISED BY ORDINARY MEMBERS OF THE LEGAL COMMUNITY

127. The detailed and specific facts plead against Defendant Penachio herein constitute gross negligence and demonstrate, by a preponderance of the evidence, that Defendant Penachio failed to exercise the degree of care, skill and diligence commonly possessed and exercised by ordinary members of the legal community, when she:

a. Delayed filing a Chapter 11 Petition on behalf of the Plaintiff for almost four years *after* being retained by the Plaintiff to do so, thus allowing the Plaintiff's secured liabilities to increase from a combined total of approximately $30,000.00 to more than $242,000.00 on the DANTE AVENUE PROPERTY and more than $162,000.00 on the GLEN ROAD PROPERTY, for a combined total of approximately $400,000.00.

b. Entered an appearance, and filed an answer to the DANTE AVENUE Foreclosure Action, and then failed to defend against a Motion for Summary Judgment, properly noticed by DEUTSCHE Bank, resulting in the entry (by default) of a Final Judgment of Foreclosure and Power of Sale as to the Dante AVENUE PROPERTY.

c. Failed to attend the Foreclosure Settlement conference in the Westchester Supreme Court.

d. Failed to include, and/or properly articulate, the affirmative defense (to the DANTE AVENUE Foreclosure Action) that DEUTSCHE Bank lacked the standing to foreclose because (1) they were not the holder of the note at the time that the foreclosure action was initiated and/or (2) that the Note as attested to in the foreclosure action was either (a) altered and/or fraudulent, or (b) in the alterantive, that the Allonge (on its face) is so irregular and incomplete as to call into question its authenticity, insofar as that purported Allonge takes the form of nothing more than an ink stamp imposed on a blank piece of paper which was placed at the end of the NOTE by DEUTSCHE and/or legal counsel to DEUTSCHE (See, EXHIBIT - 4).

e.  Failed to include, and/or properly articulate, the affirmative defense that the purported assignment of the DANTE AVENUE NOTE was (1) invalid insofar as that assignment is alleged to have been made by an entity (IndyMac, FSB) after that entity became defunct and no longer possessed the legal authority to make such assignment and/or, in the alternative (2) that the assignment is false and fraudulent and was executed and recorded soley for the purpose of concealing (or continuing to conceal) the fact that the Allonge to the note was false, fraudulent and or invalid - ab initio.

f.  Failed to inform the Plaintiff that DEUTSCHE Bank filed a Motion for Summary Judgment as to the DANTE AVENUE PROPERTY.

g.  Failed to inform the Plaintiff that the Court granted summary judgment to DEUTSCHE Bank as to the DANTE AVENUE PROPERTY.

h.  Failed to file an answer to the Glen Road Foreclosure action - insofar as she did not (1) file a Chapter 11 Petition on behalf of the Plaintiff either (i) immediately upon being retained on April 19, 2011 or (ii) immediately upon receipt from the Plaintiff of the Summons and Complaint in the GLEN ROAD Foreclosure action.

i.  Failed to defend against DEUTSCHE Bank's motion to lift the automatic stay in October of 2016.

j.  Failed to inform the Plaintiff that the Court lifted the automatic stay as to the GLEN ROAD PROPERTY, on November 21, 2016.

k.  Failed to enter an appearance in the GLEN ROAD Foreclosure Action, once she became aware that the Court lift the automatic stay as to the GLEN ROAD PROPERTY.

l.  Failed to file an answer in the GLEN ROAD Foreclosure Action, once the automatic stay was lifted.

m.  Failed to defend against the Motion for Summary Judgment filed by DEUTSCHE Bank, once the automatic stay was lifted, and after she failed to enter an appearance in that case.

n.  Failed to inform the Plaintiff that the Court granted summary judgment of foreclosure to DEUTSCHE Bank, with the Power of Sale.

o. Failed to include, and/or properly articulate, the affirmative defense that the purported assignment of the GLEN ROAD NOTE was (1) invalid insofar as that assignment is alleged to have been made by an entity (Washington Mutual, FA) after that entity became defunct and no longer possessed the legal authority to make such assignment and/or, in the alternative (2) that the assignment is false and fraudulent and was executed and recorded soley for the purpose of concealing (or continuing to conceal) the fact that the Allonge to the note was false, fraudulent and or invalid - ab initio.

p. Failed to inform the Plaintiff that the United States Trustee moved to either convert Plainitff's Chapter 11 Petition to a Chapter 7 Petition - or to dismiss the petition entirely.

q. Filed numerous false and inaccurate documents through out her representation of the Plaintiff in the United States Bankruptcy court, including, but not limited to:

  1. Filing an original petition which contained the incorrect primary address of the Plaintiff's family.

  2. Requesting loss mitigation for the GLEN ROAD PROPERTY, and pursuing that request for more than six months, when the Plaintiff's family actually resided at the DANTE AVENUE PROPERTY for more than three years before the filing of the Chapter 11 Petition, and where the Plaintiff had previously informed Defendant Penachio of his family's primary residence address.

  3. Filing multiple incomplete and/or monthly operating reports, which were then used to determine the Plaintiff's eligibility for certain loan modification programs and to determine or otherwise assess the Plaintiff's compliance with the Bankruptcy Rule of Procedure, including, but not limited to:

      a. understating monthly expenses;

      b. overstating monthly expenses;

      c. filing more than one operating statement for six monthly reporting periods, which duplicate operating statements contained completely different information than those previously filed.

4. Filed false and inaccurate loan modification documents on time, and with the required supporting documents, until such time as the attorney for DEUTSCHE Bank notified the Court that three requests for such information had been made and more than two months passed with no response.

5. Filed false status reports to the United States Bankruptcy Court.

6. Filed a false fee certification statement to the United States Bankruptcy Court.

(3)

THE PLAINTIFF HAS SUFFERED (AND WILL CONTINUE TO SUFFER) DAMAGES THAT WERE PROXIMATELY CAUSED BY DEFENDANT PENACHIO'S NEGLIGENCE

128. As a direct and proximate result of PENACHIO's gross negligence, as set forth in paragraphs 25 through 127, above, the Plaintiff has suffered and will continue to suffer damages as follows:

a. Monetary damages in the amount of 1.239 million dollars, plus accruing stautory and contractual interest;

b. Attorney's fees in the amount of at least $7,000 to attempt, with new counsel, to obtain modification of both the DANTE AVENUE and GLEN ROAD MORTGAGES, and to defend the current foreclosure action pending against the GLEN ROAD PROPERTY, which, but for PENACHIO's negligence Plaintiff would not be forced to defend.

c. Attorney fees in the amount of at least $12,000 which Plaintiff paid in order to vacate the Judgment of Foreclosure entered against the GLEN ROAD PROPERTY, when PENACHIO failed to either (i) enter and appearance and defend in the New York Supreme Court (at Westchester) or (ii) immediately file the Chapter 11 petition upon being retained to do so.

d. Attorney's fees to defend the within action, should an attorney be retained by the Plaintiff.

## VII
## SECOND CAUSE OF ACTION
## BREACH OF CONTRACT AS TO DEFENDANT ANNE J. PENACHIO
## (ALTERNATE THEORY OF LIABILITY TO LEGAL MALPRACTICE)

### COUNT TWO

129. The Plaintiff repeats and realleges each of the paragraphs above with full force and effect as though fully set forth herein.

### A
### THE ELEMENTS OF BREACH OF CONTRACT CLAIM

"To state a claim for breach of contract under New York law, a complaint need only allege: (1) the existence of an agreement; (2) adequate performance of the contract by the Plaintiff; (3) breach of contract by the defendant; and (4) damages." Designers N. Carpet N, Inc. v. Mohawk Industries, Inc., 153 F. Supp. 2d 193, 197 (E.D.N.Y. 2001) (citing Harsco corp. v. Segui, 91 F. 3d 337, 348 (2d Cir. 1996)(See, McCarthy v. The Procter & Gamble Company, 2018 U.S. Dist. LEXIS 182777).

### (1)
### A VALID AGREEMENT FOR LEGAL SERVICE EXISTED

130. At all times relevant, there existed a valid agreement between the Plaintiff, ANNE PENACHIO and PENACHIO MALARA; and, specifically between April 19, 2011 and the date on which the United States Bankruptcy Court rules (or ruled) upon the Plaintiff's motion to hold his Chapter 11 proceeding in abeyance in order to allow him the opportunity to retain new counsel, for PENACHIO to provide competent professional legal services to the Plaintiff in connection with the filing and prosecution of a Chapter 11 Bankruptcy proceeding and to defend the attempted foreclosure of the DANTE AVENUE MORTGAGE and the GLEN ROAD MORTGAGES by DEUTSCHE.

(2)
### DEFENDANT PENACHIO BREACHED THE AGREEMENT TO PROVIDE COMPETENT AND PROFESSIONAL LEGAL SERVICES

131. The detailed and specific facts plead against Defendant Penachio herein demonstrate, by a preponderance of the evidence, that PENACHIO breached the agreement to provide competent and professional legal services to the Plaintiff when she:

a. Delayed filing a Chapter 11 Petition on behalf of the Plaintiff for almost four years **after** being retained by the Plaintiff to do so, thus allowing the Plaintiff's secured liabilities to increase from a combined total of approximately $30,000.00 to more than $242,000.00 on the DANTE AVENUE PROPERTY and more than $162,000.00 on the GLEN ROAD PROPERTY, for a combined total of approximately $400,000.00.

b. Entered an appearance, and filed an answer to the DANTE AVENUE Foreclosure Action, and then failed to defend against a Motion for Summary Judgment, properly noticed by DEUTSCHE Bank, resulting in the entry (by default) of a Final Judgment of Foreclosure and Power of Sale as to the Dante AVENUE PROPERTY.

c. Failed to attend the Foreclosure Settlement conference in the Westchester Supreme Court.

d. Failed to include, and/or properly articulate, the affirmative defense (to the DANTE AVENUE Foreclosure Action) that DEUTSCHE Bank lacked the standing to foreclose because (1) they were not the holder of the note at the time that the foreclosure action was initiated and/or (2) that the Note as attested to in the foreclosure action was either (a) altered and/or fraudulent, or (b) in the alternative, that the Allonge (on its face) is so irregular and incomplete as to call into question its authenticity, insofar as that purported Allonge takes the form of nothing more than an ink stamp imposed on a blank piece of paper which was placed at the end of the NOTE by DEUTSCHE and/or legal counsel to DEUTSCHE (See, EXHIBIT - 4).

e. Failed to include, and/or properly articulate, the affirmative defense that the purported assignment of the DANTE AVENUE NOTE was (1) invalid insofar as that assignment is alleged to have been made by an entity (IndyMac, FSB) after that entity became defunct and no longer possessed the legal authority to make such assignment and/or, in the alternative (2) that the assignment is false and fraudulent and was executed and recorded soley for the purpose of concealing (or continuing to conceal) the fact that the Allonge to the note was false, fraudulent and or invalid - ab initio.

f. Failed to inform the Plaintiff that DEUTSCHE Bank filed a Motion for Summary Judgment as to the DANTE AVENUE PROPERTY.

g. Failed to inform the Plaintiff that the Court granted summary judgment to DEUTSCHE Bank as to the DANTE AVENUE PROPERTY.

h. Failed to file an answer to the Glen Road Foreclosure action - insofar as she did not (1) file a Chapter 11 Petition on behalf of the Plaintiff either (i) immediately upon being retained on April 19, 2011 or (ii) immediately upon receipt from the Plaintiff of the Summons and Complaint in the GLEN ROAD Foreclosure action.

i. Failed to defend against DEUTSCHE Bank's motion to lift the automatic stay in October of 2016.

j. Failed to inform the Plaintiff that the Court lifted the automatic stay as to the GLEN ROAD PROPERTY, on November 21, 2016.

k. Failed to enter an appearance in the GLEN ROAD Foreclosure Action, once she became aware that the Court lift the automatic stay as to the GLEN ROAD PROPERTY.

l. Failed to file an answer in the GLEN ROAD Foreclosure Action, once the automatic stay was lifted.

m. Failed to defend against the Motion for Summary Judgment filed by DEUTSCHE Bank, once the automatic stay was lifted, and after she failed to enter an appearance in that case.

n. Failed to inform the Plaintiff that the Court granted summary judgment of foreclosure to DEUTSCHE Bank, with the Power of Sale.

o. Failed to include, and/or properly articulate, the affirmative defense that the purported assignment of the GLEN ROAD NOTE was (1) invalid insofar as that assignment is alleged to have been made by an entity (Washington Mutual, FA) after that entity became defunct and no longer possessed the legal authority to make such assignment and/or, in the alternative (2) that the assignment is false and fraudulent and was executed and recorded soley for the purpose of concealing (or continuing to conceal) the fact that the Allonge to the note was false, fraudulent and or invalid - ab initio.

p. Failed to inform the Plaintiff that the United States Trustee moved to either convert Plainitff's Chapter 11 Petition to a Chapter 7 Petition - or to dismiss the petition entirely.

q. Filed numerous false and inaccurate documents through out her representation of the Plaintiff in the United States Bankruptcy court, including, but not limited to:

   1. Filing an original petition which contained the incorrect primary address of the Plaintiff's family.

   2. Requesting loss mitigation for the GLEN ROAD PROPERTY, and pursuing that request for more than six months, when the Plaintiff's family actually resided at the DANTE AVENUE PROPERTY for more than three years before the filing of the Chapter 11 Petition, and where the Plaintiff had previously informed Defendant Penachio of his family's primary residence address.

   3. Filing multiple incomplete and/or monthly operating reports, which were then used to determine the Plaintiff's eligibility for certain loan modification programs and to determine or otherwise assess the Plaintiff's compliance with the Bankruptcy Rule of Procedure, including, but not limited to:

      a. understating monthly expenses;

      b. overstating monthly expenses;

      c. filing more than one operating statement for six monthly reporting periods, which duplicate operating statements contained completely different information than those previously filed.

4. Filed false and inaccurate loan modification documents on time, and with the required supporting documents, until such time as the attorney for DEUTSCHE Bank notified the Court that three requests for such information had been made and more than two months passed with no response.

5. Filed false status reports to the United States Bankruptcy Court.

6. Filed a false fee certification statement to the United States Bankruptcy Court.

(3)
### THE PLAINTIFF HAS SUFFERED (AND WILL CONTINUE TO SUFFER) DAMAGES THAT WERE PROXIMATELY CAUSED BY DEFENDANT PENACHIO'S BREECH OF THE AGREEMENT FOR LEGAL SERVICE

132. As a direct and proximate result of PENACHIO's breech of the agreement for legal service, as set forth in paragraphs 25 through 127, above, the Plaintiff has suffered and will continue to suffer damages as follows:

a. Monetary damages in the amount of 1.239 million dollars, plus accruing stautory and contractual interest;

b. Attorney's fees in the amount of at least $7,000 to attempt, with new counsel, to obtain modification of both the DANTE AVENUE and GLEN ROAD MORTGAGES, and to defend the current foreclosure action pending against the GLEN ROAD PROPERTY, which, but for PENACHIO's negligence Plaintiff would not be forced to defend.

c. Attorney fees in the amount of at least $12,000 which Plaintiff paid in order to vacate the Judgment of Foreclosure entered against the GLEN ROAD PROPERTY, when PENACHIO failed to either (i) enter and appearance and defend in the New York Supreme Court (at Westchester) or (ii) immediately file the Chapter 11 petition upon being retained to do so.

d. Attorney's fees to defend the within action, should an attorney be retained by the Plaintiff.

(4)

## THE PLAINTIFF ADEQUATELY PERFORMED ON THE AGREEMENT

133. The Plaintiff adequately performed on the agreement for legal service, insofar as he paid, in three installments (as per the Engagement Letter) a total retainer fee of $7,500, plus additional and separate funds for the payment of the Chapter 11 filling fee.

134. Additionally, the Plaintiff adequately performed on the agreement for legal service by (1) timely responding to any inquiry made by PENACHIO and (2) by providing timely accurate and truthful documents and financial information precedent to the filing, maintenance and prosecution of the Chapter 11 Petition, as well as the defense of the DANTE AVENUE and GLEN ROAD Foreclosure Actions.

135. As of the filing of the instant Complaint, there are no covenants or other terms of the agreement which the Plaintiff has failed to honor.

. . . . . . . . . .

(3)
## THE PLAINTIFF REASONABLY RELIED UPON PENACHIOS MATERIAL MISREPRESENTATIONS OF THE STATUS OF HIS CHAPTER 11

145. At all times relevant to the instant Complaint, the Plaintiff reasonably relied upon the material misrepresentations made by PENACHIO to make critical procedural decisions as to how to, or not to, proceed in with the prosecution of his Chapter 11 Petition and making his decision not to engage a new attorney, until approximately September of 2018.

(4)
## THE PLAINTIFF HAS SUFFERED (AND WILL CONTINUE TO SUFFER) DAMAGES THAT WERE PROXIMATELY CAUSED BY DEFENDANT PENACHIO'S FALSE AND MATERIAL MISREPRESENTATIONS

146. As a direct and proximate result of PENACHIO's materially false representations set forth above, the Plaintiff has suffered and will continue to suffer damages as follows:

  a. Monetary damages in the amount of 1.239 million dollars, plus accruing stautory and contractual interest;

  b. Attorney's fees in the amount of at least $7,000 to attempt, with new counsel, to obtain modification of both the DANTE AVENUE and GLEN ROAD MORTGAGES, and to defend the current foreclosure action pending against the GLEN ROAD PROPERTY, which, but for PENACHIO's negligence Plaintiff would not be forced to defend.

  c. Attorney fees in the amount of at least $12,000 which Plaintiff paid in order to vacate the Judgment of Foreclosure entered against the GLEN ROAD PROPERTY, when PENACHIO failed to either (i) enter and appearance and defend in the New York Supreme Court (at Westchester) or (ii) immediately file the Chapter 11 petition upon being retained to do so.

  d. Attorney's fees to defend the within action, should an attorney be retained by the Plaintiff.

## VIII
## THIRD CAUSE OF ACTION
## FRAUD AND MISREPRESENTATION BY DEFENDANT PENACHIO

### COUNT THREE

136. The Plaintiff repeats and realleges each of the paragraphs, above, with full force and effect as though fully set forth herein:

### A
### ELEMENTS OF A FRAUD AND MISREPRESENTATION CLAIM

"To state a claim for fraud under New York law, a Plaintiff must allege (1) a material misrepresentation or omission of fact; (2) which the defendant knew to be false; (3) which the defendant made with intent to defraud; (4) upon which the Plaintiff reasonably relied; (5) which caused injury to the plaintiff." Fin. Guar. Ins. Co., 443 F. 3d 230, 234 (2d Cir. 2006)".

### (1)
### PENACHIO MADE MATERIAL MISREPRESENTATIONS OR OMISSIONS

137. On March 31, 2017, Penachio traveled to FCI Danbury, Connecticut, presented her professional credentials and was thereafter admitted to the facility's secure visiting area where she conducted an attorney-client meeting with the Plaintiff (hereinafter referred to as the MARCH-2017 MEETING).

138. Penachio scheduled and attended the MARCH-2017 MEETING knowing at the time:

> 1. That the United States Bankruptcy Court had lifted the Automatic Stay with respect to the Plaintiff's GLEN ROAD PROPERTY.
>
> 2. That a Final Judgment of Foreclosure had been entered by the Westchester Supreme Court with respect to Plaintiff's DANTE AVENUE PROPERTY.

3. That as the attorney of record in the DANTE AVENUE Foreclosure Matter, she failed to respond to the Motion for Summary Judgment of Foreclosure, and that was the direct and proximate cause for the entry of a Final Judgment of Foreclosure and Power of Sale.

4. That she waited more than four years AFTER being retained to file the Plaintiff's Chapter 11 Petition.

5. That she waited approximately two years after receiving notice from the Plaintiff of the Complaint for Foreclosure filed against the GLEN ROAD PROPERTY and the DANTE AVENUE PROPERTY to file the Plaintiff's Chapter 11 Petition.

(2)

## PENACHIO KNEW HER MISREPRESENTATIONS AND OMISSION WERE FALSE, AND MADE WITH INTENT TO DEFRAUD THE PLAINTIFF

139. Notwithstanding her first hand knowledge of each of the facts enumerated in paragraph 138 (1)-(5), above, and 131 (a)-(q), above, when Penachio conducted the MARCH-2017 MEETING, she knowingly, intentionally and purposefully failed to inform the Plaintiff that (1) the automatic bankruptcy stays was lifted regarding the GLEN ROAD PROPERTY, (2) that a Final Judgment of Foreclosure and Power of Sale had entered against the DANTE AVENUE PROPERTY, (3) that the Final Judgment of Foreclosure and Power of Sale entered against the Dante Avenue Property as a direct result of Penachio's failure to respond to or otherwise defend against the Motion for Summary Judgement of Foreclosure.

140. Penachio conducted the MARCH-2017 MEETING with the intent to deceive the Plaintiff and in order to continue to cover-up her negligent and professional errors which led to (1) the lifting of the automatic stay with respect to the GLEN ROAD PROPERTY and (2) the Final Judgment of Foreclosure and Power of Sale entered against the DANTE AVENUE PROPERTY.

141. In addition to failing to inform the Plaintiff of the items set forth in paragraph 138 (1)-(5), above, as a further means of concealing her gross negligence and intentional breech of the agreements for legal services, when PENACHIO conducted the MARCH-2017 MEETING, she presented a bare-bones explanation of the Plaintiff preparing a "plan" to be submitted to the United States Bankruptcy Trustee and/or the Court for approval to "strip-down" unsecured portions of his mortgages and pay the so-called "secured" portions over a period of time, in order to exit from the Chapter 11.

142. After the MARCH-2017 MEETING, PENACHIO never provided the Plaintiff with any further information about preparing such a "plan" and never furnished the Plaintiff with any drafts or suggested plans to be submitted.

143. PENACHIO conducted the MARCH-2017 MEETING solely for the purpose of assuaging the Plaintiff's request for status updates and progress reports about his Chapter 11 Proceedings and the ability to save his properties from foreclosure.

144. When PENACHIO conducted the MARCH-2017 MEETING, she knew that, given the amount of the "secured" debt owed on each mortgage (which, for more than 4 years, she allowed to increase by failing to prosecute the Chapter 11 and/or defend the DANTE AVENUE and GLEN ROAD Foreclosure Actions), that submitting a "plan" was likely no longer viable, without the infusion of a large down payment which the Plaintiff was not financially capable of meeting.

## RELIEF SOUGHT

WHEREFORE, the Plaintiff respectfully demands judgment against defendants ANNE E. PENACHIO and PENACHIO MALARIA, LLP, jointly and severally, as follows:

1.   Monetary damages in the amount of $1,239,000.00, plus accruing contractual and statutory interest;

2.   Reasonable attorney's fees, in the event that the Plaintiff retains counsel to represent him in this matter;

3. $7,000.00, plus statutory interest, as reimbursement for the attorney's fee's paid to the defendants under the Fee Agreement;

4. Punitive damages in an amount to be determined by a jury, or the Court sitting without a jury;

5. Pre and Post Judgment interest, as allowed by law;

6. Cost of suit, including, but not limited to filing fees, service fees, depositions and any other ancillary costs associate with bringing the within action;

7. Any and all other relief Plaintiff is entitled to as a matter of law.

## DEMAND FOR JURY TRIAL

The Plaintiff hereby demands a jury trial, as to all issues so triable.

DATED: December 10, 2018

RESPECTFULLY SUBMITTED:

_____
Michele Pizzuti, In Propria Persona

# EXHIBIT - 1



## ADJUSTABLE RATE NOTE
### (12-MTA Index - Payment and Rate Caps)

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. MY MONTHLY PAYMENT INCREASES WILL HAVE LIMITS WHICH COULD RESULT IN THE PRINCIPAL AMOUNT I MUST REPAY BEING LARGER THAN THE AMOUNT I ORIGINALLY BORROWED, BUT NOT MORE THAN __110%__ OF THE ORIGINAL AMOUNT (OR $ __924,000.00__ ). MY INTEREST RATE CAN NEVER EXCEED THE LIMIT STATED IN THIS NOTE OR ANY RIDER TO THIS NOTE. A BALLOON PAYMENT MAY BE DUE AT MATURITY.

__September 20, 2004__       __JERICHO__      __New York__
                                               (City)             (State)

__46 GLEN ROAD, EASTCHESTER, NY 10709__
(Property Address)

### 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ __840,000.00__ plus any amounts added in accordance with Section 4 (G) below, (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is __Washington Mutual Bank, FA__ . I will make all payments under this Note in form of cash, check or money order. I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder".

### 2. INTEREST

Interest will be charged on unpaid Principal until the full amount has been paid. Up until the first day of the calendar month that immediately precedes the first payment due date set forth in Section 3 of this Note, I will pay interest at a yearly rate of __4.063__ %. Thereafter until the first Change Date (as defined in Section 4 of this Note) I will pay interest at a yearly rate of __1.000__ %. The interest rate required by this Section 2 and Section 4 of this Note is the Rate I will pay both before and after any default described in Section 7(B) of this Note.

### 3. PAYMENTS

(A) Time and Place of Payments

I will pay Principal and interest by making payments every month. In this Note, "payments" refer to Principal and interest payments only, although other charges such as taxes, insurance and/or late charges may also be payable with the monthly payment.

I will make my monthly payments on __1st__ day of each month beginning on __November, 2004__ , I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied to interest before Principal. If, on __October 1, 2034__ , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date".

I will make my monthly payments at __9451 CORBIN AVE, NORTHRIDGE, CA 91324__ , or at a different place if required by the Note Holder.

(B) Amount of My Initial Monthly Payments

Each of my monthly payments until the first Payment Change Date will be in the amount of U.S. $ __2,701.77__ , unless adjusted at an earlier time under Section 4(H) of this Note.

Page 1 of 6

ORIGINAL

MP - 0001

**(C) Payment Changes**

My monthly payment will be recomputed, according to Sections 4(E)(F)(G)(H) and (I) of this Note, to reflect changes in the Principal balance and interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

**4. INTEREST RATE AND MONTHLY PAYMENT CHANGES**

**(A) Change Dates**

The interest rate I will pay may further change on the ___1st___ day of ___November, 2004___, and on that day every month thereafter. Each such day is called a "Change Date".

**(B) The Index**

On each Change Date, my interest rate will be based on an Index. The "Index" is the Twelve-Month Average, determined as set forth below, of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve-Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12.

The most recent Index figure available as of 15 days before each interest rate Change Date is called the "Current Index". If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding ___Two & Six-Tenths___ percentage points ___2.600___ % ("Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-thousandth of one percentage point (0.001%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date. In the event a new Index is selected, pursuant to paragraph 4(B), a new Margin will be determined. The new Margin will be the difference between the average of the old Index for the most recent three year period which ends on the last date the Index was available plus the Margin on the last date the old Index was available and the average of the new Index for the most recent three year period which ends on that date (or if not available for such three year period, for such time as it is available). This difference will be rounded to the next higher 1/8 of 1%.

**(D) Interest Rate Limit**

My interest rate will never be greater than ___Nine & Ninety-Five-Hundredths___ percentage points ___9.950___ % ("Cap"), except that following any sale or transfer of the property which secures repayment of this Note after the first interest rate Change Date, the maximum interest rate will be the higher of the Cap or 5 percentage points greater than the interest rate in effect at the time of such sale or transfer.

**(E) Payment Change Dates**

Effective every year commencing ___November 1, 2005___, and on the same date each twelfth month thereafter ("Payment Change Date"), the Note Holder will determine the amount of the monthly payment that would be sufficient to repay the projected principal balance I am expected to owe as of the Payment Change Date in full on the Maturity Date at the interest rate in effect 45 days prior to the Payment Change Date in substantially equal payments. The result of this calculation is the new amount of my monthly payment, subject to Section 4(F) below, and I will make payments in the new amount until the next Payment Change Date unless my payments are changed earlier under Section 4(H) of this Note.

**(F) Monthly Payment Limitations**

Unless Section 4(H) and 4(I) below apply, the amount of my new monthly payment, beginning with a Payment Change Date, will be limited to 7 1/2% more or less than the amount I have been paying. This payment cap applies only to the principal payment and does not apply to any escrow payments Lender may require under the Security Instrument.

Page 2 of 6                    ORIGINAL

**(G) Changes in My Unpaid Principal Due to Negative Amortization or Accelerated Amortization**

Since my payment amount changes less frequently than the interest rate and since the monthly payment is subject to the payment limitations described in Section 4(F), my monthly payment could be less or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on   the maturity date in substantially equal payments.  For each month that the monthly payment is less than the interest portion, the Note Holder will subtract the monthly payment from the amount of the interest portion and will ad the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the current interest rate.  For each month that the monthly payment is greater than the interest portion, the Note Holder will apply the excess towards a principal reduction of the Note.

**(H) Limit on My Unpaid Principal; Increased Monthly Payment**

My unpaid principal can never exceed a maximum amount equal to ___110%___ of the principal amount original borrowed.  In the event my unpaid Principal would otherwise exceed that __110%__ limitation, I will begin paying a new monthly payment until the next Payment Change Date notwithstanding the 7 1/2% annual payment increase limitation.  The new monthly payment will be an amount which would be sufficient to repay my then unpaid Principal in full on the maturity date at my interest rate in effect the month prior to the payment due date in substantially equal payments.

**(I) Required Full Monthly Payment**

On the ___FIFTH___ anniversary of the due date of the first monthly payment, and on that same day every ___FIFTH___ year thereafter, the monthly payment will be adjusted without regard to the payment cap limitation in Section 4(F).

**(J) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change.  The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**(K) Failure to Make Adjustments**

If for any reason Note Holder fails to make an adjustment to the interest rate or payment amount as described in this Note, regardless of any notice requirement, I agree that Note Holder may, upon discovery of such failure, then make the adjustment as if they had been made on time.  I also agree not to hold Note Holder responsible for any damages to me which may result from Note Holder's failure to make the adjustment and to let the Note Holder, at its option, apply any excess monies which I may have paid to partial Prepayment of unpaid Principal.

**5.  BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due.  A payment of Principal only is known as a "Prepayment".  When I make a Prepayment, I will tell the Note Holder in writing that I am doing so.  I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full prepayment or partial prepayments without paying any prepayment charge.  The Note Holder will apply all of my prepayments to reduce the amount of principal that I owe under this Note.  However, the Note Holder may apply my Prepayment to reduce the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the principal amount of the Note.  If I make a partial prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes.  My partial prepayment may have the effect of reducing the amount of my monthly payments, but only after the first Payment Change Date following my partial Prepayment.  However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6.  LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then; (a) any such loan charge shall be reduced by the amount

ORIGINAL

necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

Miscellaneous Fees: I understand that the Note Holder will also charge a return item charge in the event a payment that I make in connection with repayment of this loan is not honored by the financial institution on which it is drawn. The current fee is $ __15.00__ . Lender reserves the right to change the fee from time to time without notice except as may be required by law.

**7. BORROWER'S FAILURE TO PAY AS REQUIRED**

(A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of __Fifteen__ calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be __2.000__ % of my overdue payment of Principal and interest. I will pay this late charge promptly but only once of each late payment.

(B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

(C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 10 days after the date on which the notice is delivered or mailed to me (or, if the Federal National Mortgage Association or the Federal Home Loan Mortgage Corporation buys all or part of Lender's rights under the Security Instrument, in which case the notice will specify a date, not less than 30 days from the date the notice is given the Borrower).

(D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

(E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note, whether or not a lawsuit is brought, to the extent not prohibited by Applicable Law. Those expenses include, for example, reasonable attorneys' fees.

**8. GIVING OF NOTICES**

Unless Applicable Law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety, or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety, or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

ORIGINAL

MP - 0004

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

Transfer of the Property or a Beneficial Interest in Borrower.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) the request to assume is made after one year following recordation of the Deed of Trust, (b) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (c) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument or other obligations related to the   Note or other loan document is acceptable to Lender, (d) Assuming party executes Assumption Agreement acceptable to Lender at its sole choice and discretion, which Agreement may include an increase to Cap as set forth below and (e) payment of Assumption Fee if requested by Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption and Lender may increase the maximum rate limit to the higher of the Cap or 5 percentage points greater than the interest rate in effect at the time of the transfer. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender has entered into a written Assumption Agreement with transferee and formally releases Borrower.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

## 12. MISCELLANEOUS PROVISIONS

In the event the Note Holder at any time discovers that this Note or the Security Instrument or any other document related to this loan, called collectively the "Loan Documents," contains an error which was caused by a clerical or ministerial mistake, calculation error, computer error, printing error or similar error (collectively "Errors"), I agree, upon notice from the Note Holder, to reexecute any Loan Documents that are necessary to correct any such Errors and I also agree that I will not hold the Note Holder responsible for any damage to me which may result from any such Errors.

If any of the Loan Documents are lost, stolen, mutilated or destroyed and the Note Holder delivers to me an indemnification in my favor, signed by the Note Holder, then I will sign and deliver

ORIGINAL

MP - 0005

to the Note Holder a Loan Document identical in form and content which will have the effect of the original for all purposes.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

x _____
MICHELE PIZZUTI

PAY TO THE ORDER OF

W.... ....ECOURSE
W.. ....... ....N MUTUAL BANK, FA

CINDY RILEY
VICE PRESIDENT

PAY TO THE ORDER OF

WITHOUT RECOURSE
WASHINGTON MUTUAL BANK, FA

CINDY RILEY
VICE PRESIDENT

Page 6 of 6                                    ORIGINAL

**ADJUSTABLE RATE RIDER**
**(12-MTA Index - Payment and Rate Caps)**

03-2403-068359225-7

THIS ADJUSTABLE RATE RIDER is made this ___20th___ day of ___September, 2004___,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of
Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned
(the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to
_____Washington Mutual Bank, FA_____ (the "Lender") of the same date and
covering the property described in the Security Instrument and located at:

46 GLEN ROAD, EASTCHESTER, NY 10709
(Property Address)

THIS RIDER CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST
RATE AND MY MONTHLY PAYMENT. MY MONTHLY PAYMENT INCREASES WILL
HAVE LIMITS WHICH COULD RESULT IN THE PRINCIPAL AMOUNT I MUST REPAY
BEING LARGER THAN THE AMOUNT I ORIGINALLY BORROWED, BUT NOT MORE
THAN ___110%___ OF THE ORIGINAL AMOUNT (OR $____924,000.00____).
MY INTEREST RATE CAN NEVER EXCEED THE LIMIT STATED IN THE NOTE AND
RIDER. A BALLOON PAYMENT MAY BE DUE AT MATURITY.

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

**A. INTEREST RATE AND MONTHLY PAYMENT CHANGES**
Interest will be charged on unpaid Principal until the full amount of Principal has been paid.
Up until the first day of the calendar month that immediately precedes the first payment due date
set forth in Section 3 of the Note, I will pay interest at a yearly rate of ___4.063___ %. Thereafter
until the first Change Date (as defined in Section 4 of the Note) I will pay interest at a yearly rate
of ___1.000___ %. The interest rate I will pay will thereafter change in accordance with Section 4
of the Note.
Section 4 of the Note provides for changes in the interest rate and monthly payment as
follows:

32843 (11-01)                          Page 1 of 5                    TO BE RECORDED

MP - 0030

03-2403-068359225-7

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Change Dates

The interest rate I will pay may change on the _____1st_____ day of _____November, 2004_____, and on that day every month thereafter. Each such day is called a "Change Date".

### (B) The Index

On each Change Date, my interest rate will be based on an Index. The "Index" is the Twelve-Month Average, determined as set forth below, of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve-Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12.

The most recent Index figure available as of the date 15 days before each Change Date is called the "Current Index".

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

### (C) Interest Rate Change

Before each Change Date, the Note Holder will calculate my new interest rate by adding _____Two & Six-Tenths_____ percentage points _2.600_ % ("Margin") to Current Index. The Note Holder will then round the result of this addition to the nearest one thousandth of one percentage point (0.001%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date. In the event a new Index is selected, pursuant to paragraph 4(B), a new Margin will be determined. The new Margin will be the difference between the average of the old Index for the most recent three year period which ends on the last date the Index was available plus the Margin on the last date the old Index was available and the average of the new Index for the most recent three year period which ends on that date (or if not available for such three year period, for such time as it is available). The difference will be rounded to the next higher 1/8 of 1%.

### (D) Interest Rate Limit

My interest rate will never be greater than _9.950_ % ("Cap"), except that following any sale or transfer of the property which secures repayment of this Note after the first interest rate Change Date, the maximum interest rate will be the higher of the Cap or 5 percentage points greater than the interest rate in effect at the time of such sale or transfer.

### (E) Payment Change Dates

Effective every year commencing _____November 1, 2005_____, and on the same date each twelfth month thereafter ("Payment Change Date"), the Note Holder will determine the

32843 (11-01)                    Page 2 of 5                    TO BE RECORDED

MP - 0031

03-2403-068359225-7

amount of the monthly payment that would be sufficient to repay the projected Principal balance I am expected to owe as of the Payment Change Date in full on the maturity date at the interest rate in effect 45 days prior to the Payment Change Date in substantially equal payments. The result of this calculation is the new amount of my monthly payment, subject to Section 4(F) below, and I will make payments in the new amount until the next Payment Change Date unless my payments are changed earlier under Section 4(H) of the Note.

**(F) Monthly Payment Limitations**

Unless Section 4(H) and 4(I) below apply, the amount of my new monthly payment, beginning with a Payment Change Date, will be limited to 7 1/2% more or less than the amount I have been paying. This payment cap applies only to the Principal Payment and does not apply to any escrow payments Lender may require under the Security Instrument.

**(G) Changes in My Unpaid Principal Due to Negative Amortization or Accelerated Amortization**

Since my payment amount changes less frequently than the interest rate and since the monthly payment is subject to the payment limitations described in Section 4(F), my monthly payment could be less or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the maturity date in substantially equal payments. For each month that the monthly payment is less than the interest portion, the Note Holder will subtract the monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the current interest rate. For each month that the monthly payment is greater than the interest portion, the Note Holder will apply the excess towards a Principal reduction of the Note.

**(H) Limit on My Unpaid Principal; Increased Monthly Payment**

My unpaid Principal can never exceed a maximum amount equal to ___110%___ of the principal amount original borrowed. In the event my unpaid Principal would otherwise exceed that ___110%___ limitation, I will begin paying a new monthly payment until the next Payment Change Date notwithstanding the 7 1/2% annual payment increase limitation. The new monthly payment will be an amount which would be sufficient to repay my then unpaid principal in full on the maturity date at my interest rate in effect the month prior to the payment due date in substantially equal payments.

**(I) Required Full Monthly Payment**

On the ___FIFTH___ anniversary of the due date of the first monthly payment, and on that same day every ___FIFTH___ year thereafter, the monthly payment will be adjusted without regard to the payment cap limitation in Section 4(F).

**(J) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in the amount of my

32843 (11-01)                          Page 3 of 5                          TO BE RECORDED

03-2403-068359225-7

monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any questions I may have regarding the notice.

**(K) Failure to Make Adjustments**

If for any reason Note Holder fails to make an adjustment to the interest rate or payment amount as described in this Note, regardless of any notice requirement, I agree that Note Holder may, upon discovery of such failure, then make the adjustment as if they had been made on time. I also agree not to hold Note Holder responsible for any damages to me which may result from Note Holder's failure to make the adjustment and to let the Note Holder, at its option, apply any excess monies which I may have paid to partial prepayment of unpaid "Principal."

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Section 18 of the Security Instrument is amended to read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement , the intent of which is the transfer of title by Borrower at a future date to a purchaser. If all or any part of the Property or any interest in the Property is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Agreement or other obligations related to the Note or other loan document is acceptable to Lender, (d) Assuming party executes Assumption Agreement acceptable to Lender at its sole choice and discretion, which Agreement may include an increase to Cap as set forth below and (d) payment of Assumption Fee if requested by Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption, and Lender may increase the maximum interest rate limit to the higher of the Cap or 5 percentage points greater than the interest rate in effect at the time of the transfer. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the

MP - 0033

03-2403-068359225-7

transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender has entered into a written assumption agreement with transferee and formally releases Borrower.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider. Borrower agrees to execute any document necessary to reform this Agreement to accurately reflect the terms of the Agreement between Borrower and Beneficiary or if the original Note, Trust Deed or other document is lost, mutilated or destroyed.

X
MICHELE PIZZUTI

*Michelle Pizzuti*
Michelle Pizzuti

32843 (11-01)                    Page 5 of 5                    **TO BE RECORDED**

MP - 0034

# EXHIBIT - 2



## QUITCLAIM DEED (INDIVIDUAL OR CORPORATION)
### FORM 8009

CAUTION: THIS AGREEMENT SHOULD BE PREPARED BY AN ATTORNEY AND REVIEWED BY ATTORNEYS FOR SELLER AND PURCHASER BEFORE SIGNING.

*THIS INDENTURE*, made the 20ᵗʰ day of September, 2004,

between

MICHELE PIZZUTI A/K/A MICHAEL PIZZUTI
46 Glen Road, Eastchester, New York

party of the first part, and

MICHELE PIZZUTI A/K/A MICHAEL PIZZUTI AND MICHELLE PIZZUTI
46 Glen Road, Eastchester, New York

party of the second part,

*WITNESSETH*, that the party of the first part, in consideration of ten dollars, lawful money of the United States, paid by the party of the second part, does hereby remise, release and quitclaim unto the party of the second part, the heirs or successors and assigns of the party of the second part forever,

*ALL* that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the

See schedule Attached Hereto

*TOGETHER* with all right, title and interest, if any, of the party of the first part in and to any streets and roads abutting the above described premises to the center lines thereof,

*TOGETHER* with the appurtenances and all the estate and rights of the party of the first part in and to said premises,

*TO HAVE AND TO HOLD* the premises herein granted unto the party of the second part, the heirs or successors and assigns of the party of the second part forever.

*AND* the party of the first part, in compliance with Section 13 of the Lien Law, covenants that the party of the first part will receive the consideration for this conveyance and will hold the right to receive such consideration as a trust fund to be applied first for the purpose of paying the costs of the improvement and will apply the same first to the payment of the cost of the improvement before using any part of the total of the same for any other purpose.

The word "party" shall be construed as if it read "parties" whenever the sense of this indenture so requires.

*IN WITNESS WHEREOF*, the party of the first part has duly executed this deed the day and year first above written.

MICHELE PIZZUTI A/K/A MICHAEL PIZZUTI

NYSBA Residential Real Estate Forms on HotDocs¹ (9/00)         -1-         Copyright Capsoft¹ Development

IN PRESENCE OF:

Acknowledgment by a Person Within New York State (RPL § 309-a)
STATE OF NEW YORK )
COUNTY OF _____ ) ss.:

On the 20th day of September, 2004, before me, the undersigned, personally appeared MICHELE PIZZUTI A/K/A MICHAEL PIZZUTI AND MICHELLE PIZZUTI,  personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that they executed the same in their capacity(ies), and that by their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

(signature and office of individual taking acknowledgment)

RUSSELL TRAINA
MY NOTARY PUBLIC BOTTL#5882223455
NASSAU COUNTY
VALID FROM 10/30/3 THRU 7/13/07

**DEED**

Title No.

BLS-NY073004012

To
MICHELE PIZZUTI A/K/A
MICHAEL PIZZUTI
AND
MICHELLE PIZZUTI

Section 40
Block 2.
Lot     39
County or Town Eastchester
Street Address 46 Glen Road, Eastchester, NY

Return By Mail To:

MICHAEL PIZZUITI AND MICHELLE PIZZUITI
46 Glen Road
Eastchester, New York

Reserve This Space For Use Of Recording Office

NYSBA Residential Real Estate Forms on HotDocs[?] (9/00)          -2-                              Copyright Capsoft[?] Development

EXHIBIT - 3

MTG
ASP
EAS
1-2

AFTER RECORDING RETURN TO:

Washington Mutual Bank, FA
C/O ACS IMAGE SOLUTIONS
12691 PALA DRIVE MS156DPCA
GARDEN GROVE, CA 92841

*Town: EASTCHESTER*
*Sec: 40*
*BLK: 2*
*LOT: 39*

———————— SPACE ABOVE THIS LINE FOR RECORDING DATA ————————
STEWART TITLE INSURANCE COMPANY BLSNY073004012

# MORTGAGE

03-2403-068359225-7

## WORDS USED OFTEN IN THIS DOCUMENT

**(A) "Security Instrument."** This document, which is dated ____September 20, 2004____,
together with all Riders to this document, will be called the "Security Instrument."
**(B) "Borrower."** __MICHELE PIZZUTI A.K.A. MICHAEL PIZZUTI__ *& Michelle Pizzuti* M.P

whose address is ____46 GLEN ROAD, EASTCHESTER, NY 10709____
sometimes will be called "Borrower."
**(C) "Lender."** ____Washington Mutual Bank, FA, a federal association____
will be called "Lender." Lender is a corporation or association which exists under the laws of
____United States of America____. Lender's address is
____400 East Main Street Stockton, CA 95290____.
**(D) "Note."** The note signed by Borrower and dated ____September 20, 2004____, will be called
the "Note." The Note shows that I owe Lender ____Eight Hundred Forty Thousand & 00/100____

*$$924,000.°°*

Dollars (U.S. __840,000.00__ ~~*$*~~ ) plus interest and other amounts that may be payable. I
have promised to pay this debt in Periodic Payments and to pay the debt in full by
____October 1, 2034____.
**(E) "Property."** The property that is described below in the section titled "Description of the
Property," will be called the "Property."
**(F) "Loan."** The "Loan" means the debt evidenced by the Note, plus interest, any prepayment
charges and late charges due under the Note, and all sums due under this Security Instrument,
plus interest.
**(G) "Sums Secured."** The amounts described below in the section titled "Borrower's Transfer to
Lender of Rights in the Property" sometimes will be called the "Sums Secured."
**(H) "Riders."** All Riders attached to this Security Instrument that are signed by Borrower will be
called "Riders." The following Riders are to be signed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] 1-4 Family Rider |
| [ ] Graduated Payment Rider | [ ] Planned Unit Development Rider | [ ] Biweekly Payment Rider |
| [ ] Balloon Rider | [ ] Rate Improvement Rider | [ ] Second Home Rider |
| [ ] Other(s) [specify] | | |

NEW YORK
73234 (02-01)

Page 1 of 19

TO BE RECORDED

MP - 0010

03-2403-068359225-7

(I) **"Applicable Law."** All controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable, judicial opinions will be called "Applicable Law."

(J) **"Community Association Dues, Fees, and Assessments."** All dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization will be called "Community Association Dues, Fees, and Assessments".

(K) **"Electronic Funds Transfer."** "Electronic Funds Transfer" means any transfer of money, other than by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Some common examples of an Electronic Funds Transfer are point-of-sale transfers (where a card such as an asset or debit card is used at a merchant), automated teller machine (or ATM) transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(L) **"Escrow Items."** Those items that are described in Section 3 will be called "Escrow Items."

(M) **"Miscellaneous Proceeds."** "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds, whether by way of judgment, settlement or otherwise, paid by any third party (other than insurance proceeds paid under the coverage described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation or sale to avoid condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property. A taking of the Property by any governmental authority by eminent domain is known as "Condemnation."

(N) **"Mortgage Insurance."** "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(O) **"Periodic Payment."** The regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 will be called "Periodic Payment."

(P) **"RESPA."** "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Subsection 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

## BORROWER'S TRANSFER TO LENDER OF RIGHTS IN THE PROPERTY

I mortgage, grant and convey the Property to Lender subject to the terms of this Security Instrument. This means that, by signing this Security Instrument, I am giving Lender those rights that are stated in this Security Instrument and also those rights that Applicable Law gives to lenders who hold mortgages on real property. I am giving Lender these rights to protect Lender from possible losses that might result if I fail to:

(A) Pay all the amounts that I owe Lender as stated in the Note including, but not limited to, all renewals, extensions and modifications of the Note;

(B) Pay, with interest, any amounts that Lender spends under this Security Instrument to protect the value of the Property and Lender's rights in the Property; and

(C) Keep all of my other promises and agreements under this Security Instrument and the Note.

NEW YORK
73234 (02-01)

**TO BE RECORDED**

MP - 0011

03-2403-068359225-7

**DESCRIPTION OF THE PROPERTY**

I give Lender rights in the Property described in (A) through (G) below:

**(A)** The Property which is located at ___46 GLEN ROAD___

[Street]

___EASTCHESTER___ , New York ___10709___ ,
[City, Town or Village]          [Zip Code]

This Property is in ___Westchester___ County. It has the following legal description:

LEGAL DESCRIPTION TO BE ATTACHED HERETO AND MADE A PART HEREOF

**(B)** All buildings and other improvements that are located on the Property described in subsection (A) of this section;

**(C)** All rights in other property that I have as owner of the Property described in subsection (A) of this section. These rights are known as "easements and appurtenances attached to the Property;"

**(D)** All rights that I have in the land which lies in the streets or roads in front of, or next to, the Property described in subsection (A) of this section;

**(E)** All fixtures that are now or in the future will be on the Property described in subsections (A) and (B) of this section;

**(F)** All of the rights and property described in subsections (B) through (E) of this section that I acquire in the future; and

**(G)** All replacements of or additions to the Property described in subsections (B) through (F) of this section and all proceeds of insurance for loss or damage to, and all Miscellaneous Proceeds of the Property described in subsections (A) through (F) of this section.

**BORROWER'S RIGHT TO MORTGAGE THE PROPERTY AND BORROWER'S OBLIGATION TO DEFEND OWNERSHIP OF THE PROPERTY**

I promise that: (A) I lawfully own the Property; (B) I have the right to mortgage, grant and convey the Property to Lender; and (C) there are no outstanding claims or charges against the Property, except for those which are of public record.

I give a general warranty of title to Lender. This means that I will be fully responsible for any losses which Lender suffers because someone other than myself has some of the rights in the Property which I promise that I have. I promise that I will defend my ownership of the Property against any claims of such rights.

NEW YORK
73234 (02-01)

Page 3 of 19

TO BE RECORDED

MP - 0012

Policy No.: M 8832 - 823789

## SCHEDULE A
## LEGAL DESCRIPTION

All that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the Town of Eastchester, County of Westchester and State of New York being Lots 882 and a portion of 883 as shown on a certain map entitled "Map of Property belonging to the New York Central Realty Company, W.H. Cooper, President, known as Westchester Park, situated on the Harlem Railroad, Westchester County, N.Y." dated June 30, 1906 and filed in the Office of the Register of the Westchester County (now Westchester County Clerk's Office Division of Land Records) on November 14, 1906, as Map No. 1672 being more particularly bounded and described as follows:

BEGINNING at a point on the westerly side of Glen Road at the division line between Lots 881 and 882 on the aforesaid map;

RUNNING THENCE along said division line South 79 degrees 06 minutes 43 seconds West 155.73 feet to the division line between Lots 882 and Lot 893 on the aforesaid map;

RUNNING THENCE along said division line and the division line between Lots numbers 882 and 892 North 28 degrees 32 minutes 00 seconds East 31.62 to a point;

RUNNING THENCE through Lot 883 North 58 degrees 21 minutes 48 seconds East 72.30 feet to the division line between Lots 883 and 884 on the aforesaid map;

RUNNING THENCE along said division line North 79 degrees 06 minutes 43 seconds East 64.00 feet to the westerly side of Glen Road;

RUNNING THENCE along said westerly side of Glen Road on a curve to the right having a radius of 315 a distance of 50.24 feet to the point or place of BEGINNING.

SAID PREMISES also being known as          **46 Glen Rd**
                                           **Eastchester, New York**

4612 (1/93)
NY Alta Loan

MP - 0013

03-2403-068359225-7

**PLAIN LANGUAGE SECURITY INSTRUMENT**

This Security Instrument contains promises and agreements that are used in real property security Instruments all over the country. It also contains other promises and agreements that vary in different parts of the country. My promises and agreements are stated in "plain language."

**COVENANTS**

I promise and I agree with Lender as follows:

**1. Borrower's Promise to Pay.** I will pay to Lender on time principal and interest due under the Note and any prepayment, late charges and other amounts due under the Note.

I will also pay all amounts for Escrow Items under Section 3 of this Security Instrument.

Payments due under the Note and this Security Instrument shall be made in U.S. currency. If any of my payments by check or other payment instrument is returned to Lender unpaid, Lender may require my payment be made by: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location required in the Note, or at another location designated by Lender under Section 15 of this Security Instrument. Lender may return or accept any payment or partial payment if it is for an amount that is less than the amount that is then due. If Lender accepts a lesser payment, Lender may refuse to accept a lesser payment that I may make in the future and does not waive any of its rights. Lender is not obligated to apply such lesser payments when it accepts such payments. If interest on principal accrues as if all Periodic Payments had been paid when due, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until I make payments to bring the Loan current. If I do not do so within a reasonable period of time, Lender will either apply such funds or return them to me. In the event of foreclosure, any unapplied funds will be applied to the outstanding principal balance immediately prior to foreclosure. No offset or claim which I might have now or in the future against Lender will relieve me from making payments due under the Note and this Security Instrument or keeping all of my other promises and agreements secured by this Security Instrument.

**2. Application of Borrower's Payments and Insurance Proceeds.** Unless Applicable Law or this Section 2 requires otherwise, Lender will apply each of my payments that Lender accepts in the following order:

First, to pay any interest due under the Note;

Next, to pay principal due under the Note; and

Next, to pay the amounts due Lender under Section 3 of this Security Instrument.

Such payments will be applied to each Periodic Payment in the order in which it became due. Any remaining amounts will be applied as follows:

First, to pay any late charges;

Next, to pay any other amounts due under this Security Instrument; and

Next, to reduce the principal balance of the Note.

If Lender receives a payment from me for a late Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the late Periodic Payment and the late charge. If more than one Periodic Payment is due, Lender may apply any payment received from me: First, to the repayment of the Periodic Payments that are due if, and to the extent that, each payment can be paid in full; Next, to the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any

NEW YORK
73234 (02-01)                    Page 4 of 19                    **TO BE RECORDED**

MP - 0014

late charges due.

Voluntary prepayments will be applied as follows: First, to any prepayment charges; and Next, as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note will not extend or postpone the due date of the Periodic Payments or change the amount of those payments.

**3. Monthly Payments for Taxes and Insurance.**

**(a) Borrower's Obligations.** I will pay to Lender all amounts necessary to pay for taxes, assessments, water charges, sewer rents and other similar charges, ground leasehold payments or rents (if any), hazard or property insurance covering the Property, flood insurance (if any), and any required Mortgage Insurance, or a loss reserve as described in Section 10 in the place of Mortgage Insurance. Each Periodic Payment will include an amount to be applied toward payment of the following items which are called "Escrow Items:"

(1) The taxes, assessments, water charges, sewer rents and other similar charges, on the Property which under Applicable Law may be superior to this Security Instrument as a lien on the Property. Any claim, demand or charge that is made against property because an obligation has not been fulfilled is known as a "lien;"

(2) The leasehold payments or ground rents on the Property (if any);

(3) The premium for any and all insurance required by Lender under Section 5 of this Security Instrument;

(4) The premium for Mortgage Insurance (if any);

(5) The amount I may be required to pay Lender under Section 10 of this Security Instrument instead of the payment of the premium for Mortgage Insurance (if any); and

(6) If required by Lender, the amount for any Community Association Dues, Fees and Assessments.

After signing the Note, or at any time during its term, Lender may include these amounts as Escrow Items. The monthly payment I will make for Escrow Items will be based on Lender's estimate of the annual amount required.

I will pay all of these amounts to Lender unless Lender tells me, in writing, that I do not have to do so, or unless Applicable Law requires otherwise. I will make these payments on the same day that my Periodic Payments of principal and interest are due under the Note.

The amounts that I pay to Lender for Escrow Items under this Section 3 will be called "Funds." I will pay Lender the Funds for Escrow Items unless Lender waives my obligation to pay the Funds for any or all Escrow Items. Lender may waive my obligation to pay Lender Funds for any or all Escrow Items at any time. Any such waiver must be in writing. In the event of such waiver, I will pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, will promptly send to Lender receipts showing such payment within such time period as Lender may require. My obligation to make such payments and to provide receipts will be considered to be a promise and agreement contained in this Security Instrument, as the phrase "promises and agreements" is used in Section 9 of this Security Instrument. If I am obligated to pay Escrow Items directly, pursuant to a waiver, and I fail to pay the amount due for an Escrow Item, Lender may pay that amount and I will then be obligated under Section 9 of this Security Instrument to repay to Lender. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 of this Security Instrument and, upon the revocation, I will pay to Lender all Funds, and in amounts, that are then required under this Section 3.

I promise to promptly send to Lender any notices that I receive of Escrow Item amounts to be paid. Lender will estimate from time to time the amount of Funds I will have to pay by using

Page 5 of 19

**TO BE RECORDED**

03-2403-068359225-7

existing assessments and bills and reasonable estimates of the amount I will have to pay for Escrow Items in the future, unless Applicable Law requires Lender to use another method for determining the amount I am to pay.

Lender may, at any time, collect and hold Funds in an amount sufficient to permit Lender to apply the Funds at the time specified under RESPA. Applicable Law puts limits on the total amount of Funds Lender can at any time collect and hold. This total amount cannot be more than the maximum amount a lender could require under RESPA. If there is another Applicable Law that imposes a lower limit on the total amount of Funds Lender can collect and hold, Lender will be limited to the lower amount.

(b) **Lender's Obligations.** Lender will keep the Funds in a savings or banking institution which has its deposits insured by a federal agency, instrumentality, or entity, or in any Federal Home Loan Bank. If Lender is such a savings or banking institution, Lender may hold the Funds. Lender will use the Funds to pay the Escrow Items no later than the time allowed under RESPA or other Applicable Law. Lender will give to me, without charge, an annual accounting of the Funds. That accounting will show all additions to and deductions from the Funds and the reason for each deduction.

Lender may not charge me for holding or keeping the Funds, for using the Funds to pay Escrow Items, for making a yearly analysis of my payment of Funds or for receiving, or for verifying and totaling assessments and bills. However, Lender may charge me for these services if Lender pays me interest on the Funds and if Applicable Law permits Lender to make such a charge. Lender will not be required to pay me any interest or earnings on the Funds unless either (1) Lender and I agree in writing that Lender will pay interest on the Funds; or (2) Applicable Law requires Lender to pay interest on the Funds.

(c) **Adjustments to the Funds.** Under Applicable Law, there is a limit on the amount of Funds Lender may hold. If the amount of Funds held by Lender exceeds this limit, then there will be an excess amount and RESPA requires Lender to account to me in a special manner for the excess amount of Funds.

If, at any time, Lender has not received enough Funds to make the payments of Escrow Items when the payments are due, Lender may tell me in writing that an additional amount is necessary. I will pay to Lender whatever additional amount is necessary to pay the Escrow Items when the payments are due, but the number of payments will not be more than twelve.

When I have paid all of the Sums Secured, Lender will promptly refund to me any Funds that are then being held by Lender.

4. **Borrower's Obligation to Pay Charges, Assessments and Claims.** I will pay all taxes, assessments, water charges, sewer rents and other similar charges, and any other charges and fines that may be imposed on the Property and that may be superior to this Security Instrument. I will also make ground rents or payments due under my lease if I am a tenant on the Property and Community Association Dues, Fees and Assessments (if any) due on the Property. If these items are Escrow Items, I will do this by making the payments as described in Section 3 of this Security Instrument. In this Security Instrument, the word "person" means any individual, organization, governmental authority or other party.

I will promptly pay or satisfy all liens against the Property that may be superior to this Security Instrument. However, this Security Instrument does not require me to satisfy a superior lien if: (a) I agree, in writing, to pay the obligation which gave rise to the superior lien and Lender approves the way in which I agree to pay that obligation, but only so long as I am performing such agreement; (b) in good faith, I argue or defend against the superior lien in a lawsuit so that in Lender's opinion, during the lawsuit, the superior lien may not be enforced, but only until the lawsuit ends; or (c) I secure from the holder of that other lien an agreement, approved in writing

MP - 0016

03-2403-068359225-7

by Lender, that the lien of this Security Instrument is superior to the lien held by that person. If Lender determines that any part of the Property is subject to a superior lien, Lender may give Borrower a notice identifying the superior lien. Within 10 days of the date on which the notice is given, Borrower shall pay or satisfy the superior lien or take one or more of the actions mentioned in this Section 4.

Lender also may require me to pay a one-time charge for an independent real estate tax reporting service used by Lender in connection with the Loan, unless Applicable Law does not permit Lender to make such a charge.

**5. Borrower's Obligation to Maintain Hazard Insurance or Property Insurance.** I will obtain hazard or property insurance to cover all buildings and other improvements that now are, or in the future will be, located on the Property. The insurance will cover loss or damage caused by fire, hazards normally covered by "extended coverage" hazard insurance policies, and any other hazards for which Lender requires coverage, including, but not limited to earthquakes and floods. The insurance will be in the amounts (including, but not limited to, deductible levels) and for the periods of time required by Lender. What Lender requires under the last sentence can change during the term of the Loan. I may choose the insurance company, but my choice is subject to Lender's right to disapprove. Lender may not disapprove my choice unless the disapproval is reasonable. Lender may require me to pay either (a) a one-time charge for flood zone determination, certification and tracking services, or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect the flood zone determination or certification. If I disagree with the flood zone determination, I may request the Federal Emergency Management Agency to review the flood zone determination and I promise to pay any fees charged by the Federal Emergency Management Agency for its review.

If I fail to maintain any of the insurance coverages described above, Lender may obtain insurance coverage, at Lender's option and my expense. Lender is under no obligation to purchase any particular type or amount of coverage. Lender may purchase such insurance from or through any company acceptable to Lender including, without limitation, an affiliate of Lender, and Borrower acknowledges and agrees that Lender's affiliate may receive consideration for such purchase. Therefore, such coverage will cover Lender, but might or might not protect me, my equity in the Property, or the contents of the Property, against any risk, hazard, or liability and might provide greater or lesser coverage than was previously in effect. I acknowledge that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that I could have obtained. Any amounts disbursed by Lender under this Section 5 will become my additional debt secured by this Security Instrument. These amounts will bear interest at the interest rate set forth in the Note from the date of disbursement and will be payable with such interest, upon notice from Lender to me requesting payment.

All of the insurance policies and renewals of those policies will include what is known as a "Standard Mortgage Clause" to protect Lender and will name Lender as mortgagee and/or as an additional loss payee. Borrower hereby absolutely and irrevocably assigns to Lender all of Borrower's right, title and interest in and to all proceeds from any insurance policy (whether or not the insurance policy was required by Lender) that are due, paid or payable with respect to any damage to such property, regardless of whether the insurance policy is established before, on or after the date of this Security Instrument. By absolutely and irrevocably assigning to Lender all of Borrower's rights to receive any and all proceeds from any insurance policy, Borrower hereby

MP - 0017

03-2403-068359225-7

waives, to the full extent allowed by law, all of Borrower's rights to receive any and all such insurance proceeds.

Borrower hereby absolutely and irrevocably assigns to Lender all of Borrower's right, title and interest in and to (a) any and all claims, present and future, known or unknown, absolute or contingent, (b) any and all causes of action, (c) any and all judgments and settlements (whether through litigation, mediation, arbitration or otherwise), (d) any and all funds sought against or from any party or parties whosoever, and (e) any and all funds received or receivable in connection with any damage to such property, resulting from any cause or causes whatsoever, including but not limited to, land subsidence, landslide, windstorm, earthquake, fire, flood or any other cause.

Borrower agrees to execute, acknowledge if requested, and deliver to Lender, and/or upon notice from Lender shall request any insurance agency or company that has issued any insurance policy to execute and deliver to Lender, any additional instruments or documents requested by Lender from time to time to evidence Borrower's absolute and irrevocable assignments set forth in this paragraph.

The form of all policies and renewals will be acceptable to Lender. Lender will have the right to hold the policies and renewal certificates. If Lender requires, I will promptly give Lender all receipts of paid premiums and renewal notices that I receive.

If I obtain any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy will include a standard mortgage clause and will name Lender as mortgagee and/or as an additional loss payee.

If there is a loss or damage to the Property, I will promptly notify the insurance company and Lender. If I do not promptly prove to the insurance company that the loss or damage occurred, then Lender may do so.

The amount paid by the insurance company for loss or damage to the Property is called "proceeds." Unless Lender and I otherwise agree in writing, any proceeds, whether or not the underlying insurance was required by Lender, will be used to repair or to restore the damaged Property unless: (a) it is not economically feasible to make the repairs or restoration; (b) the use of the proceeds for that purpose would lessen the protection given to Lender by this Security Instrument; or (c) Lender and I have agreed in writing not to use the proceeds for that purpose. During the period that any repairs or restorations are being made, Lender may hold any proceeds until it has had an opportunity to inspect the Property to verify that the repair work has been completed to Lender's satisfaction. However, this inspection will be done promptly. Lender may make payments for the repairs and restorations in a single payment or in a series of progress payments as the work is completed. Unless Lender and I agree otherwise in writing or unless Applicable Law requires otherwise, Lender is not required to pay me any interest or earnings on the proceeds. I will pay for any public adjusters or other third parties that I hire, and their fees will not be paid out of the proceeds. If the repair or restoration is not economically feasible or if it would lessen Lender's protection under this Security Instrument, then the proceeds will be used to reduce the amount that I owe to Lender under this Security Instrument. Such insurance proceeds will be applied in the order provided for in Section 2. If any of the proceeds remain after the amount that I owe to Lender has been paid in full, the remaining proceeds will be paid to me.

If I abandon the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If I do not answer, within 30 days, a notice from Lender stating that the insurance company has offered to settle a claim, Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 of this Security Instrument or otherwise, I give Lender my rights to any insurance proceeds in an amount not greater than the amounts unpaid under the Note and this

MP - 0018

03-2403-068359225-7

Security Instrument. I also give Lender any other of my rights (other than the right to any refund of unearned premiums that I paid) under all insurance policies covering the Property, if the rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Borrower's Obligations to Occupy The Property.** I will occupy the Property and use the Property as my principal residence within sixty days after I sign this Security Instrument. I will continue to occupy the Property and to use the Property as my principal residence for at least one year. The one-year period will begin when I first occupy the Property. However, I will not have to occupy the Property and use the Property as my principal residence within the time frames set forth above if Lender agrees in writing that I do not have to do so. Lender may not refuse to agree unless the refusal is reasonable. I also will not have to occupy the Property and use the Property as my principal residence within the time frames set forth above if extenuating circumstances exist which are beyond my control.

**7. Borrower's Obligations to Maintain and Protect The Property And to Fulfill Any Lease Obligations.**

**(a) Maintenance and Protection of the Property.** I will not destroy, damage or harm the Property, or remove or demolish any building thereon, and I will not allow the Property to deteriorate. Whether or not I am residing in the Property, I will keep the Property in good condition and repair so that it will not deteriorate or decrease in value due to its condition. Unless it is determined under Section 5 of this Security Instrument that repair is not economically feasible, I will promptly repair the Property in good and workmanlike manner if damaged to avoid further deterioration or damage. Lender shall, unless otherwise agreed in writing between Lender and Borrower, have the right to hold insurance or condemnation proceeds. If insurance or condemnation (as described in the definition of Miscellaneous Proceeds) proceeds are paid because of loss or damage to, or condemnation of, the Property, I will repair or restore the Property only if Lender has released those proceeds for such purposes. Lender may pay for the repairs and restoration out of proceeds in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, I promise to pay for the completion of such repair or restoration. Lender does not make any warranty or representation regarding, and assumes no responsibility for, the work done on the Property, and Borrower shall not have any right to rely in any way on any inspection(s) by or for Lender or its agent. Borrower shall be solely responsible for determining that the work is done in a good, thorough, efficient, and workmanlike manner in accordance will all applicable laws.

**(b) Lender's Inspection of Property.** Lender, and others authorized by Lender, may enter on and inspect the Property. They will do so in a reasonable manner and at reasonable times. If it has a reasonable purpose, Lender may inspect the inside of the home or other improvements on the Property. Before or at the time an inspection is made, Lender will give me notice stating a reasonable purpose for such interior inspection.

Borrower shall (a) appear in and defend any action or proceeding purporting to affect the security hereof, the Property or the rights or powers of Lender; (b) at Lender's option, assign to Lender, to the extent of Lender's interest, any claims, demands, or causes of action of any kind, and any award, court judgement, or proceeds of settlement of any such claim, demand or cause of action of any kind which Borrower now has or may hereafter acquire arising out of or relating to to any interest in the acquisition or ownership of the Property. Lender shall not have any duty to prosecute any such claim, demand or cause of action. Without limiting the foregoing, any such claim, demand or cause of action arising out of or relating to any interest in the acquisition or

NEW YORK
73234 (02-01)

Page 9 of 19

**TO BE RECORDED**

MP - 0019

03-2403-068359225-7

ownership of the Property may include (i) any such injury or damage to the Property including without limit injury or damage to any structure or improvement situated thereon, (ii) or any claim or cause of action in favor of Borrower which arises out of the transaction financed in whole or in part by the making of the loan secured hereby, (iii) any claim or cause of action in favor of Borrower (except for bodily injury) which arises as a result of any negligent or improper construction, installation or repair of the Property including without limit, any surface or subsurface thereof, or of any building or structure thereon or (iv) any proceeds of insurance, whether or not required by Lender, payable as a result of any damage to or otherwise relating to the Property or any interest therein. Lender may apply, use or release such monies so received by it in the same manner as provided in Paragraph 5 for the proceeds of insurance.

8. **Borrower's Loan Application.** If, during the application process for the Loan, I, or any person or entity acting at my direction or with my knowledge or consent, made false, misleading or inaccurate statements to Lender about information important to Lender in determining my eligibility for the Loan (or did not provide Lender with such information), Lender will treat my actions as a default under this Security Instrument. False, misleading or inaccurate statements about information important to Lender would include a misrepresentation of my intention to occupy the Property as a principal residence. This is just one example of a false, misleading or inaccurate statement of important information.

9. **Lender's Right to Protect Its Rights in The Property.** If: (a) I do not keep my promises and agreements made in this Security Instrument; (b) someone, including me, begins a legal proceeding that may significantly affect Lender's interest in the Property or rights under this Security Instrument (such as a legal proceeding in bankruptcy, in probate, for condemnation or forfeiture, proceedings which could give a person rights which could equal or exceed Lender's interest in the Property or under this Security Instrument, proceedings for enforcement of a lien which may become superior to this Security Instrument, or to enforce laws or regulations); or (c) I have abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and Lender's rights under this Security Instrument.

Lender's actions may include, but are not limited to: (a) protecting and/or assessing the value of the Property; (b) securing and/or repairing the Property; (c) paying sums to eliminate any lien against the Property that may be equal or superior to this Security Instrument; (d) appearing in court; and (e) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Lender can also enter the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, have utilities turned on or off, and take any other action to secure the Property. Although Lender may take action under this Section 9, Lender does not have to do so and is under no duty to do so. I agree that Lender will not be liable for not taking any or all actions under this Section 9.

I will pay to Lender any amounts, with interest, which Lender spends under this Section 9. I will pay those amounts to Lender when Lender sends me a notice requesting that I do so. I will pay interest on those amounts at the interest rate set forth in the Note. Interest on each amount will begin on the date that the amount is spent by Lender. This Security Instrument will protect Lender in case I do not keep this promise to pay those amounts with interest.

If I do not own, but am a tenant on the Property, I will fulfill all my obligations under my lease. I also agree that, if I acquire the full title (sometimes called "fee title") to the Property, my lease interest and the fee title will not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required mortgage insurance as a condition of making the

MP - 0020

03-2403-068359225-7

Loan, I will pay the premiums for the Mortgage Insurance. If, for any reason, the Mortgage Insurance coverage ceases to be available from the mortgage insurer that previously provided such insurance and Lender required me to make separate payments toward the premiums for Mortgage Insurance, I will pay the premiums for substantially equivalent Mortgage Insurance coverage from an alternate mortgage insurer. However, the costs of this Mortgage Insurance coverage will be substantially equivalent to the cost to me of the previous Mortgage Insurance coverage, and the alternate mortgage insurer will be selected by Lender.

If substantially equivalent Mortgage Insurance coverage is not available, Lender will establish a non-refundable "loss reserve" as a substitute for the Mortgage Insurance coverage. I will continue to pay Lender each month an amount equal to one-twelfth of the yearly Mortgage Insurance premium (as of the time the coverage lapsed or ceased to be in effect). Lender will retain these payments, and will use these payments to pay for losses that the Mortgage Insurance would have covered. The loss reserve is non-refundable even if the Loan is ultimately paid in full and Lender is not required to pay me any interest on the loss reserve. Lender can no longer require loss reserve payments if: (a) Mortgage Insurance coverage again becomes available through an insurer selected by Lender; (b) such Mortgage Insurance is obtained; (c) Lender requires separately designated payments toward the premiums for Mortgage Insurance; and (d) the Mortgage Insurance coverage is in the amount and for the period of time required by Lender.

If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separate payments toward the premiums for Mortgage Insurance, I will pay the Mortgage Insurance premiums, or the loss reserve payments, until the requirement for Mortgage Insurance ends according to any written agreement between Lender and me providing for such termination or until termination of Mortgage Insurance is required by Applicable Law. Lender may require me to pay the premiums, or the loss reserve payments, in the manner described in Section 3 of this Security Instrument. Nothing in this Section 10 will affect my obligation to pay interest at the rate provided in the Note.

A Mortgage Insurance policy pays Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance policy.

Mortgage insurers assess their total risk on all Mortgage Insurance form time to time. Mortgage insurers may enter into agreements with other parties to share or change their risk, or to reduce losses. These agreements are based on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include Mortgage Insurance premiums).

As a result of these agreements, Lender, any owner of the Note, another insurer, any reinsurer, or any other entity may receive (directly or indirectly) amounts that come from a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or changing the mortgage insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." It also should be understood that: (a) any of these agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. These agreements will not increase the amount Borrower will owe for Mortgage Insurance, and hey will not entitle Borrower to any refund; and (b) any of these agreements will not affect the rights Borrower has - if any - regarding the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right (a) to receive certain disclosures, (b) to requires and obtain cancellation of the Mortgage Insurance, (c) to have the Mortgage Insurance terminated automatically, and/or (d) to receive a refund of any Mortgage Insurance premiums that were not earned at the time of such cancellation or termination.

03-2403-068359225-7

**11. Agreements About Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are assigned to and will be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds will be applied to restoration or repair of the Property, if (a) the restoration or repair is economically feasible, and (b) Lender's security given in this Security Instrument is not lessened. During such repair and restoration period, Lender will have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect the Property to verify that the work has been completed to Lender's satisfaction. However, the inspection will be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless Lender and I otherwise agree in writing or unless Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender will not be required to pay Borrower any interest or earnings on the Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security given in this Security Instrument would be lessened, the Miscellaneous Proceeds will be applied to the Sums Secured, whether or not then due. The excess, if any, will be paid to me. Such Miscellaneous Proceeds will be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds will be applied to the Sums Secured, whether or not then due. The excess, if any, will be be paid to me.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the Sums Secured immediately before the partial taking, destruction, or loss in value, the Sums Secured will be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the Sums Secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to me.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the Sums Secured immediately before the partial taking, destruction, or loss in value, the Miscellaneous Proceeds will be applied to the Sums Secured whether or not the sums are then due.

If I abandon the Property, or if, after Lender sends me notice that the Opposing Party (as defined in the next sentence) offered to make an award to settle a claim for damages, I fail to respond to Lender within 30 days after the date the Lender gives notice, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the Sums Secured, whether or not then due. "Opposing Party" means the third party that owes me Miscellaneous Proceeds or the party against whom I have a right of action in regard to Miscellaneous Proceeds.

I will be in default under this Security Instrument if any civil or criminal action or proceeding that Lender determines could result in a court ruling (a) that would require forfeiture of the Property, or (b) that could damage Lender's interest in the Property or rights under this Security Instrument. "Forfeiture" is a court action to require the Property, or any part of the Property, to be given up. I may correct the default by obtaining a court ruling that dismisses the court action, if Lender determines that this court ruling prevents forfeiture of the Property and also prevents any damage to Lender's interest in the Property or rights under this Security Instrument. If I correct the default, I will have the right to have enforcement of this Security Instrument discontinued, as provided in Section 19 of this Security Instrument, even if Lender has require Immediate Payment

in Full (as defined in Section 22). The proceeds of any award or claim for damages that are attributable to the damage or reduction in Lender's interest in the Property are assigned, and will be paid, to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property will be applied in the order provided for in Section 2.

**12. Continuation of Borrower's Obligations And of Lender's Rights.** This Security Instrument cannot be changed or modified except as otherwise provided herein or by agreement in writing signed by Borrower, or any successor in interest to Borrower and Lender.

**(a) Borrower's Obligations.** Lender may allow me, or a person who takes over my rights and obligations, to delay or to change the amount of the Periodic Payments. Even if Lender does this, however, I will still be fully obligated under the Note and under this Security Instrument unless Lender agrees to release me, in writing, from my obligations.

Lender may allow those delays or changes for me or a person who takes over my rights and obligations, even if Lender is requested not to do so. Even if Lender is requested to do so, Lender will not be required to (1) bring a lawsuit against me or such a person for not fulfilling obligations under the Note or under this Security Instrument, or (2) refuse to extend time for payment or otherwise modify amortization of the Sums Secured.

**(b) Lender's Rights.** Even if Lender does not exercise or enforce any right of Lender under this Security Instrument or under Applicable Law, Lender will still have all of those rights and may exercise and enforce them in the future. Even if: (1) Lender obtains insurance, pays taxes, or pays other claims, charges or liens against the Property; (2) Lender accepts payments from third Persons; or (3) Lender accepts payments in amounts less than the amount then due, Lender will have the right under Section 22 below to demand that I make Immediate Payment in Full of any amounts remaining due and payable to Lender under the Note and under this Security Instrument. No waiver by Lender of any right under this Security Instrument shall be effective unless in writing. Waiver by Lender of any right granted to Lender under this Security Instrument or of any provision of this Security Instrument as to any transaction or occurrence shall not be deemed a waiver as to any future transaction or occurrence.

**13. Obligations of Borrower And of Persons Taking Over Borrower's Rights or Obligations.** If more than one Person signs this Security Instrument as Borrower, each of us is fully obligated to keep all of Borrower's promises and obligations contained in this Security Instrument. Lender may enforce Lender's rights under this Security Instrument against each of us individually or against all of us together. This means that any one of us may be required to pay all of the Sums Secured. However, if one of us does not sign the Note: (a) that Person is signing this Security Instrument only to give that Person's rights in the Property to Lender under the terms of this Security Instrument; (b) that Person is not personally obligated to pay the Sums Secured; and (c) that Person agrees that Lender may agree with the other Borrowers to delay enforcing any of Lender's rights, to modify, or make any accommodations with regard to the terms of this Security Instrument or the Note without that Person's consent.

Subject to the provisions of Section 18 of this Security Instrument, any person who takes over my rights or obligations under this Security Instrument in writing, and is approved by Lender in writing, will have all of my rights and will be obligated to keep all of my promises and agreements made in this Security Instrument. Borrower will not be released from Borrower's obligations and liabilities under this Security Instrument unless Lender agrees to such release in writing. Any person who takes over Lender's rights or obligations under this Security Instrument will have all of Lender's rights and will be obligated to keep all of Lender's promises and agreements made in this Security Instrument except as provided under Section 20.

MP - 0023

03-2403-068359225-7

**14. Loan Charges.** Lender may charge me fees for services performed in connection with my default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. Borrower shall pay such other charges as Lender may deem reasonable for services rendered by Lender and furnished at the request for Borrower, any successor in interest to Borrower or any agent of Borrower. With regard to other fees, the fact that this Security Instrument does not expressly indicate that Lender may charge a certain fee does not mean that Lender cannot charge that fee. Lender may not charge fees that are prohibited by this Security Instrument or by Applicable Law.

If the loan is subject to Applicable Law which sets maximum loan charges, and that Applicable Law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed permitted limits: (a) any such loan charge will be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (even if a prepayment charge is provided for under the Note). If I accept such a refund that is paid directly to me, I will waive any right to bring a lawsuit against Lender because of the overcharge.

**15. Notices Required under this Security Instrument.** All notices given by me or Lender in connection with this Security Instrument will be made in writing. Any notice to me in connection with this Security Instrument is considered given to me when mailed by first class mail or when actually delivered to my notice address if sent by other means.  Notice to any one Borrower will be notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address is the address of the Property unless I give notice to Lender of a different address. I will promptly notify Lender of my change of address. If Lender specifies a procedure for reporting my change of address, then I will only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender will be given by delivering it or by mailing it by first class mail to Lender's address stated on the first page of this Security Instrument unless Lender has given me notice of another address. Any notice in connection with this Security Instrument is given to Lender when it is actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Law That Governs this Security Instrument; Word Usage.** This Security Instrument is governed by federal law and the law of New York State. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might allow the parties to agree by contract or it might be silent, but such silence does not mean that Lender and I cannot agree by contract. If any term of this Security Instrument or of the Note conflicts with Applicable Law, the conflict will not affect other provisions of this Security Instrument or the Note which can operate, or be given effect, without the conflicting provision. This means that the Security Instrument or the Note will remain as if the conflicting provision did not exist.

As used in this Security Instrument: (a) words of the masculine gender mean and include corresponding words of the feminine and neuter genders; (b) words in the singular mean and include the plural, and words in the plural mean and include the singular; and (c) the word "may" gives sole discretion without any obligation to take any action.

NEW YORK
73234 (02-01)                       Page 14 of 19                    **TO BE RECORDED**

03-2403-068359225-7

**17. Borrower's Copy.** I will be given one copy of the Note and of this Security Instrument.

**18. Agreements about Lender's Rights If the Property Is Sold or Transferred.** Lender may require Immediate Payment in Full of all Sums Secured by this Security Instrument if all or any part of the Property, or if any right in the Property, is sold or transferred without Lender's prior written permission. If Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred without Lender's prior written permission, Lender also may require Immediate Payment in Full. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender requires Immediate Payment in Full under this Section 18, Lender will give me a notice which states this requirement. The notice will give me at least 30 days to make the required payment. The 30-day period will be on the date the notice is given to me in the manner required by Section 15 of this Security Instrument. If I do not make the required payment during that period, Lender may act to enforce its rights under this Security Instrument without giving me any further notice or demand for payment.

**19. Borrower's Right to Have Lender's Enforcement of this Security Instrument Discontinued.** Even if Lender has required Immediate Payment in Full, I may have the right to have enforcement of this Security Instrument stopped. I will have this right at any time before the earliest of: (a) five days before sale of the Property under any power of sale granted by this Security Instrument; (b) another period as Applicable Law might specify for the termination of my right to have enforcement of the Loan stopped; or (c) a judgment has been entered enforcing this Security Instrument. In order to have this right, I will meet the following conditions:

(a) I pay to Lender the full amount that then would be due under this Security Instrument and the Note as if immediate payment in full had never been required;

(b) I correct my failure to keep any of my other promises or agreements made in this Security Instrument;

(c) I pay all of Lender's reasonable expenses in enforcing this Security Instrument including, for example, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and

(d) I do whatever Lender reasonably requires to assure that Lender's interest in the Property and rights under this Security Instrument and my obligations under the Note and under this Security Instrument continue unchanged.

Lender may require that I pay the sums and expenses mentioned in (a) through (d) in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer.

If I fulfill all of the conditions in this Section 19, then this Security Instrument will remain in full effect as if immediate payment in full had never been required. However, I will not have the right to have Lender's enforcement of this Security Instrument discontinued if Lender has required Immediate Payment in Full under Section 18 of this Security Instrument.

**20. Note Holder's Right to Sell the Note or an Interest in the Note; Borrower's Right to Notice of Change of Loan Servicer; Lender's and Borrower's Right to Notice of Grievance.** The Note, or an interest in the Note, together with this Security Instrument, may be sold one or more times. I might not receive any prior notice of these sales.

The entity that collects the Periodic Payments and performs other mortgage loan servicing obligations under under the Note, this Security Instrument, and Applicable Law is called the "Loan Servicer." There may be a change of the Loan Servicer as a result of the sale of the Note. There also may be one or more changes of the Loan Servicer unrelated to a sale of the Note. Applicable

MP - 0025

03-2403-068359225-7

Law requires that I be given written notice of any change of the Loan Servicer. The notice will state the name and address of the new Loan Servicer, and also tell me the address to which I should make my payments. The notice also will contain any other information required by RESPA or Applicable Law. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to me will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither I nor Lender may commence, join or be joined to any court action (as either an individual party or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other has not fulfilled any of its obligations under this Security Instrument, unless the other is notified (in the manner required under Section 15 of this Security Instrument) of the unfulfilled obligation and given a reasonable time period to take corrective action. If Applicable Law provides a time period which will elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to me under Section 22 and the notice of the demand for payment in full given to me under Section 22 will be deemed to satisfy the notice and opportunity to take correction action provisions of this Section 20. All rights under this paragraph are subject to Applicable Law.

**21. Continuation of Borrower's Obligations to Maintain and Protect the Property.** The federal laws and the laws of New York State that relate to health, safety or environmental protection are called "Environmental Law." Environmental Law classifies certain substances as toxic or hazardous. There are other substances that are considered hazardous for purposes of this Section 21. These substances are gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. The substances defined as toxic or hazardous by Environmental Law and the substances considered hazardous for purposes of this Section 21 are called "Hazardous Substances." "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law. An "Environmental Condition" means a condition that can cause, contribute to, or other trigger an Environmental Cleanup.

I will not do anything affecting the Property that violates Environmental Law, and I will not allow anyone else to do so. I will not cause or permit Hazardous Substances to be present on the Property. I will not use or store Hazardous Substances on the Property. I also will not dispose of Hazardous Substances on the Property, or release any Hazardous Substance on the Property, and I will not allow anyone else to do so. I will also not do, nor allow anyone else to do, anything affecting the Property that: (a) is in violation of any Environmental Law; (b) creates an Environmental Condition; or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The promises in this paragraph do not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized as appropriate for normal residential use and maintenance of the Property (including, but not limited to, Hazardous Substances in consumer products). I may use or store these small quantities on the Property. In addition, unless Environmental Law requires removal or other action, the buildings, the improvements and the fixtures on the Property are permitted to contain asbestos and asbestos-containing materials if the asbestos and asbestos-containing materials are undisturbed and "non-friable" (that is, not easily crumbled by hand pressure).

I will promptly give Lender written notice of: (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which I have actual knowledge; (b) any

NEW YORK
73234 (02-01)

Page 16 of 19

TO BE RECORDED

03-2403-068359225-7

Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance; and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If I learn, or any governmental or regulatory authority, or any private party, notifies me any removal or other remediation of any Hazardous Substance affecting the Property is necessary, I will promptly take all necessary remedial actions in accordance with Environmental Law.

Nothing in this Security Instrument creates an obligation on Lender for an Environmental Cleanup.

**NON-UNIFORM COVENANTS**

I also promise and agree with Lender as follows:

**22. Lender's Rights If Borrower Fails to Keep Promises and Agreements.** Except as provided in Section 18 of this Security Instrument, if all of the conditions stated in subsections (a), (b) and (c) of this Section 22 are met, Lender may require that I pay immediately the entire amount then remaining unpaid under the Note and under this Security Instrument. Lender may do this without making any further demand for payment. This requirement is called "Immediate Payment in Full."

If Lender requires Immediate Payment in Full, Lender may bring a lawsuit to take away all of my remaining rights in the Property and have the Property sold. At this sale Lender or another Person may acquire the Property. This is known as "Foreclosure and Sale." In any lawsuit for Foreclosure and Sale, Lender will have the right to collect all costs and disbursements and additional allowances allowed by Applicable Law and will have the right to add all reasonable attorneys' fees to the amount I owe Lender, which fees shall become part of the Sums Secured.

If Borrower or any successor in interest to Borrower files (or has filed against Borrower or any successor in interest to Borrower) a bankruptcy petition under Title II or any successor title of the United States Code which provides for the curing of prepetition default due on the Note, interest at a rate determined by the Court shall be paid to Lender on post-petition arrears.

Lender may require Immediate Payment in Full under this Section 22 only if all of the following conditions are met:

(a) I fail to keep any promise or agreement made in this Security Instrument or the Note, including, but not limited to, the promises to pay the Sums Secured when due, or if another default occurs under this Security Instrument;

(b) Lender sends to me, in the manner described in Section 15 of this Security Instrument, a notice that states:

(1) The promise or agreement that I failed to keep or the default that has occurred;

(2) The action that I must take to correct that default;

(3) A date by which I must correct the default. That date must be at least 30 days from the date on which the notice is given;

(4) That if I do not correct the default by the date stated in the notice, Lender may require Immediate Payment in Full, and Lender or another Person may acquire the Property by means of Foreclosure and Sale;

(5) That if I meet the conditions stated in Section 19 of this Security Instrument, I will have the right to have Lender's enforcement of this Security Instrument stopped and to have the Note and this Security Instrument remain fully effective as if Immediate Payment in Full had never been required; and

(6) That I have the right in any lawsuit for Foreclosure and Sale to argue that I did keep my promises and agreements under the Note and under this Security Instrument, and to present any other defenses that I may have; and

MP – 0027

03-2403-068359225-7

(c) I do not correct the default stated in the notice from Lender by the date stated in the notice.

**23. Lender's Obligation to Discharge this Security Instrument.** When Lender has been paid all amounts due under the Note and under this Security Instrument, Lender will discharge this Security Instrument by delivering a certificate stating that this Security Instrument has been satisfied. I will pay all costs of recording the discharge in the proper official records. I agree to pay a fee for the discharge of this Security Instrument, if Lender so requires. Lender may require that I pay such a fee, but only if the fee is permitted by a Applicable Law.

**24. Agreements About New York Lien Law.** I will receive all amounts lent to me by Lender subject to the trust fund provisions of Section 13 of the New York Lien Law. This means that I will: (a) hold all amounts which I receive and which I have a right to receive from Lender under the Note as a trust fund; and (b) use those amounts to pay for "Cost of Improvement" (as defined in Section 13 of the New York Lien Law) before I use them for any other purpose. The fact that I am holding those amounts as a trust fund means that for any building or other improvement located on the Property I have a special responsibility under the law to use the amount in the manner described in this Section 24.

**25. Borrower's Statement Regarding the Property [check box as applicable].**

[X] This Security Instrument covers real property improved, or to be improved, by a one or two family dwelling only.

[ ] This Security Instrument covers real property principally improved, or to be improved, by one or more structures containing, in the aggregate, not more than six residential dwelling units with each dwelling unit having its own separate cooking facilities.

[ ] This Security Instrument does not cover real property improved as described above.

BY SIGNING BELOW, I accept and agree to the promises and agreements contained in pages 1 through 19 of this Security Instrument and in any Rider signed by me and recorded with it.

TO BE RECORDED

MP - 0028

03-2403-068359225-7

X _____
MICHELE PIZZUTI

_Michelle Pssuti_

Michelle Pizzuti

──────── (Space Below This Line For Acknowledgment) ────────

STATE OF NEW YORK,            )
                             ) ss:
County of _Westchester_       )

On the 20TH day of _September_ in the year 2004 before me, the undersigned
personally appeared _Michele Pizzuti & Michelle Pizzuti_

personally known to me or proved to me on the basis of satisfactory evidence to be individual(s)
whose name(s) is (are) subscribed to the within instrument and acknowledged to me that
he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s)
on the instrument, the individual(s) or the person upon behalf of which the individual(s) acted,
executed the instrument.

_____
Signature and Office of Individual
taking acknowledgment

RUSSELL TRAUB
NY NOTARY PUBLIC #01TR6085972
NASSAU COUNTY
VALID FROM 1/13/03 THRU 1/13/07

NEW YORK
73234 (02-01)                Page 19 of 19                TO BE RECORDED

MP - 0029

# EXHIBIT - 4

Loan No:

# ADJUSTABLE RATE NOTE
MULTISTATE 12MAT   Payment and Rate Caps)

THIS NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT THE MONTHLY PAYMENT CAN INCREASE OR DECREASE. THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED, BUT NOT MORE THAN THE LIMIT STATED IN THIS NOTE.

February  9, 2005                      Tarrytown                         New York
[Date]                              [City]                             [State]

267 Dante Avenue, Tuckahoe, NY 10707
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 920,250.00     (this amount is called "principal"), plus interest, to the order of the Lender. The Lender is  IndyMac Bank, F.S.B., a federally chartered savings bank

I will make all payments under this Note in the form of cash, check or money order. I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

(A) Interest Rate
Interest will be charged on unpaid principal until the full amount of principal has been paid. I will pay interest at a yearly rate of   1.000     %. The interest rate I will pay may change.
The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note.

(B) Interest Rate Change Dates
The interest rate I will pay may change on  the first day of     April     ,2005     , and on that day every month thereafter. Each date on which my interest rate could change is called an "Interest Rate Change Date." The new rate of interest will become effective on each Interest Rate Change Date.

(C) Interest Rate Limit
My interest rate will never be greater than     9.950    %.

(D) Index
Beginning with the first Interest Rate Change Date, my interest rate will be based on an Index. The "Index" is the Twelve-Month Average, determined as set forth below, of the monthly yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rate (H.15)" ("the Monthly Yields"). The Twelve-Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. The most recent Index figure available as of 15 days before each Interest Rate Change Date is called the "Current Index".

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

MIN:



MULTISTATE ADJUSTABLE RATE NOTE                                         Form 3003 1/2000

(0010)                              Page 1 of 4                         Initials:
                              VMP MORTGAGE FORMS - (800)521-7291

Loan No:

**(E) Calculation of Interest Rate Changes**

Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding two and 950/1000ths percentage point(s) ( 2.950 %) to the Current Index. Subject to the limit stated in Section 2(C) above, the result of this addition will be my new interest rate until the next Interest Rate Change Date.

## 3. PAYMENTS

**(A) Time and Place of Payments**

I will pay principal and interest by making payments every month.

I will make my monthly payments on the first day of each month beginning on       April  1, 2005         . I will make these payments every month until I have paid all the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before principal. If, on          March  1, 2035       , I still owe amounts under this Note, I will pay these amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at  IndyMac Bank, F.S.B., P.O. Box 78826, Phoenix, AZ 85062-8826                                                            or at a different place if required by the Note Holder.

**(B) Amount of My Initial Monthly Payments**

Each of my initial monthly payments will be in the amount of U.S. $     2,959.89     . This amount may change.

**(C) Payment Change Dates**

My monthly payment may change as required by Section 3(D) below beginning on the          1st       day of April         ,  2006      , and on that day every 12th month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment also will change at any time Section 3(F) or 3(G) below requires me to pay a different monthly payment.

I will pay the amount of my new monthly payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

**(D) Calculation of Monthly Payment Changes**

Before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Payment Change Date in full on the Maturity Date in substantially equal installments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment." Unless Section 3(F) or 3(G) below requires me to pay a different amount, my new monthly payment will be in the amount of the Full Payment, except that my new monthly payment will be limited to an amount that will not be more than 7.5% greater or less than the amount of my last monthly payment due before the Payment Change Date.

**(E) Additions to My Unpaid Principal**

My monthly payment could be less than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. If so, each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid principal. The Note Holder also will add interest on the amount of this difference to my unpaid principal each month. The interest rate on the interest added to principal will be the rate required by Section 2 above.

**(F) Limit on My Unpaid Principal; Increased Monthly Payment**

My unpaid principal can never exceed a maximum amount equal to one hundred          TEN AND NO/100THS percent (          110.000  %) of the principal amount I originally borrowed. Because of my paying only limited monthly payments, the addition of unpaid interest to my unpaid principal under Section 3(E) above could cause my unpaid principal to exceed that maximum amount when interest rates increase. In that event, on the date that my paying my monthly payment would cause me to exceed that limit, I will instead pay a new monthly payment. The new monthly payment will be in an amount that would be sufficient to repay my then unpaid principal in full on the Maturity Date in substantially equal installments at the interest rate effective during the preceding month.

Form 3003
Initials:

Loan No: [redacted]

**(G) Required Full Payment**

On the 5th Payment Change Date and on each succeeding 5th Payment Change Date thereafter, I will begin paying the Full Payment as my monthly payment until my monthly payment changes again. I also will begin paying the Full Payment as my monthly payment on the final Payment Change Date.

## 4. NOTICE OF CHANGES

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## 5. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of principal at any time before they are due. A payment of principal only is known as a "prepayment." When I make a prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a prepayment if I have not made all the monthly payments due under this Note.

I may make a full prepayment or partial prepayments without paying any prepayment charge. The Note Holder will use my prepayments to reduce the amount of principal that I owe under this Note. However, the Note Holder may apply my prepayment to the accrued and unpaid interest on the prepayment before applying my prepayment to reduce the principal amount of this Note. If I make a partial prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to these changes. My partial prepayment may reduce the amount of my monthly payments after the first Payment Change Date following my partial prepayment. However, any reduction due to my partial prepayment may be offset by an interest rate increase.

## 6. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (i) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the principal I owe under this Note or by making a direct payment to me. If a refund reduces principal, the reduction will be treated as a partial prepayment.

## 7. BORROWER'S FAILURE TO PAY AS REQUIRED

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of my monthly payment by the end of        15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be        2.000 % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. These expenses include, for example, reasonable attorneys' fees.

8480185  (0010)

Page 3 of 4

Form 3003
Initials:

Loan No:

## 8. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given notice of that different address.

## 9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all the amounts owed under this Note.

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of these conditions are described as follows:

Transfer of the Property or a Beneficial Interest in Borrower. If all or any part of the Property or any interest in it is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by applicable law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)       _____ (Seal)
Michele Pizzuti       -Borrower               -Borrower

_____ (Seal)       _____ (Seal)
-Borrower              -Borrower

*[Sign Original Only]*

Pay To The Order Of

Without Recourse
IndyMac Bank, F.S.B.

BY: ~~Brand Goddard~~

First Vice President

VAULT

MP  -  0135

## ADDENDUM TO ADJUSTABLE RATE NOTE
### (Prepayment)

Loan #:

THIS ADDENDUM is made this   9th   day of   February,   2005   , and is incorporated into and intended to form a part of an Adjustable Rate Note dated the same date as this Addendum.

1.   Section 5 of the Adjustable Rate Note is modified to provide that I have the right to make payments of principal at any time before they are due. A Prepayment of all of the unpaid principal is known as a "Full Prepayment." A Prepayment of only part of the unpaid principal is known as a "Partial Prepayment."

Except as provided below, I may make a Full Prepayment or a Partial Prepayment at any time without paying any Prepayment charge. If within the first   three   ( 3 ) year(s) I make a Partial Prepayment or Partial Prepayment(s) of less than twenty percent (20%) of the original principal amount in any twelve (12) month period, I will not pay a Prepayment penalty. However, if within the first   three   ( 3 ) year(s), I make a Full Prepayment, Partial Prepayment or Partial Prepayments of more than twenty percent (20%) of the original principal amount in any 12-month period, I will pay a Prepayment charge in an amount equal to the payment of six (6) months' advance interest on the amount prepaid in excess of twenty percent (20%) of the original principal amount.

If I make a Partial Prepayment equal to one or more of my monthly payments, the due date of my next scheduled monthly payment may be advanced no more than one month. If I make a Partial Prepayment in any other amount, I must still make all subsequent monthly payments as scheduled.

2.   All other provisions of the Adjustable Rate Note are unchanged by this Addendum and remain in full force and effect.

Dated: _____

_____ (Seal)   
Michele Pizzuti   -Borrower

_____ (Seal)   -Borrower

_____ (Seal)   -Borrower

_____ (Seal)   -Borrower

_____ (Seal)   -Borrower

_____ (Seal)   -Borrower

_____ (Seal)   -Borrower

_____ (Seal)   -Borrower

IndyMac Bank and Federally Exempted Seller Use Only
Hard Prepayment Addendum (1-3 yrs) - ARM
First Mortgages - Multistate, Arkansas (loans over $150,000)

8480279   (0407)                     VMP Mortgage Solutions, Inc. (800)521-7291

SPD #084
(08/04)

# EXHIBIT - 5



\*450560013MTG4\*

| Control Number | WIID Number | Instrument Type |
|---|---|---|
| 450560013 | 2005056-000001 | MTG |



## WESTCHESTER COUNTY RECORDING AND ENDORSEMENT PAGE
### (THIS PAGE FORMS PART OF THE INSTRUMENT)
### \*\*\* DO NOT REMOVE \*\*\*

**THE FOLLOWING INSTRUMENT WAS ENDORSED FOR THE RECORD AS FOLLOWS:**

TYPE OF INSTRUMENT  MTG - MORTGAGE

FEE PAGES  24         TOTAL PAGES  24

### RECORDING FEES

| | |
|---|---|
| STATUTORY CHARGE | $6.00 |
| RECORDING CHARGE | $72.00 |
| RECORD MGT. FUND | $19.00 |
| RP 5217 | $0.00 |
| TP-584 | $0.00 |
| CROSS REFERENCE | $0.00 |
| MISCELLANEOUS | $0.00 |
| TOTAL FEES PAID | $97.00 |

### TRANSFER TAXES

| | |
|---|---|
| CONSIDERATION | $0.00 |
| TAX PAID | $0.00 |
| TRANSFER TAX # | |

RECORDING DATE       04/07/2005
        TIME          10:16:00

### MORTGAGE TAXES

| | |
|---|---|
| MORTGAGE DATE | 02/09/2005 |
| MORTGAGE AMOUNT | $920,250.00 |
| EXEMPT | Yes |
| COUNTY TAX | $2,300.50 |
| YONKERS | $0.00 |
| BASIC | $4,601.00 |
| ADDITIONAL | $2,275.50 |
| SUBTOTAL | $9,177.00 |
| MTA | $2,300.50 |
| SPECIAL | $0.00 |
| TOTAL PAID | $11,477.50 |

SERIAL NUMBER          CV88824
DWELLING                1-2 Family

THE PROPERTY IS SITUATED IN
WESTCHESTER COUNTY, NEW YORK IN THE:

**TOWN OF EASTCHESTER**

WITNESS MY HAND AND OFFICIAL SEAL

*Leonard N. Spano*

LEONARD N. SPANO
WESTCHESTER COUNTY CLERK

STATE OF NEW YORK, COUNTY OF WESTCHESTER SS.
I, TIMOTHY C. IDONI, COUNTY CLERK AND CLERK OF THE SUPREME AND COUNTY COURTS,
WESTCHESTER COUNTY DO HEREBY CERTIFY THAT I HAVE COMPARED THIS COPY WITH THE ORIGINAL
THEREOF RECORDED IN MY OFFICE ON  4-7-05  AND THAT THE SAME IS A
CORRECT TRANSCRIPT THEREFROM AND OF THE WHOLE OF SUCH ORIGINAL.
IN WITNESS WHEREOF, I HAVE HEREUNTO SET MY HAND AND AFFIXED MY OFFICIAL SEAL

10-23-2018

Record & Return to:
INDYMAC BANK FSB
3465 E FOOTHILL BLVD
PASADENA, CA 91107

MP - 0091

238

**After recording please return to:**
IndyMac Bank, F.S.B. c/o Document
Management

*[Company Name]*

*[Name of Natural Person]*
3465 E. Foothill Blvd.

*[Street Address]*
Pasadena, CA 91107

*[City, State  Zip Code]*

Section #  42  Title # BA - Q5-2 088
Block #  9  County Westchester
Lot#  23  Town/City Eastchester

BLACKACRE TITLE AGENCY CORP.
399 KNOLLWOOD ROAD, SUITE 201
WHITE PLAINS, NY 10603
TEL: (914) 993-3344 FAX: (914) 993-1433

———————— *[Space Above This Line For Recording Data]* ————————

# MORTGAGE

MIN:  100055401208428930

## WORDS USED OFTEN IN THIS DOCUMENT

(A)  "Security Instrument." This document, which is dated     February  9, 2005
together with all Riders to this document, will be called the "Security Instrument."

(B)  "Borrower." Michele Pizzuti - Michelle Pizzuti

, whose address is  46 Glen Road, Eastchester,
NY 10709
sometimes will be called "Borrower" and sometimes simply "I" or "me."

(C)  "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting
solely as a nominee for Lender and Lender's successors and assigns. MERS is organized and existing under the
laws of Delaware, and has an address and telephone number of 1313 Milley Rd. Flint, MI 48501-2026,
tel. (888) 679-MERS.  FOR PURPOSES OF RECORDING THIS MORTGAGE, MERS IS THE
MORTGAGEE OF RECORD.

(D)  "Lender." IndyMac Bank, F.S.B., a federally chartered savings bank
                                                will be called "Lender."   Lender is a corporation or
association which exists under the laws of          United States of America          . Lender's
address is  155 North Lake Avenue, Pasadena, CA 91101

(E)  "Note." The note signed by Borrower and dated          February  9, 2005
will be called the "Note." The Note shows that I owe Lender : nine hundred twenty thousand two
hundred fifty and NO/100ths                            Dollars (U.S. $  920,250.00         )
plus interest and other amounts that may be payable. I have promised to pay this debt in Periodic Payments and to
pay the debt in full by        March  1, 2035

Loan No: 120842893
New York Mortgage-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          MERS Modified Form 3033 01/01
—THE COMPLIANCE SOURCE, INC.—                                    Page 1 of 17          14301NY 08/00 (Rev. 06/03)
www.compliancesource.com                                                      ©2000, The Compliance Source, Inc.

Said premises is or will be
improved by a 1 or 2 family
dwelling only.

MP - 0092

(F)     **"Property."**  The property that is described below in the section titled "Description of the Property," will be called the "Property."

(G)     **"Loan."**  The "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(H)     **"Sums Secured."**  The amounts described below in the section titled "Borrower's Transfer to Lender of Rights in the Property" sometimes will be called the "Sums Secured."

(I)     **"Riders."**  All Riders attached to this Security Instrument that are signed by Borrower will be called "Riders." The following Riders are to be signed by Borrower *[check box as applicable]*:

| | | |
|---|---|---|
| [XX] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] Biweekly Payment Rider |
| [ ] 1-4 Family Rider | [ ] Revocable Trust Rider | |
| [ ] Other(s) *[specify]* | | |

(J)     **"Applicable Law."**  All controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable, judicial opinions will be called "Applicable Law."

(K)     **"Community Association Dues, Fees, and Assessments."**  All dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization will be called "Community Association Dues, Fees, and Assessments."

(L)     **"Electronic Funds Transfer."**  "Electronic Funds Transfer" means any transfer of money, other than by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Some common examples of an Electronic Funds Transfer are point-of-sale transfers (where a card such as an asset or debit card is used at a merchant), automated teller machine (or ATM) transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M)     **"Escrow Items."**  Those items that are described in Section 3 will be called "Escrow Items."

(N)     **"Miscellaneous Proceeds."**  "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than Insurance Proceeds paid under the coverage described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) Condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of Condemnation or sale to avoid Condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property. A taking of the Property by any governmental authority by eminent domain is known as "Condemnation."

(O)     **"Mortgage Insurance."**  "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P)     **"Periodic Payment."**  The regularly scheduled amount due for (i) principal and interest under the Note, and (ii) any amounts under Section 3 will be called "Periodic Payment."

(Q)     **"RESPA."**  "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any

Loan No: 120842893

additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

## BORROWER'S TRANSFER TO LENDER OF RIGHTS IN THE PROPERTY

I mortgage, grant and convey the Property to MERS (solely as nominee for Lender and Lender's successors in interest) and its successors in interest subject to the terms of this Security Instrument. This means that, by signing this Security Instrument, I am giving Lender those rights that are stated in this Security Instrument and also those rights that Applicable Law gives to lenders who hold mortgages on real property. I am giving Lender these rights to protect Lender from possible losses that might result if I fail to:

> (A) Pay all the amounts that I owe Lender as stated in the Note including, but not limited to, all renewals, extensions and modifications of the Note;

> (B) Pay, with interest, any amounts that Lender spends under this Security Instrument to protect the value of the Property and Lender's rights in the Property; and

> (C) Keep all of my other promises and agreements under this Security Instrument and the Note.

I understand and agree that MERS holds only legal title to the rights granted by me in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right:

> (A) to exercise any or all of those rights, including, but not limited to, the right to foreclose and sell the Property; and

> (B) to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

## DESCRIPTION OF THE PROPERTY

I give MERS (solely as nominee for Lender and Lender's successors in interest) rights in the Property described in (A) through (G) below:

> (A) The Property which is located at        267 Dante Avenue
>                                                      *[Street]*
>        Tuckahoe             , New York        10707            . This Property is in
>   *[City, Town or Village]*                  *[Zip Code]*
>        Westchester                    County. It has the following legal description:
> Legal description attached hereto and made a part hereof.

> (B) All buildings and other improvements that are located on the Property described in subsection (A) of this section;

Loan No: 120842893

(C)  All rights in other property that I have as owner of the Property described in subsection (A) of this section. These rights are known as "easements and appurtenances attached to the Property;"

(D)  All rights that I have in the land which lies in the streets or roads in front of, or next to, the Property described in subsection (A) of this section;

(E)  All fixtures that are now or in the future will be on the Property described in subsections (A) and (B) of this section;

(F)  All of the rights and property described in subsections (B) through (E) of this section that I acquire in the future; and

(G)  All replacements of or additions to the Property described in subsections (B) through (F) of this section and all Insurance Proceeds for loss or damage to, and all Miscellaneous Proceeds of the Property described in subsections (A) through (F) of this section.

**BORROWER'S RIGHT TO MORTGAGE THE PROPERTY AND BORROWER'S OBLIGATION TO DEFEND OWNERSHIP OF THE PROPERTY**

I promise that:  (A) I lawfully own the Property; (B) I have the right to mortgage, grant and convey the Property to Lender; and (C) there are no outstanding claims or charges against the Property, except for those which are of public record.

I give a general warranty of title to Lender.  This means that I will be fully responsible for any losses which Lender suffers because someone other than myself has some of the rights in the Property which I promise that I have.  I promise that I will defend my ownership of the Property against any claims of such rights.

**PLAIN LANGUAGE SECURITY INSTRUMENT**

This Security Instrument contains promises and agreements that are used in real property security instruments all over the country.  It also contains other promises and agreements that vary in different parts of the country.  My promises and agreements are stated in "plain language."

**COVENANTS**

I promise and I agree with Lender as follows:
1.    **Borrower's Promise to Pay.**  I will pay to Lender on time principal and interest due under the Note and any prepayment, late charges and other amounts due under the Note.  I will also pay all amounts for Escrow Items under Section 3 of this Security Instrument.

Payments due under the Note and this Security Instrument shall be made in U.S. currency.  If any of my payments by check or other payment instrument is returned to Lender unpaid, Lender may require my payment be made by:  (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location required in the Note, or at another location designated by Lender under Section 15 of this Security Instrument.  Lender may return or accept any payment or partial payment if it is for an amount that is less than the amount that is then due.  If Lender accepts a lesser payment, Lender may refuse to accept a lesser payment that I may make in the future and does not waive any of its rights.  Lender is not obligated to apply such lesser payments when it accepts such payments.  If interest on principal accrues as if all Periodic Payments had been paid when due, then Lender need not pay interest on unapplied funds.  Lender may hold such unapplied funds until I make payments to bring the Loan current.  If I do

New York Mortgage-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                                    MERS Modified Form 3033  01/01
—THE COMPLIANCE SOURCE, INC.—                                    Page 4 of 17                                    14301NY 08/00 (Rev. 06/03)
www.compliancesource.com                                                                                             ©2000, The Compliance Source, Inc.

not do so within a reasonable period of time, Lender will either apply such funds or return them to me. In the event of foreclosure, any unapplied funds will be applied to the outstanding principal balance immediately prior to foreclosure. No offset or claim which I might have now or in the future against Lender will relieve me from making payments due under the Note and this Security Instrument or keeping all of my other promises and agreements secured by this Security Instrument.

2.   **Application of Borrower's Payments and Insurance Proceeds.**   Unless Applicable Law or this Section 2 requires otherwise, Lender will apply each of my payments that Lender accepts in the following order:
First, to pay interest due under the Note;
Next, to pay principal due under the Note; and
Next, to pay the amounts due Lender under Section 3 of this Security Instrument.
Such payments will be applied to each Periodic Payment in the order in which it became due.
Any remaining amounts will be applied as follows:
First, to pay any late charges;
Next, to pay any other amounts due under this Security Instrument; and
Next, to reduce the principal balance of the Note.
If Lender receives a payment from me for a late Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the late Periodic Payment and the late charge. If more than one Periodic Payment is due, Lender may apply any payment received from me: First, to the repayment of the Periodic Payments that are due if, and to the extent that, each payment can be paid in full; Next, to the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due.
Voluntary prepayments will be applied as follows: First, to any prepayment charges; and Next, as described in the Note.
Any application of payments, Insurance Proceeds, or Miscellaneous Proceeds to principal due under the Note will not extend or postpone the due date of the Periodic Payments or change the amount of those payments.

3.   **Monthly Payments For Taxes And Insurance.**
(a)   **Borrower's Obligations.**   I will pay to Lender all amounts necessary to pay for taxes, assessments, water charges, sewer rents and other similar charges, ground leasehold payments or rents (if any), hazard or property insurance covering the Property, flood insurance (if any), and any required Mortgage Insurance, or a Loss Reserve as described in Section 10 in the place of Mortgage Insurance. Each Periodic Payment will include an amount to be applied toward payment of the following items which are called "Escrow Items:"
(1)   The taxes, assessments, water charges, sewer rents and other similar charges, on the Property which under Applicable Law may be superior to this Security Instrument as a lien on the Property. Any claim, demand or charge that is made against property because an obligation has not been fulfilled is known as a "Lien;"
(2)   The leasehold payments or ground rents on the Property (if any);
(3)   The premium for any and all insurance required by Lender under Section 5 of this Security Instrument;
(4)   The premium for Mortgage Insurance (if any);
(5)   The amount I may be required to pay Lender under Section 10 of this Security Instrument instead of the payment of the premium for Mortgage Insurance (if any); and
(6)   If required by Lender, the amount for any Community Association Dues, Fees, and Assessments.
After signing the Note, or at any time during its term, Lender may include these amounts as Escrow Items. The monthly payment I will make for Escrow Items will be based on Lender's estimate of the annual amount required.
I will pay all of these amounts to Lender unless Lender tells me, in writing, that I do not have to do so, or unless Applicable Law requires otherwise. I will make these payments on the same day that my Periodic Payments of principal and interest are due under the Note.
The amounts that I pay to Lender for Escrow Items under this Section 3 will be called "Escrow Funds." I will pay Lender the Escrow Funds for Escrow Items unless Lender waives my obligation to pay the Escrow Funds for any or all Escrow Items. Lender may waive my obligation to pay to Lender Escrow Funds for any or all Escrow Items at any time. Any such waiver must be in writing. In the event of such waiver, I will pay directly, when and

where payable, the amounts due for any Escrow Items for which payment of Escrow Funds has been waived by Lender and, if Lender requires, will promptly send to Lender receipts showing such payment within such time period as Lender may require. My obligation to make such payments and to provide receipts will be considered to be a promise and agreement contained in this Security Instrument, as the phrase "promises and agreements" is used in Section 9 of this Security Instrument. If I am obligated to pay Escrow Items directly, pursuant to a waiver, and I fail to pay the amount due for an Escrow Item, Lender may pay that amount and I will then be obligated under Section 9 of this Security Instrument to repay to Lender. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 of this Security Instrument and, upon the revocation, I will pay to Lender all Escrow Funds, and in amounts, that are then required under this Section 3.

I promise to promptly send to Lender any notices that I receive of Escrow Item amounts to be paid. Lender will estimate from time to time the amount of Escrow Funds I will have to pay by using existing assessments and bills and reasonable estimates of the amount I will have to pay for Escrow Items in the future, unless Applicable Law requires Lender to use another method for determining the amount I am to pay.

Lender may, at any time, collect and hold Escrow Funds in an amount sufficient to permit Lender to apply the Escrow Funds at the time specified under RESPA. Applicable Law puts limits on the total amount of Escrow Funds Lender can at any time collect and hold. This total amount cannot be more than the maximum amount a lender could require under RESPA. If there is another Applicable Law that imposes a lower limit on the total amount of Escrow Funds Lender can collect and hold, Lender will be limited to the lower amount.

**(b) Lender's Obligations.** Lender will keep the Escrow Funds in a savings or banking institution which has its deposits insured by a federal agency, instrumentality, or entity, or in any Federal Home Loan Bank. If Lender is such a savings or banking institution, Lender may hold the Escrow Funds. Lender will use the Escrow Funds to pay the Escrow Items no later than the time allowed under RESPA or other Applicable Law. Lender will give to me, without charge, an annual accounting of the Escrow Funds. That accounting will show all additions to and deductions from the Escrow Funds and the reason for each deduction.

Lender may not charge me for holding or keeping the Escrow Funds, for using the Escrow Funds to pay Escrow Items, for making a yearly analysis of my payment of Escrow Funds or for receiving, or for verifying and totaling assessments and bills. However, Lender may charge me for these services if Lender pays me interest on the Escrow Funds and if Applicable Law permits Lender to make such a charge. Lender will not be required to pay me any interest or earnings on the Escrow Funds unless either (1) Lender and I agree in writing that Lender will pay interest on the Escrow Funds, or (2) Applicable Law requires Lender to pay interest on the Escrow Funds.

**(c) Adjustments to the Escrow Funds.** Under Applicable Law, there is a limit on the amount of Escrow Funds Lender may hold. If the amount of Escrow Funds held by Lender exceeds this limit, then there will be an excess amount and RESPA requires Lender to account to me in a special manner for the excess amount of Escrow Funds.

If, at any time, Lender has not received enough Escrow Funds to make the payments of Escrow Items when the payments are due, Lender may tell me in writing that an additional amount is necessary. I will pay to Lender whatever additional amount is necessary to pay the Escrow Items when the payments are due, but the number of payments will not be more than 26.

When I have paid all of the Sums Secured, Lender will promptly refund to me any Escrow Funds that are then being held by Lender.

**4.    Borrower's Obligation to Pay Charges, Assessments And Claims.** I will pay all taxes, assessments, water charges, sewer rents and other similar charges, and any other charges and fines that may be imposed on the Property and that may be superior to this Security Instrument. I will also make ground rents or payments due under my lease if I am a tenant on the Property and Community Association Dues, Fees, and Assessments (if any) due on the Property. If these items are Escrow Items, I will do this by making the payments as described in Section 3 of this Security Instrument. In this Security Instrument, the word "Person" means any individual, organization, governmental authority or other party.

I will promptly pay or satisfy all liens against the Property that may be superior to this Security Instrument. However, this Security Instrument does not require me to satisfy a superior lien if: (a) I agree, in writing, to pay the obligation which gave rise to the superior lien and Lender approves the way in which I agree to pay that obligation, but only so long as I am performing such agreement; (b) in good faith, I argue or defend against the superior lien in

a lawsuit so that in Lender's opinion, during the lawsuit, the superior lien may not be enforced, but only until the lawsuit ends; or (c) I secure from the holder of that other lien an agreement, approved in writing by Lender, that the lien of this Security Instrument is superior to the lien held by that person. If Lender determines that any part of the Property is subject to a superior lien, Lender may give Borrower a notice identifying the superior lien. Within 10 days of the date on which the notice is given, Borrower shall pay or satisfy the superior lien or take one or more of the actions mentioned in this Section 4.

Lender also may require me to pay a one-time charge for an independent real estate tax reporting service used by Lender in connection with the Loan, unless Applicable Law does not permit Lender to make such a charge.

**5. Borrower's Obligation to Maintain Hazard Insurance or Property Insurance.** I will obtain hazard or property insurance to cover all buildings and other improvements that now are, or in the future will be, located on the Property. The insurance will cover loss or damage caused by fire, hazards normally covered by "Extended Coverage" hazard insurance policies, and any other hazards for which Lender requires coverage, including, but not limited to earthquakes and floods. The insurance will be in the amounts (including, but not limited to, deductible levels) and for the periods of time required by Lender. What Lender requires under the last sentence can change during the term of the Loan. I may choose the insurance company, but my choice is subject to Lender's right to disapprove. Lender may not disapprove my choice unless the disapproval is reasonable. Lender may require me to pay either (a) a one-time charge for flood zone determination, certification and tracking services, or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect the flood zone determination or certification. If I disagree with the flood zone determination, I may request the Federal Emergency Management Agency to review the flood zone determination and I promise to pay any fees charged by the Federal Emergency Management Agency for its review.

If I fail to maintain any of the insurance coverages described above, Lender may obtain insurance coverage, at Lender's option and my expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage will cover Lender, but might or might not protect me, my equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. I acknowledge that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that I could have obtained. Any amounts disbursed by Lender under this Section 5 will become my additional debt secured by this Security Instrument. These amounts will bear interest at the interest rate set forth in the Note from the date of disbursement and will be payable with such interest, upon notice from Lender to me requesting payment.

All of the insurance policies and renewals of those policies will include what is known as a "Standard Mortgage Clause" to protect Lender and will name Lender as mortgagee and/or as an additional loss payee. The form of all policies and renewals will be acceptable to Lender. Lender will have the right to hold the policies and renewal certificates. If Lender requires, I will promptly give Lender all receipts of paid premiums and renewal notices that I receive.

If I obtain any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy will include a Standard Mortgage Clause and will name Lender as mortgagee and/or as an additional loss payee.

If there is a loss or damage to the Property, I will promptly notify the insurance company and Lender. If I do not promptly prove to the insurance company that the loss or damage occurred, then Lender may do so.

The amount paid by the insurance company for loss or damage to the Property is called "Insurance Proceeds." Unless Lender and I otherwise agree in writing, any Insurance Proceeds, whether or not the underlying insurance was required by Lender, will be used to repair or to restore the damaged Property unless: (a) it is not economically feasible to make the repairs or restoration; (b) the use of the Insurance Proceeds for that purpose would lessen the protection given to Lender by this Security Instrument; or (c) Lender and I have agreed in writing not to use the Insurance Proceeds for that purpose. During the period that any repairs or restorations are being made, Lender may hold any Insurance Proceeds until it has had an opportunity to inspect the Property to verify that the repair work has been completed to Lender's satisfaction. However, this inspection will be done promptly. Lender may make payments for the repairs and restorations in a single payment or in a series of progress payments as the work is completed. Unless Lender and I agree otherwise in writing or unless Applicable Law requires

Loan No: 120842893

New York Mortgage-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT  
—THE COMPLIANCE SOURCE, INC.—  
www.compliancesource.com

Page 7 of 17

MERS Modified Form 3033 01/01  
14301NY 08/00 (Rev. 06/03)  
©2000, The Compliance Source, Inc.

MP - 0098

otherwise, Lender is not required to pay me any interest or earnings on the Insurance Proceeds. I will pay for any public adjusters or other third parties that I hire, and their fees will not be paid out of the Insurance Proceeds. If the repair or restoration is not economically feasible or if it would lessen Lender's protection under this Security Instrument, then the Insurance Proceeds will be used to reduce the amount that I owe to Lender under this Security Instrument. Such Insurance Proceeds will be applied in the order provided for in Section 2. If any of the Insurance Proceeds remain after the amount that I owe to Lender has been paid in full, the remaining proceeds will be paid to me.

If I abandon the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If I do not answer, within 30 days, a notice from Lender stating that the insurance company has offered to settle a claim, Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 of this Security Instrument or otherwise, I give Lender my rights to any Insurance Proceeds in an amount not greater than the amounts unpaid under the Note and this Security Instrument. I also give Lender any other of my rights (other than the right to any refund of unearned premiums that I paid) under all insurance policies covering the Property, if the rights are applicable to the coverage of the Property. Lender may use the Insurance Proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6.   **Borrower's Obligations to Occupy The Property.** I will occupy the Property and use the Property as my principal residence within 60 days after I sign this Security Instrument. I will continue to occupy the Property and to use the Property as my principal residence for at least one year. The one-year period will begin when I first occupy the Property. However, I will not have to occupy the Property and use the Property as my principal residence within the time frames set forth above if Lender agrees in writing that I do not have to do so. Lender may not refuse to agree unless the refusal is reasonable. I also will not have to occupy the Property and use the Property as my principal residence within the time frames set forth above if extenuating circumstances exist which are beyond my control.

7.   **Borrower's Obligations to Maintain And Protect The Property And to Fulfill Any Lease Obligations.**

(a)   **Maintenance and Protection of the Property.** I will not destroy, damage or harm the Property, and I will not allow the Property to deteriorate. Whether or not I am residing in the Property, I will keep the Property in good repair so that it will not deteriorate or decrease in value due to its condition. Unless it is determined under Section 5 of this Security Instrument that repair is not economically feasible, I will promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or Condemnation (as described in the definition of Miscellaneous Proceeds) proceeds are paid because of loss or damage to, or Condemnation of, the Property, I will repair or restore the Property only if Lender has released those proceeds for such purposes. Lender may pay for the repairs and restoration out of proceeds in a single payment or in a series of progress payments as the work is completed. If the insurance or Condemnation proceeds are not sufficient to repair or restore the Property, I promise to pay for the completion of such repair or restoration.

(b)   **Lender's Inspection of Property.** Lender, and others authorized by Lender, may enter on and inspect the Property. They will do so in a reasonable manner and at reasonable times. If it has a reasonable purpose, Lender may inspect the inside of the home or other improvements on the Property. Before or at the time an inspection is made, Lender will give me notice stating a reasonable purpose for such interior inspection.

8.   **Borrower's Loan Application.** If, during the application process for the Loan, I, or any Person or entity acting at my direction or with my knowledge or consent, made false, misleading, or inaccurate statements to Lender about information important to Lender in determining my eligibility for the Loan (or did not provide Lender with such information), Lender will treat my actions as a default under this Security Instrument. False, misleading, or inaccurate statements about information important to Lender would include a misrepresentation of my intention to occupy the Property as a principal residence. This is just one example of a false, misleading, or inaccurate statement of important information.

9.   **Lender's Right to Protect Its Rights in The Property.** If: (a) I do not keep my promises and agreements made in this Security Instrument; (b) someone, including me, begins a legal proceeding that may significantly affect Lender's interest in the Property or rights under this Security Instrument (such as a legal proceeding in bankruptcy, in probate, for Condemnation or Forfeiture, proceedings which could give a Person rights

Loan No:  120842893

New York Mortgage-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.—                        Page 8 of 17
www.compliancesource.com

MERS Modified Form 3033  01/01
1430INY  08/00 (Rev. 06/03)
©2000, The Compliance Source, Inc.

which could equal or exceed Lender's interest in the Property or under this Security Instrument, proceedings for enforcement of a lien which may become superior to this Security Instrument, or to enforce laws or regulations); or (c) I have abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and Lender's rights under this Security Instrument.

Lender's actions may include, but are not limited to: (a) protecting and/or assessing the value of the Property; (b) securing and/or repairing the Property; (c) paying sums to eliminate any lien against the Property that may be equal or superior to this Security Instrument; (d) appearing in court; and (e) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Lender can also enter the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, have utilities turned on or off, and take any other action to secure the Property. Although Lender may take action under this Section 9, Lender does not have to do so and is under no duty to do so. I agree that Lender will not be liable for not taking any or all actions under this Section 9.

I will pay to Lender any amounts, with interest, which Lender spends under this Section 9. I will pay those amounts to Lender when Lender sends me a notice requesting that I do so. I will pay interest on those amounts at the interest rate set forth in the Note. Interest on each amount will begin on the date that the amount is spent by Lender. This Security Instrument will protect Lender in case I do not keep this promise to pay those amounts with interest.

If I do not own, but am a tenant on the Property, I will fulfill all my obligations under my lease. I also agree that, if I acquire the full title (sometimes called "Fee Title") to the Property, my lease interest and the Fee Title will not merge unless Lender agrees to the merger in writing.

10. Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan, I will pay the premiums for the Mortgage Insurance. If, for any reason, the Mortgage Insurance coverage ceases to be available from the mortgage insurer that previously provided such insurance and Lender required me to make separate payments toward the premiums for Mortgage Insurance, I will pay the premiums for substantially equivalent Mortgage Insurance coverage from an alternate mortgage insurer. However, the cost of this Mortgage Insurance coverage will be substantially equivalent to the cost to me of the previous Mortgage Insurance coverage, and the alternate mortgage insurer will be selected by Lender.

If substantially equivalent Mortgage Insurance coverage is not available, Lender will establish a non-refundable "Loss Reserve" as a substitute for the Mortgage Insurance coverage. I will continue to pay to Lender every 14 days an amount equal to one-twenty-sixth of the yearly Mortgage Insurance premium (as of the time the coverage lapsed or ceased to be in effect). Lender will retain these payments, and will use these payments to pay for losses that the Mortgage Insurance would have covered. The Loss Reserve is non-refundable even if the Loan is ultimately paid in full and Lender is not required to pay me any interest on the Loss Reserve. Lender can no longer require Loss Reserve payments if: (a) Mortgage Insurance coverage again becomes available through an insurer selected by Lender; (b) such Mortgage Insurance is obtained; (c) Lender requires separately designated payments toward the premiums for Mortgage Insurance; and (d) the Mortgage Insurance coverage is in the amount and for the period of time required by Lender.

If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separate payments toward the premiums for Mortgage Insurance, I will pay the Mortgage Insurance premiums, or the Loss Reserve payments, until the requirement for Mortgage Insurance ends according to any written agreement between Lender and me providing for such termination or until termination of Mortgage Insurance is required by Applicable Law. Lender may require me to pay the premiums, or the Loss Reserve payments, in the manner described in Section 3 of this Security Instrument. Nothing in this Section 10 will affect my obligation to pay interest at the rate provided in the Note.

A Mortgage Insurance policy pays Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance policy.

Mortgage insurers assess their total risk on all Mortgage Insurance from time to time, and may enter into agreements with other parties that share or change their risk, or reduce losses. These agreements are based on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements.

Loan No: 120842893
New York Mortgage-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.—
www.compliancesource.com
Page 9 of 17
MERS Modified Form 3033 01/01
1430INY 08/00 (Rev. 06/03)
©2000, The Compliance Source, Inc.

MP - 0100

These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include Mortgage Insurance premiums).

As a result of these agreements, Lender, any owner of the Note, another insurer, any reinsurer, any other entity may receive (directly or indirectly) amounts that come from a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or changing the mortgage insurer's risk, or reducing losses. If these agreements provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." It also should be understood that: (a) any of these agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. These agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund; and (b) any of these agreements will not affect the rights Borrower has – if any – regarding the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to (a) receive certain disclosures, (b) to request and obtain cancellation of the Mortgage Insurance, (c) to have the Mortgage Insurance terminated automatically, and/or (d) to receive a refund of any Mortgage Insurance premiums that were not earned at the time of such cancellation or termination.

**11. Agreements About Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are assigned to and will be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds will be applied to restoration or repair of the Property, if (a) the restoration or repair is economically feasible, and (b) Lender's security given in this Security Instrument is not lessened. During such repair and restoration period, Lender will have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect the Property to verify that the work has been completed to Lender's satisfaction. However, the inspection will be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless Lender and I agree otherwise in writing or unless Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender will not be required to pay Borrower any interest or earnings on the Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security given in this Security Instrument would be lessened, the Miscellaneous Proceeds will be applied to the Sums Secured, whether or not then due. The excess, if any, will be paid to me. Such Miscellaneous Proceeds will be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds will be applied to the Sums Secured, whether or not then due. The excess, if any, will be paid to me.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the Sums Secured immediately before the partial taking, destruction, or loss in value, the Sums Secured will be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the Sums Secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to me.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the Sums Secured immediately before the partial taking, destruction, or loss in value, the Miscellaneous Proceeds will be applied to the Sums Secured whether or not the sums are then due.

If I abandon the Property, or if, after Lender sends me notice that the Opposing Party (as defined in the next sentence) offered to make an award to settle a claim for damages, I fail to respond to Lender within 30 days after the date the Lender gives notice, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the Sums Secured, whether or not then due. "Opposing Party" means the third party that owes me Miscellaneous Proceeds or the party against whom I have a right of action in regard to Miscellaneous Proceeds.

I will be in default under this Security Instrument if any civil or criminal action or proceeding that Lender determines could result in a court ruling (a) that would require Forfeiture of the Property, or (b) that could damage Lender's interest in the Property or rights under this Security Instrument. "Forfeiture" is a court action to require the Property, or any part of the Property, to be given up. I may correct the default by obtaining a court ruling that dismisses the court action, if Lender determines that this court ruling prevents Forfeiture of the Property and also

Loan No: 120842893

New York Mortgage-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.—
www.compliancesource.com

Page 10 of 17

MERS Modified Form 3033 01/01
1430INY 08/00 (Rev. 06/03)
©2000, The Compliance Source, Inc.

prevents any damage to Lender's interest in the Property or rights under this Security Instrument. If I correct the default, I will have the right to have enforcement of this Security Instrument discontinued, as provided in Section 19 of this Security Instrument, even if Lender has required Immediate Payment in Full. The proceeds of any award or claim for damages that are attributable to the damage or reduction of Lender's interest in the Property are assigned, and will be paid, to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property will be applied in the order provided for in Section 2.

**12. Continuation of Borrower's Obligations And of Lender's Rights.**

**(a) Borrower's Obligations.** Lender may allow me, or a Person who takes over my rights and obligations, to delay or to change the amount of the Periodic Payments. Even if Lender does this, however, I will still be fully obligated under the Note and under this Security Instrument unless Lender agrees to release me, in writing, from my obligations.

Lender may allow those delays or changes for me or a Person who takes over my rights and obligations, even if Lender is requested not to do so. Even if Lender is requested to do so, Lender will not be required to (1) bring a lawsuit against me or such a Person for not fulfilling obligations under the Note or under this Security Instrument, or (2) refuse to extend time for payment or otherwise modify amortization of the Sums Secured.

**(b) Lender's Rights.** Even if Lender does not exercise or enforce any right of Lender under this Security Instrument or under Applicable Law, Lender will still have all of those rights and may exercise and enforce them in the future. Even if: (1) Lender obtains insurance, pays taxes, or pays other claims, charges or Liens against the Property; (2) Lender accepts payments from third Persons; or (3) Lender accepts payments in amounts less than the amount then due, Lender will have the right under Section 22 below to demand that I make Immediate Payment in Full of any amounts remaining due and payable to Lender under the Note and under this Security Instrument.

**13. Obligations of Borrower And of Persons Taking Over Borrower's Rights or Obligations.** If more than one Person signs this Security Instrument as Borrower, each of us is fully obligated to keep all of Borrower's promises and obligations contained in this Security Instrument. Lender may enforce Lender's rights under this Security Instrument against each of us individually or against all of us together. This means that any one of us may be required to pay all of the Sums Secured. However, if one of us does not sign the Note: (a) that Person is signing this Security Instrument only to give that Person's rights in the Property to Lender under the terms of this Security Instrument; (b) that Person is not personally obligated to pay the Sums Secured; and (c) that Person agrees that Lender may agree with the other Borrowers to delay enforcing any of Lender's rights, to modify, or make any accommodations with regard to the terms of this Security Instrument or the Note without that Person's consent.

Subject to the provisions of Section 18 of this Security Instrument, any Person who takes over my rights or obligations under this Security Instrument in writing, and is approved by Lender in writing, will have all of my rights and will be obligated to keep all of my promises and agreements made in this Security Instrument. Borrower will not be released from Borrower's obligations and liabilities under this Security Instrument unless Lender agrees to such release in writing. Any Person who takes over Lender's rights or obligations under this Security Instrument will have all of Lender's rights and will be obligated to keep all of Lender's promises and agreements made in this Security Instrument except as provided under Section 20.

**14. Loan Charges.** Lender may charge me fees for services performed in connection with my default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. With regard to other fees, the fact that this Security Instrument does not expressly indicate that Lender may charge a certain fee does not mean that Lender cannot charge that fee. Lender may not charge fees that are prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to Applicable Law which sets maximum loan charges, and that Applicable Law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed permitted limits: (a) any such loan charge will be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without

Loan No: 120842893

New York Mortgage-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT | Page 11 of 17 | MERS Modified Form 3033 01/01

—THE COMPLIANCE SOURCE, INC.— 14301NY 08/00 (Rev. 06/03)
www.compliancesource.com ©2000, The Compliance Source, Inc.

MP - 0102

any prepayment charge (even if a prepayment charge is provided for under the Note). If I accept such a refund that is paid directly to me, I will waive any right to bring a lawsuit against Lender because of the overcharge.

**15. Notices Required under this Security Instrument.** All notices given by me or Lender in connection with this Security Instrument will be in writing. Any notice to me in connection with this Security Instrument is considered given to me when mailed by first class mail or when actually delivered to my notice address if sent by other means. Notice to any one Borrower will be notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address is the address of the Property unless I give notice to Lender of a different address. I will promptly notify Lender of my change of address. If Lender specifies a procedure for reporting my change of address, then I will only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender will be given by delivering it or by mailing it by first class mail to Lender's address stated on the first page of this Security Instrument unless Lender has given me notice of another address. Any notice in connection with this Security Instrument is given to Lender when it is actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Law That Governs this Security Instrument; Word Usage.** This Security Instrument is governed by federal law and the law of New York State. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might allow the parties to agree by contract or it might be silent, but such silence does not mean that Lender and I cannot agree by contract. If any term of this Security Instrument or of the Note conflicts with Applicable Law, the conflict will not affect other provisions of this Security Instrument or the Note which can operate, or be given effect, without the conflicting provision. This means that the Security Instrument or the Note will remain as if the conflicting provision did not exist.

As used in this Security Instrument: (a) words of the masculine gender mean and include corresponding words of the feminine and neuter genders; (b) words in the singular mean and include the plural, and words in the plural mean and include the singular; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** I will be given one copy of the Note and of this Security Instrument.

**18. Agreements about Lender's Rights If the Property Is Sold or Transferred.** Lender may require Immediate Payment in Full of all Sums Secured by this Security Instrument if all or any part of the Property, or if any right in the Property, is sold or transferred without Lender's prior written permission. If Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred without Lender's prior written permission, Lender also may require Immediate Payment in Full. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender requires Immediate Payment in Full under this Section 18, Lender will give me a notice which states this requirement. The notice will give me at least 30 days to make the required payment. The 30-day period will begin on the date the notice is given to me in the manner required by Section 15 of this Security Instrument. If I do not make the required payment during that period, Lender may act to enforce its rights under this Security Instrument without giving me any further notice or demand for payment.

**19. Borrower's Right to Have Lender's Enforcement of this Security Instrument Discontinued.** Even if Lender has required Immediate Payment in Full, I may have the right to have enforcement of this Security Instrument stopped. I will have this right at any time before the earliest of: (a) five days before sale of the Property under any power of sale granted by this Security Instrument; (b) another period as Applicable Law might specify for the termination of my right to have enforcement of the Loan stopped; or (c) a judgment has been entered enforcing this Security Instrument. In order to have this right, I will meet the following conditions:

(a) I pay to Lender the full amount that then would be due under this Security Instrument and the Note as if Immediate Payment in Full had never been required;

(b) I correct my failure to keep any of my other promises or agreements made in this Security Instrument;

(c) I pay all of Lender's reasonable expenses in enforcing this Security Instrument including, for example, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and

Loan No: 120842893

New York Mortgage-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.—                    Page 12 of 17
www.compliancesource.com

MERS Modified Form 3033 01/01
14301NY 08/00 (Rev. 05/03)
©2000, The Compliance Source, Inc.

(d) I do whatever Lender reasonably requires to assure that Lender's interest in the Property and rights under this Security Instrument and my obligations under the Note and under this Security Instrument continue unchanged.

Lender may require that I pay the sums and expenses mentioned in (a) through (d) in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer.

If I fulfill all of the conditions in this Section 19, then this Security Instrument will remain in full effect as if Immediate Payment in Full had never been required. However, I will not have the right to have Lender's enforcement of this Security Instrument discontinued if Lender has required Immediate Payment in Full under Section 18 of this Security Instrument.

**20. Note Holder's Right to Sell the Note or an Interest in the Note; Borrower's Right to Notice of Change of Loan Servicer; Lender's and Borrower's Right to Notice of Grievance.** The Note, or an interest in the Note, together with this Security Instrument, may be sold one or more times. I might not receive any prior notice of these sales.

The entity that collects the Periodic Payments and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law is called the "Loan Servicer." There may be a change of the Loan Servicer as a result of the sale of the Note. There also may be one or more changes of the Loan Servicer unrelated to a sale of the Note. Applicable Law requires that I be given written notice of any change of the Loan Servicer. The notice will state the name and address of the new Loan Servicer, and also tell me the address to which I should make my payments. The notice also will contain any other information required by RESPA or Applicable Law. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to me will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither I nor Lender may commence, join or be joined to any court action (as either an individual party or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other has not fulfilled any of its obligations under this Security Instrument, unless the other is notified (in the manner required under Section 15 of this Security Instrument) of the unfulfilled obligation and given a reasonable time period to take corrective action. If Applicable Law provides a time period which will elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to me under Section 22 and the notice of the demand for payment in full given to me under Section 22 will be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20. All rights under this paragraph are subject to Applicable Law.

**21. Continuation of Borrower's Obligations to Maintain and Protect the Property.** The federal laws and the laws of New York State that relate to health, safety or environmental protection are called "Environmental Law." Environmental Law classifies certain substances as toxic or hazardous. There are other substances that are considered hazardous for purposes of this Section 21. These substances are gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. The substances defined as toxic or hazardous by Environmental Law and the substances considered hazardous for purposes of this Section 21 are called "Hazardous Substances." "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law. An "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

I will not do anything affecting the Property that violates Environmental Law, and I will not allow anyone else to do so. I will not cause or permit Hazardous Substances to be present on the Property. I will not use or store Hazardous Substances on the Property. I also will not dispose of Hazardous Substances on the Property, or release any Hazardous Substance on the Property, and I will not allow anyone else to do so. I also will not do, nor allow anyone else to do, anything affecting the Property that: (a) is in violation of any Environmental Law; (b) creates an Environmental Condition; or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The promises in this paragraph do not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized

as appropriate for normal residential use and maintenance of the Property (including, but not limited to, Hazardous Substances in consumer products). I may use or store these small quantities on the Property. In addition, unless Environmental Law requires removal or other action, the buildings, the improvements and the fixtures on the Property are permitted to contain asbestos and asbestos-containing materials if the asbestos and asbestos-containing materials are undisturbed and "non-friable" (that is, not easily crumbled by hand pressure).

I will promptly give Lender written notice of: (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which I have actual knowledge; (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat or release of any Hazardous Substance; and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If I learn, or any governmental or regulatory authority, or any private party, notifies me that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, I will promptly take all necessary remedial actions in accordance with Environmental Law.

Nothing in this Security Instrument creates an obligation on Lender for an Environmental Cleanup.

**NON-UNIFORM COVENANTS**

I also promise and agree with Lender as follows:

**22. Lender's Rights If Borrower Fails to Keep Promises and Agreements.** Except as provided in Section 18 of this Security Instrument, if all of the conditions stated in subsections (a), (b) and (c) of this Section 22 are met, Lender may require that I pay immediately the entire amount then remaining unpaid under the Note and under this Security Instrument. Lender may do this without making any further demand for payment. This requirement is called "Immediate Payment in Full."

If Lender requires Immediate Payment in Full, Lender may bring a lawsuit to take away all of my remaining rights in the Property and have the Property sold. At this sale Lender or another person may acquire the Property. This is known as "Foreclosure and Sale." In any lawsuit for Foreclosure and Sale, Lender will have the right to collect all costs and disbursements and additional allowances allowed by Applicable Law and will have the right to add all reasonable attorneys' fees to the amount I owe Lender, which fees shall become part of the Sums Secured.

Lender may require Immediate Payment in Full under this Section 22 only if all of the following conditions are met:

(a) I fail to keep any promise or agreement made in this Security Instrument or the Note, including, but not limited to, the promises to pay the Sums Secured when due, or if another default occurs under this Security Instrument;

(b) Lender sends to me, in the manner described in Section 15 of this Security Instrument, a notice that states:

(1) The promise or agreement that I failed to keep or the default that has occurred;

(2) The action that I must take to correct that default;

(3) A date by which I must correct the default. That date will be at least 30 days from the date on which the notice is given;

(4) That if I do not correct the default by the date stated in the notice, Lender may require Immediate Payment in Full, and Lender or another Person may acquire the Property by means of foreclosure and sale;

(5) That if I meet the conditions stated in Section 19 of this Security Instrument, I will have the right to have Lender's enforcement of this Security Instrument stopped and to have the Note and this Security Instrument remain fully effective as if Immediate Payment in Full had never been required; and

(6) That I have the right in any lawsuit for Foreclosure and Sale to argue that I did keep my promises and agreements under the Note and under this Security Instrument, and to present any other defenses that I may have; and

(c) I do not correct the default stated in the notice from Lender by the date stated in that notice.

Loan No: 120842893

New York Mortgage-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT —THE COMPLIANCE SOURCE, INC.— www.compliancesource.com

Page 14 of 17

MERS Modified Form 3033 01/01 14301NY 08/00 (Rev. 06/03) ©2000, The Compliance Source, Inc.

**23. Lender's Obligation to Discharge this Security Instrument.** When Lender has been paid all amounts due under the Note and under this Security Instrument, Lender will discharge this Security Instrument by delivering a certificate stating that this Security Instrument has been satisfied. I will pay all costs of recording the discharge in the proper official records. I agree to pay a fee for the discharge of this Security Instrument, if Lender so requires. Lender may require that I pay such a fee, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted by Applicable Law.

**24. Agreements about New York Lien Law.** I will receive all amounts lent to me by Lender subject to the trust fund provisions of Section 13 of the New York Lien Law. This means that I will: (a) hold all amounts which I receive and which I have a right to receive from Lender under the Note as a trust fund; and (b) use those amounts to pay for "Cost of Improvement" (as defined in the New York Lien Law) before I use them for any other purpose. The fact that I am holding those amounts as a trust fund means that for any building or other improvement located on the Property I have a special responsibility under the law to use the amount in the manner described in this Section 24.

**25. Borrower's Statement Regarding the Property [check box as applicable].**

[X] This Security Instrument covers real property improved, or to be improved, by a one or two family dwelling only.

[ ] This Security Instrument covers real property principally improved, or to be improved, by one or more structures containing, in the aggregate, not more than six residential dwelling units with each dwelling unit having its own separate cooking facilities.

[ ] This Security Instrument does not cover real property improved as described above.

Loan No: 120842893

New York Mortgage-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.—
www.compliancesource.com
Page 15 of 17

MERS Modified Form 3033 01/01
14301NY 08/00 (Rev. 06/03)
©2000, The Compliance Source, Inc.

MP - 0106

BY SIGNING BELOW, I accept and agree to the promises and agreements contained in pages 1 through 16 of this Security Instrument and in any rider signed by me and recorded with it.

Witnesses:

_____ (Seal)
Michele Pizzuti                                    -Borrower

_____ (Seal)
Michelle Pizzuti                                   -Borrower

_____ (Seal)
                                                   -Borrower

_____ (Seal)
                                                   -Borrower

——————— [Acknowledgment on Following Page] ———————

Loan No: 120842893

New York Mortgage-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.—
www.compliancesource.com

Page 16 of 17

MERS Modified Form 3033  01/01
1430INY 08/00 (Rev. 06/03)
©2000, The Compliance Source, Inc.

State of _New York_     §
                        § ss:
County of _Westchest._   §

On the _9th_ day of _February_ in the year _2005_ before me, the undersigned, personally appeared Michele Pizzuti _& Michelle Pizzuti_

personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

Signature

(Seal)

Office

GARY BOTCHMAN
Notary Public, State of New York
No. 4901306
Qualified in Westchester County
Commission Expires June 29, 2007

Loan No: 120842893

New York Mortgage-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.—                 Page 17 of 17
www.compliancesource.com

MERS Modified Form 3033  01/01
1401NY 08/00 (Rev. 06/03)
©2000, The Compliance Source, Inc.

# EXHIBIT - 6

PENACHIO MALARA LLP
235 Main Street - Suite 600A
White Plains, NY 10601
(914) 946-2889

April 19, 2011

Re:    Engagement Letter: Chapter 11

**By US Mail**

Michael Pizzuti
Allenwood Federal Correctional Facility

Dear Michael:

This letter is intended to confirm the terms upon which you have agreed to retain this law firm to represent you in connection with your voluntary Chapter 11 proceeding. If acceptable, we request that you sign and return a copy of the letter to us. A formal retention letter is mandated by guidelines governing attorneys.

1.    PARTIES. PENACHIO MALARA LLP is sometimes hereinafter referred to as "Counsel," and "Michael Pizzuti" is sometimes hereinafter referred to as "Client."

2.    LEGAL SERVICES TO BE PROVIDED. Ordinary Services in connection with Chapter 11 case including preparation of petition and schedules, appearance at hearings, review of claims, motions to strip down liens if availalbe, loss mitigation, and confirmation.

3.    ATTORNEYS' FEES AND EXPENSES. Counsel will consult with you consistently on an ongoing basis on all matters of case strategy and keep you apprised in writing of all scheduled events. . I will be the primary attorney responsible and billing contact. My partner, Frank Malara, will also work on your case. We will use paralegals wherever appropriate.

This type of proceeding generally implicates an hourly fee structure which could range from $15,000.00 - $20,000.00, depending upon the complexity. A portion of is payable in advance and a portion of which is payable under your Chapter 11 plan. The balance depends upon how complicated your case becomes (for example, whether objectionable claims are filed, whether you wish to pursue loan

0862 / LTR / 00090220.WPD v1

Page 2

modification and whether you decide to sell your home).

A retainer fee of $7,500.00 is required. Plus the filing fee of $1,039.00. The balance is subject to Court approval.  As discussed, you may pay the retainer in installments.

4.     TERMINATION OF LEGAL SERVICES. Client has the right to terminate our services upon written notice to us.  Subject to our obligations to Client to maintain proper standards of professional conduct, we reserve the right to terminate our services for good reasons which include, but are not limited to:

(a)     if Client fails to cooperate with us in any reasonable request; or

(b)     if our continuing to act would be unethical or impractical;

5.     DISCLAIMER OF GUARANTY.  Although Counsel may offer an opinion about possible results regarding the subject matter of this agreement, Counsel cannot guarantee any particular results. Counsel have made no promises about the outcome, and any opinion offered by the Counsel in the future will not constitute a guarantee.

6.     Under certain circumstances, New York law provides clients with the right to arbitration of fee disputes pursuant to 22 N.Y.C.R.R. 137.

0862 / LTR / 00090220.WPD v1

MP  -   0246

Page 3

We appreciate the opportunity to represent you and look forward to working with you and obtaining a favorable result.

Very truly yours,

/s/ Anne Penachio

Anne Penachio

Michael Pizzuti

# EXHIBIT - 7

15-22324-rdd   Doc 17   Filed 05/26/15   Entered 05/26/15 13:18:28   Main Document
Pg 1 of 1

# United States Bankruptcy Court
## Southern District of New York

In re   **Michele Pizzuti**                                       Case No.

                                        Debtor(s)          Chapter        11

## DISCLOSURE OF COMPENSATION OF ATTORNEY FOR DEBTOR(S)

1.  Pursuant to 11 U.S.C. § 329(a) and Bankruptcy Rule 2016(b), I certify that I am the attorney for the above-named debtor and that compensation paid to me within one year before the filing of the petition in bankruptcy, or agreed to be paid to me, for services rendered or to be rendered on behalf of the debtor(s) in contemplation of or in connection with the bankruptcy case is as follows:

    For legal services, I have agreed to accept ............................................................   $        7,000.00

    Prior to the filing of this statement I have received ..............................................   $        7,000.00

    Balance Due ...........................................................................................................   $             0.00

2.  The source of the compensation paid to me was:

    ☐ Debtor      ■ Other (specify):   **Debtor's spouse**

3.  The source of compensation to be paid to me is:

    ■ Debtor      ☐ Other (specify):

4.  ■ I have not agreed to share the above-disclosed compensation with any other person unless they are members and associates of my law firm.

    ☐ I have agreed to share the above-disclosed compensation with a person or persons who are not members or associates of my law firm. A copy of the agreement, together with a list of the names of the people sharing in the compensation is attached.

5.  In return for the above-disclosed fee, I have agreed to render legal service for all aspects of the bankruptcy case, including:

    a.  Analysis of the debtor's financial situation, and rendering advice to the debtor in determining whether to file a petition in bankruptcy;
    b.  Preparation and filing of any petition, schedules, statement of affairs and plan which may be required;
    c.  Representation of the debtor at the meeting of creditors and confirmation hearing, and any adjourned hearings thereof;
    d.  [Other provisions as needed]
        **Negotiations with secured creditors to reduce to market value; exemption planning; preparation and filing of reaffirmation agreements and applications as needed;.**

6.  By agreement with the debtor(s), the above-disclosed fee does not include the following service:
    **Representation of the debtors in any dischargeability actions, judicial lien avoidances, relief from stay actions or any other adversary proceeding.**

### CERTIFICATION

    I certify that the foregoing is a complete statement of any agreement or arrangement for payment to me for representation of the debtor(s) in this bankruptcy proceeding.

Dated:   5/26/2015

                                        Anne Penachio
                                        Penachio Malara, LLP
                                        235 Main Street, 6th Floor
                                        White Plains, NY 10601
                                        914-946-2889  Fax: 914-946-2882
                                        FMalara@PMLawLLP.com

# EXHIBIT - 8

FILED: WESTCHESTER COUNTY CLERK 04/01/2013

NYSCEF DOC. NO. 24

INDEX NO. 52519/2013

RECEIVED NYSCEF: 04/01/2013

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER
-------------------------------------------------------------------X

DEUTSCHE BANK NATIONAL TRUST
COMPANY, AS TRUSTEE OF THE INDYMAC
INDX MORTGAGE LOAN TRUST 2005-AR6,
MORTGAGE PASS-THROUGH CERTIFICATES,
SERIES 2005-AR6 UNDER THE POOLING AND
SERVICING AGREEMENT DATED MARCH 1, 2005

                            Plaintiff,

        -against-

MICHELE PIZZUTI
MICHELLE PIZZUTI
FLEET NATIONAL BANK
UNITED STATES OF AMERICA
and "JOHN DOE #1" to "JOHN DOE #10," the last 10
names being fictitious and unknown to the plaintiff, the
persons or parties intended being the persons or parties,
if any, having or claiming an interest in or lien upon
the mortgaged premises described in the verified
complaint.

                         Defendants.
-------------------------------------------------------------------X

**VERIFIED ANSWER**

INDEX NO.: 52519/2013

MORTGAGED PREMISES:
267 Dante Avenue
Tuckahoe a/k/a T/O
Eastchester, NY 10707

SBL # 42-9-23

      Defendants, Michele Pizzuti and Michelle Pizzuti, (collectively referred to as

"Defendants") by their attorney, Penachio Malara, LLP, for their Answer to the Plaintiff's

complaint set forth as follows:

      1.      Defendants deny knowledge and information sufficient to form a belief as to the

truth of each and every allegation set forth in paragraphs 1, 2, 3, 4, 5, 6, 7, 9, 11, 13, 14, 15 16

and 17 of the Complaint.

      2.      Defendants deny the allegations contained in Paragraphs 8, 10, 18, 19 and 20 of

the Complaint.

      3.      Defendants admit the allegations set forth in Paragraph 12 of the Complaint.

## AS AND FOR A FIRST
## AFFIRMATIVE DEFENSE

4.      Defendants repeat and reiterate the assertions set forth in paragraphs 1 through

3 hereof as it set forth in their entirety.

5.      Upon information and belief, the Court is without personal jurisdiction over

Defendant.

## AS AND FOR A SECOND
## AFFIRMATIVE DEFENSE

6.      Defendants repeat and reiterate the assertions set forth in paragraphs 1 through

5 hereof as it set forth in their entirety.

7.      The Complaint, and each purported cause of action alleged therein, fails to state

facts sufficient to constitute a cause of action against which relief should be granted.

## AS AND FOR A THIRD
## AFFIRMATIVE DEFENSE

8.      Defendants repeat and reiterate the assertions set forth in paragraph 1 through 7

hereof as if set forth in their entirety.

9.      Plaintiff is barred and precluded from obtaining any of the relief requested in the

complaint, in whole or in part, by virtue of application of the doctrines of waiver, estoppel, and

acquiescence.

## AS AND FOR A FOURTH
## AFFIRMATIVE DEFENSE

10.     Defendants repeat and reiterate the assertions set forth in paragraph 1 through 9

hereof as if set forth in their entirety.

11.     The Plaintiff does not hold a valid claim against Defendants or Defendants' property.

## AS AND FOR A FIFTH
## AFFIRMATIVE DEFENSE

12.     Defendants repeat and reiterate the assertions set forth in paragraph 1 through 11 hereof as if set forth in their entirety.

13.     Plaintiff lacks standing to assert the relief sought.

**WHEREFORE**, Defendants demand judgment in their favor as follows:

I.      dismissing the complaint against Defendants on the merits and with prejudice;

II.     awarding them costs and disbursements of this action.

Dated: White Plains, New York
       March 26, 2013

                                        PENACHIO MALARA, LLP

                                        Anne Penachio, Esq.
                                        235 Main Street, Suite 600A
                                        White Plains, New York 10601
                                        (914) 946-2889

                                        *Attorneys for Defendants*
                                        *Michele Pizzuti and Michelle Pizzuti*

TO:  Natalie Giraldo, Esq.
     McCabe, Weisberg & Conway, P.C.
     Attorneys for Plaintiff
     145 Huguenot Street, Suite 210
     New Rochelle, NY 10801

     Michele Pizzuti
     267 Dante Avenue
     Tuckahoe a/k/a T/O Eastchester, New York 10707

Michele Pizzuti
P.O. Box 1000
White Deer, Pennsylvania 17887

Michelle Pizzuti
267 Dante Avenue
Tuckahoe a/k/a T/O Eastchester, New York 10707

Michelle Pizzuti
P.O. Box 1000
White Deer, Pennsylvania 17887

Fleet National Bank
315 Court Street
P.O. Box 3092
Utica, New York 13502

United States Attorney
Financial Litigation Unit
86 Chambers Street
New York, NY 10007

United States of America
Internal Revenue Service
290 Broadway
New York, NY 10007

"JOHN DOE NO.1" through "JOHN DOE NO. 10"
267 Dante Avenue
Tuckahoe a/k/a T/O Eastchester, New York 10707

## VERIFICATION

**MICHELLE PIZZUTI**, has read the foregoing Answer and knows the contents thereof; and that the same is true to her own knowledge except as to matters stated to be alleged on information and belief, and those matters she believes it to be true; and further that the sources of affirmant's knowledge are examination of documents.

Dated: White Plains, New York
       March 25, 2013

Michaelle Pizzuti

## ATTORNEY VERIFICATION

ANNE PENACHIO, hereby affirms under penalty of perjury as follows:

1. I am an attorney duly licensed to practice law before this Court.

2. I maintain an office in Westchester County.

3. I serve as counsel to Defendant Michele Pizzuti. Defendant Michele Pizzuti is

   currently an inmate in a U.S. Correctional Facility in Pennsylvania. As such, I verify

   that the statements set forth in the attached Answer are to the best of my knowledge,

   information and belief.

Dated: March 26, 2013
       White Plains, New York

_____
Anne Penachio

# EXHIBIT - 9

FILED: WESTCHESTER COUNTY CLERK 01/22/2014

NYSCEF DOC. NO. 46

INDEX NO. 52519/2013

RECEIVED NYSCEF: 01/22/2014

At an IAS ___ of the Supreme Court of the
State of New York, held in and for the
County of WESTCHESTER at the
Courthouse thereof, Supreme Court
Building, 111 Dr. Martin Luther King Jr.
Blvd, White Plains, New York on the 22
day of ___JAN___ 2013  2014

PRESENT:

Honorable ~~Hon. William J. Giacomo, JSC~~

J.S.C.

---------------------------------------------------------X

DEUTSCHE BANK NATIONAL TRUST COMPANY,
AS TRUSTEE OF THE INDYMAC INDX MORTGAGE
LOAN TRUST 2005-AR6, MORTGAGE PASS-
THROUGH CERTIFICATES, SERIES 2005-AR6
UNDER THE POOLING AND SERVICING
AGREEMENT DATED MARCH 1, 2005

Plaintiff,

-against-

MICHELE PIZZUTI
MICHELLE PIZZUTI
FLEET NATIONAL BANK
UNITED STATES OF AMERICA
UNITED STATES ATTORNEY
"JOHN DOE #1" to "JOHN DOE #10," the last 10 names
being fictitious and unknown to plaintiff, the persons or
parties intended being the persons or parties, if any, having
or claiming an interest in or lien upon the mortgaged
premises described in the verified complaint,

Defendants.

---------------------------------------------------------X

Index No.: 52519/2013

ORDER GRANTING
SUMMARY JUDGMENT,
DEFAULT JUDGMENT
AND APPOINTING
REFEREE TO COMPUTE

Premises:
267 Dante Ave
Tuckahoe, New York 10707

Upon reading and filing the annexed attorney's statement of Mark Golab, Esq. dated November 19, 2013, the affidavit of Diana C. Miralles, sworn to on July 8, 2013, the exhibits annexed thereto, and upon the pleadings previously had herein, and it appearing that the Defendants having been duly served with the summons and complaint, and that all the Defendants herein have defaulted in pleading, or served a notice of appearance, and no answer or motion having been directed to the sufficiency of the complaint has been interposed by any of the Defendants and their time to do so has expired except for an answer submitted by Michelle Pizzuti and Michele Pizzuti, and United States of America; and

FURTHER, it appearing that since the filing of the notice of pendency on February 26, 2013, the complaint has not been amended in any manner whatsoever; and

FURTHER, it appearing that none of the Defendants herein is an infant, incompetent or absentee, and no one other than Michelle Pizzuti and Michele Pizzuti, and United States of America is entitled to notice of this application;

NOW upon motion of McCabe, Weisberg & Conway, P.C., attorneys for plaintiff it is

ORDERED, that the motion for summary judgment is hereby granted against Michelle Pizzuti and Michele Pizzuti, and United States of America; and it is further

ORDERED, that the Answer interposed by Defendant Michelle Pizzuti and Michelle Pizzuti is hereby stricken from the record and shall be treated as a limited Notice of Appearance; and it is further

ORDERED, that pursuant to CPLR 3215 that the Plaintiff be granted a default judgment for the relief demanded in the complaint for those Defendants who were served and have not appeared, Fleet National Bank and United States Attorney; and it is further

ORDERED, that this action be and the same is hereby referred to _Teani Salotto_
Esq., of _2345 RT 52, Hopewell, Junction, N.Y._
telephone number _845-519-4273_, as Referee to ascertain and compute the amount due to
the plaintiff herein for principal, interest, and other disbursements advanced as provided for in
the note and mortgage, excluding attorney's fees, upon which this action was brought, to
examine and report whether or not the mortgaged premises can be sold in parcels, and that the
Referee make his/her report to the Court with all convenient speed; and it is further

ORDERED, that the caption be amended by striking therefrom the remaining
Defendants sued herein as "John Doe #1" to "John Doe #10", all without prejudice to the
proceedings heretofore had herein; and it is further,

ORDERED, that the caption shall read as follows:

---------------------------------------------------------X

DEUTSCHE BANK NATIONAL TRUST                    Index No: 52519/2013
COMPANY, AS TRUSTEE OF THE INDYMAC
INDX MORTGAGE LOAN TRUST 2005-AR6,
MORTGAGE PASS-THROUGH CERTIFICATES,
SERIES 2005-AR6 UNDER THE POOLING AND
SERVICING AGREEMENT DATED MARCH 1,
2005

                         Plaintiff,

                    -against-

MICHELE PIZZUTI
MICHELLE PIZZUTI
FLEET NATIONAL BANK
UNITED STATES OF AMERICA
UNITED STATES ATTORNEY

                         Defendants.
---------------------------------------------------------X

and it is further

ORDERED, that the referee's computation may be had in any county of the State of New York; and it is further

~~ORDERED that, pursuant to CPLR 8003(a)~~ ―――――――――― ~~shall be paid to the Referee for the computation stage and upon the filing of his/her report;~~ and it is further

ORDERED that the Referee is prohibited from accepting or returning any funds for him/herself or paying funds to him/herself without compliance with Part 36 of the Rules of the Chief Administrative Judge; and it is further

ORDERED, that by accepting this appointment the referee certifies that he/she is in compliance with Part 36 of the Rules of the Chief Judge (22NYCRR Part 36), including, but not limited to, section 36.2(c) ("Disqualifications from appointment"), and section 36.2(d) ("Limitations on appointments based upon compensation"); and it is further

ORDERED, that the mortgage be reformed so as to include a description of the mortgaged premises as contained in Schedule A, attached hereto, and that the Clerk of the County Westchester be authorized and directed to record a copy of the description, aforementioned, and as an original, forthwith upon submission of an attorney certified copy of the judgment or order which shall issue from this action.

ORDERED, that this motion be and the same is hereby granted, and that Plaintiff is awarded summary judgment for the relief demanded in the complaint, and for such other and further relief as this Court may deem just and proper.

~~The Referee's fees shall be:~~
~~1. $250.00 upon the report; and~~
~~2. $500.00 upon the sale~~
~~3. $250.00 on any sale~~
~~cancelled less than~~
~~48 hours notice~~

ENTER

_William J. Tucci_

J.S.C.   ~~Hon. William J. Giacomo, JSC~~

This order is effective for 90 days. This order of reference will be vacated and the case dismissed if a judgement of foreclosure and sale is not filed with this Court within that time. Upon a showing of good cause plaintiff may receive a 90-day adjournment provided the application is filed before the time to submit the judgment expires.

FILED: WESTCHESTER COUNTY CLERK 03/26/2015 05:06 PM

NYSCEF DOC. NO. 57

INDEX NO. 52519/2013

RECEIVED NYSCEF: 03/26/2015

At        an        _____ of the Supreme Court of the State of New York, held in and for the County of Westchester at the Courthouse thereof, Supreme Court Building, 111 Dr. Martin Luther King Jr. Blvd, White Plains, New York on the *24* day of *MARCH* , 2015.

P R E S E N T:

Honorable HON. WILLIAM J. GIACOMO , JSC. Justice.

SUPREME COURT THE STATE OF NEW YORK:
COUNTY OF WESTCHESTER
----------------------------------------------------------X

DEUTSCHE BANK NATIONAL TRUST
COMPANY, AS TRUSTEE OF THE INDYMAC
INDX MORTGAGE LOAN TRUST 2005-AR6,
MORTGAGE PASS-THROUGH CERTIFICATES,
SERIES 2005-AR6 UNDER THE POOLING AND
SERVICING AGREEMENT DATED MARCH 1,
2005

                              Plaintiff,

              -against-

MICHELE PIZZUTI
MICHELLE PIZZUTI
FLEET NATIONAL BANK
UNITED STATES OF AMERICA
UNITED STATES ATTORNEY

                              Defendants.
----------------------------------------------------------X

Index No: 52519/2013

FINAL JUDGMENT FOR
FORECLOSURE AND SALE

Mortgaged Premises:
267 Dante Ave
Tuckahoe, New York 10707

Upon the summons and complaint filed herein on February 26, 2013 and notice of pendency of action previously filed herein on February 26, 2013, and on the attorney affirmation in support of Mark Golab, Esq., dated November 19, 2013, demonstrating that all of the defendants have been duly served with the summons and complaint herein and the affidavits of

service of the defendant previously filed herein, and upon the Order entered herein on January 22, 2014 appointing Theoni Salotto, Esq., as referee to ascertain and compute the amount due to the plaintiff pursuant to the note and mortgage and to protect the lien of said mortgage, and to examine and report whether the mortgage premises can be sold in parcels; and

Upon reading and filing the report of the referee dated January 30, 2015 from which report it appears that the sum of $1,239,092.26 was due to plaintiff, as of September 29, 2014, on the note and mortgage described in the complaint, and that the mortgaged premises should be sold in one parcel; and

Upon reading and filing the affidavit of regularity of Deana Cheli, Esq. sworn to on February 10, 2015, from which it appears that this action was brought to foreclose a mortgage on certain real property situated in the County of Westchester and State of New York more commonly known as 267 Dante Ave, Tuckahoe, New York 10707 and that the whole amount secured by said mortgage is due and payable as computed in the aforesaid Referee's report, and that all of the defendants herein have been duly served with the summons and complaint, and upon the entry of summary judgment on plaintiff's foreclosure complaint against the defendants, and that none of the defendants is an infant, incompetent or absentee,

"Sale" is herein defined as the foreclosure auction date.

NOW, on motion of McCabe, Weisberg & Conway, P.C., attorneys for the plaintiff, it is

ORDERED, ADJUDGED and DECREED, that the report of the Referee,

Theoni Salotto, Esq., dated February 2, 2015, by and the same is hereby in all respects ratified and confirmed; and it is further

ORDERED, ADJUDGED and DECREED, that plaintiff is entitled to judgment establishing the validity of said mortgage and that the plaintiff if entitled to recover upon said mortgage herein the sum of $1,239,092.26, with interest thereon from Tuesday, September 30, 2014 to date of the closing of title of the referee's sale of the mortgaged premises, and also any amount paid by plaintiff for local realty taxes, water charges and assessments, hazard and F.H.A. Insurance, and the preservation or protection of the property; and it is further

ORDERED, ADJUDGED and DECREED, that said premises affected by said mortgage set forth in the complaint herein and hereinafter set forth, constituting one parcel to be sold in one parcel at public auction, at _LOBBY OF 111 DR. MARTIN LUTHER KING JR. BLVD. WHITE PLAINS, N.Y._ under the direction of Theoni Salotto, Referee, and that said Referee give public notice of the time and place of sale according to law and the rules and practice of this Court by publishing the notice of sale in the ___JOURNAL NEWS___ and that plaintiff on such sale, or any other party to this action, may become purchaser, the payment of all taxes, transfer fees and costs, including New York State and local Transfer taxes and the cost of the deed stamps to be attached to the Referee's Deed shall be paid by the Purchaser. Any and all maintenance fees and assessments, taxes, water rates, and any fees associated with the transfer of title for the subject premises accrued from the Sale date forward are the obligation of the purchaser; and that said Referee shall sell and convey said premises subject to the following:

1.     Any state of fact which would be shown by an accurate survey;

MP - 0215

2.     All covenants, restrictions, easements, agreements and reservations, if any, or record, and to any violations thereof;

3.     Any and all building and zoning regulations, restrictions and ordinances of the municipality in which said premises are situated, and any violations of the same;

4.     Any and all orders or requirements issued by any governmental body having jurisdiction against or affecting said premises pursuant to Title 28; Section 2410 of the United States Code; and

5.     The Right, if any, of the United States of America to redeem the premises pursuant to Title 28; Section 2410 of the United States Code; and

6.     The physical condition of any building or structure on the premises as of the date of sale hereunder; that said Referee shall then deposit the balance of such proceeds in his/her own name as referee and shall thereafter make the following payments, and his checks drawn for such purpose shall be paid by said depository; and

7.     Any prior outstanding mortgages or liens that may exist on the subject premises.

First:  He shall pay a sum not exceeding $500.00 for said Referee's fees as provided in Section 8003 (b) of the Civil Practice Law and Rules.

Second:  Unless the mortgaged premises are hereby specifically ordered to be sold subject to the same, he shall pay all local realty taxes, water rates and assessments which are or shall become liens on said premises to the date of sale, and redeem any such liens that may be sold.

Third:  He shall pay the advertising and posting expenses shown by the bills presented and certified by said Referee to be corrected.

Fourth:  He shall pay to the plaintiff or plaintiff's attorney the sum of $2,505.00 adjudged to plaintiff for the costs and disbursements of this action, to be taxed by the Clerk of the Court ~~and an additional allowance of $_____ awarded to plaintiff or plaintiff's attorney in addition to costs with interest thereon~~, and an amount of

$ _3000 00/xx_____ to plaintiff's attorneys for reasonable attorneys' fees as provided in the note and mortgage, and also the sum of $1,239,092.26 the amount reported due as aforesaid, together with interest thereon from Tuesday, September 30, 2014 to the date of the closing of title of the referee's sale of the mortgaged premises, and also any amounts paid by plaintiff for any hazard and F.H.A. Insurance, or the preservation of the property and, unless the premises are sold thereto, any payments necessary to satisfy all local realty taxes, water and other municipal charges and assessments, and that he take a receipt or affidavit thereof and file it with his report of sale.

      Fifth:   He shall, within five days after the same shall be received and be ascertainable, place on deposit with the Clerk of the County of Westchester the surplus money, if any, to the credit of this action, to be withdrawn only on an order of this Court signed by a Justice of this Court;

      Sixth:   In the absence of the designated Referee, the court will designate a substitute Referee forthwith, and it is further

      ORDERED, ADJUDGED and DECREED, that said Referee make a report of sale and file it with the Clerk of the County of Westchester within 30 days of completing the sale and executing the proper conveyance to the purchasers; and that the purchaser or purchasers at such sale be forthwith let into possession on production of the Referee's Deed; and it is further

      ORDERED, ADJUDGED AND DECREED that the Referee deposit all funds received pursuant to this Order in his/her own name as Referee in Referee's I.O.L.A. account maintained for legal clients at a bank within the state of New York or in an FDIC-insured bank of the Referee's choice within the state of New York, and it is further

ORDERED, ADJUDGED and DECREED, that in case the plaintiff shall become the purchaser of the Premises directed to be sold at an amount equal to or less than the amount due under this judgment with costs, allowance and expenses, the payment by the plaintiff to said Referee of the sum bid by it for said Premises or any part thereof, is hereby dispensed with, and that the plaintiff shall be given due credit and allowance by said Referee for the amount due, and that plaintiff before the delivery of the deed to it, shall pay the fee of the Referee and the expenses of sale and costs and allowance, all as provided for above, and all local realty taxes, assessments and water rents which may be a lien upon said Premises at the time of such sale, unless the Premises are sold subject thereto; and it is further

ORDERED, ADJUDGED and DECREED, that each and all of the defendants in this action, and also all persons claiming under them or any of them, after the filing of a notice of pendency of action, be and same hereby are forever barred and foreclosed of all right, claim, lien, title, interest and equity of redemption in said premises and every part thereof, except nothing herein shall bar any right of the United States of America to redeem as provided in Title 28 of the United States Code, Section 2410; and it is further

ORDERED, ADJUDGED and DECREED, that in the event that the plaintiff shall elect to accept a purchase money mortgage from any purchaser or purchasers at such sale, the amount thereof shall be credited against the amount due the plaintiff under this judgment, and that the purchaser, or purchasers, shall not be required to pay the same in cash, but shall be credited upon its bid with such amount, and that the Referee take plaintiff's receipt for such amount and file it with his report of sale; and it is further

ORDERED, ADJUDGED AND DECREED, that to ensure that the Foreclosure Action Surplus Monies Form was timely filed and any surplus funds appropriately deposited, a

conference will be scheduled within 90 days from the date of this Order.  If the form has been timely filed with this Court and the Clerk's Office, a conference will not be scheduled; and it is further

ORDERED, ADJUDGED and DECREED, that by accepting this appointment the referee certifies that he/she is in compliance with Part 36 of the Rules of the Chief Judge (22NYCRR Part 36), including, but not limited to, section 36.2(c) ("Disqualifications from appointment"), and section 36.2(d) ("Limitations on appointments based upon compensation").

THAT a particular description of said premises described in said mortgage and to be sold by said referee is annexed hereto as Exhibit A.

ENTER

HON. WILLIAM J. GIACOMO
J.S.C.          J.S.C.

03-26-2015

**Schedule A Description**

Page    1

Title Number ░░░░░░░░

Section 42 Block 9 Lot 23, in the Town of Eastchester, County of Westchester

ALL that certain plot, peice or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in teh Village of Tuckahoe, Town of Eastchester and County of Westchester, State of New York, being known and designated as Lots 14, 15, 16, 17, 18 and Part of Lot 19 in Block 102, on a certain map entitled, "Map of Hollywood", dated March 1911 and filed in the Westchester County Clerk's Office on April 12, 1911 as Map No. 1938, which said lots and part of lot are more particularly bounded and described as follows:

BEGINNING at a point on the northerly side of Dante Avenue distant 305 feet easterly from the easterly end of a curve having a radius of 17.50 feet connecting the northerly side of Dante Avenue with the easterly side of Exit Road;

RUNNING thence through Lot 19 on said map, North 8 degrees 24 feet 19 inches West 127 feet to a point;

RUNNING thence along the northerly line of Lots 19, 18, 171 16 15 and 14 the following courses and distances:

South 89 degrees 52 feet 56 inches East 51.94 feet;

South 80 degrees 16 feet 50 inches East 65.86 feet; and

South 73 degrees 27 feet 05 inches East 18.84 feet to the westerly line of Lot 13 on said map;

RUNNING thence along the westerly line of Lot 13 South 0 degrees 55 feet 02 inches West 103.47 feet to the northerly side of Dante Avenue;

RUNNING thence along the northerly side of Dante Avenue in a westerly direction on a curve to the left having a radius of 681.13 feet a distance of 115 feet to the point or place of BEGINNING.

# EXHIBIT - 10

B1 (Official Form 1)(04/13)

| United States Bankruptcy Court<br>Southern District of New York | Voluntary Petition |
|---|---|

| Name of Debtor (if individual, enter Last, First, Middle):<br>**Pizzuti, Michele** | Name of Joint Debtor (Spouse) (Last, First, Middle): |
|---|---|
| All Other Names used by the Debtor in the last 8 years<br>(include married, maiden, and trade names):<br>**AKA Michael Pizzuti** | All Other Names used by the Joint Debtor in the last 8 years<br>(include married, maiden, and trade names): |
| Last four digits of Soc. Sec. or Individual-Taxpayer I.D. (ITIN)/Complete EIN<br>(if more than one, state all)<br>**xxx-xx-7247** | Last four digits of Soc. Sec. or Individual-Taxpayer I.D. (ITIN) No./Complete EIN<br>(if more than one, state all) |
| Street Address of Debtor (No. and Street, City, and State):<br>**46 Glen Road<br>Eastchester, NY**<br>ZIP Code<br>**10709** | Street Address of Joint Debtor (No. and Street, City, and State):<br>ZIP Code |
| County of Residence or of the Principal Place of Business:<br>**Westchester** | County of Residence or of the Principal Place of Business: |
| Mailing Address of Debtor (if different from street address):<br>**Low Security Correctional Institution<br>Allenwood<br>PO Box 1000<br>White Deer, PA**<br>ZIP Code<br>**17887** | Mailing Address of Joint Debtor (if different from street address):<br>ZIP Code |
| Location of Principal Assets of Business Debtor<br>(if different from street address above): | |

| Type of Debtor<br>(Form of Organization) (Check one box) | Nature of Business<br>(Check one box) | Chapter of Bankruptcy Code Under Which<br>the Petition is Filed (Check one box) |
|---|---|---|
| ■ Individual (includes Joint Debtors)<br>*See Exhibit D on page 2 of this form.*<br>☐ Corporation (includes LLC and LLP)<br>☐ Partnership<br>☐ Other (If debtor is not one of the above entities,<br>check this box and state type of entity below.) | ☐ Health Care Business<br>☐ Single Asset Real Estate as defined<br>in 11 U.S.C. § 101 (51B)<br>☐ Railroad<br>☐ Stockbroker<br>☐ Commodity Broker<br>☐ Clearing Bank<br>☐ Other | ☐ Chapter 7<br>☐ Chapter 9<br>■ Chapter 11<br>☐ Chapter 12<br>☐ Chapter 13    ☐ Chapter 15 Petition for Recognition<br>of a Foreign Main Proceeding<br><br>☐ Chapter 15 Petition for Recognition<br>of a Foreign Nonmain Proceeding |
| **Chapter 15 Debtors**<br>Country of debtor's center of main interests:<br><br>Each country in which a foreign proceeding<br>by, regarding, or against debtor is pending: | **Tax-Exempt Entity**<br>(Check box, if applicable)<br>☐ Debtor is a tax-exempt organization<br>under Title 26 of the United States<br>Code (the Internal Revenue Code). | **Nature of Debts**<br>(Check one box)<br>☒ Debts are primarily consumer debts,<br>defined in 11 U.S.C. § 101(8) as<br>"incurred by an individual primarily for<br>a personal, family, or household purpose."    ☐ Debts are primarily<br>business debts. |

| Filing Fee (Check one box) | Chapter 11 Debtors |
|---|---|
| ■ Full Filing Fee attached<br><br>☐ Filing Fee to be paid in installments (applicable to individuals only). Must<br>attach signed application for the court's consideration certifying that the<br>debtor is unable to pay fee except in installments. Rule 1006(b). See Official<br>Form 3A.<br><br>☐ Filing Fee waiver requested (applicable to chapter 7 individuals only). Must<br>attach signed application for the court's consideration. See Official Form 3B. | Check one box:<br>☐ Debtor is a small business debtor as defined in 11 U.S.C. § 101(51D).<br>☒ Debtor is not a small business debtor as defined in 11 U.S.C. § 101(51D).<br>Check if:<br>☐ Debtor's aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates)<br>are less than $2,490,925 *(amount subject to adjustment on 4/01/16 and every three years thereafter).*<br>Check all applicable boxes:<br>☐ A plan is being filed with this petition.<br>☐ Acceptances of the plan were solicited prepetition from one or more classes of creditors,<br>in accordance with 11 U.S.C. § 1126(b). |

**Statistical/Administrative Information**      THIS SPACE IS FOR COURT USE ONLY

■ Debtor estimates that funds will be available for distribution to unsecured creditors.
☐ Debtor estimates that, after any exempt property is excluded and administrative expenses paid,
there will be no funds available for distribution to unsecured creditors.

Estimated Number of Creditors

| ■ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
|---|---|---|---|---|---|---|---|---|---|
| 1-<br>49 | 50-<br>99 | 100-<br>199 | 200-<br>999 | 1,000-<br>5,000 | 5,001-<br>10,000 | 10,001-<br>25,000 | 25,001-<br>50,000 | 50,001-<br>100,000 | OVER<br>100,000 |

Estimated Assets

| ☐ | ☐ | ☐ | ☐ | ■ | ☐ | ☐ | ☐ | ☐ | ☐ |
|---|---|---|---|---|---|---|---|---|---|
| $0 to<br>$50,000 | $50,001 to<br>$100,000 | $100,001 to<br>$500,000 | $500,001<br>to $1<br>million | $1,000,001<br>to $10<br>million | $10,000,001<br>to $50<br>million | $50,000,001<br>to $100<br>million | $100,000,001<br>to $500<br>million | $500,000,001<br>to $1 billion | More than<br>$1 billion |

Estimated Liabilities

| ☐ | ☐ | ☐ | ☐ | ■ | ☐ | ☐ | ☐ | ☐ | ☐ |
|---|---|---|---|---|---|---|---|---|---|
| $0 to<br>$50,000 | $50,001 to<br>$100,000 | $100,001 to<br>$500,000 | $500,001<br>to $1<br>million | $1,000,001<br>to $10<br>million | $10,000,001<br>to $50<br>million | $50,000,001<br>to $100<br>million | $100,000,001<br>to $500<br>million | $500,000,001<br>to $1 billion | More than<br>$1 billion |

MT – 0277

Page 2

| B1 (Official Form 1)(04/13) | Name of Debtor(s): |
|---|---|
| **Voluntary Petition** | Pizzuti, Michele |
| *(This page must be completed and filed in every case)* | |

### All Prior Bankruptcy Cases Filed Within Last 8 Years (If more than two, attach additional sheet)

| Location Where Filed:  - None - | Case Number: | Date Filed: |
|---|---|---|
| Location Where Filed: | Case Number: | Date Filed: |

### Pending Bankruptcy Case Filed by any Spouse, Partner, or Affiliate of this Debtor (If more than one, attach additional sheet)

| Name of Debtor:  - None - | Case Number: | Date Filed: |
|---|---|---|
| District: | Relationship: | Judge: |

| Exhibit A | Exhibit B |
|---|---|
| (To be completed if debtor is required to file periodic reports (e.g., forms 10K and 10Q) with the Securities and Exchange Commission pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 and is requesting relief under chapter 11.)<br><br>☐ Exhibit A is attached and made a part of this petition. | (To be completed if debtor is an individual whose debts are primarily consumer debts.)<br><br>I, the attorney for the petitioner named in the foregoing petition, declare that I have informed the petitioner that [he or she] may proceed under chapter 7, 11, 12, or 13 of title 1, United States Code, and have explained the relief available under each such chapter. I further certify that I delivered to the debtor the notice required by 11 U.S.C. §342(b).<br><br>X _____     March 1, 2015<br>Signature of Attorney for Debtor(s)          (Date)<br>Anne Penachio |

### Exhibit C

Does the debtor own or have possession of any property that poses or is alleged to pose a threat of imminent and identifiable harm to public health or safety?

☐ Yes, and Exhibit C is attached and made a part of this petition.

☑ No.

### Exhibit D

(To be completed by every individual debtor. If a joint petition is filed, each spouse must complete and attach a separate Exhibit D.)

☑ Exhibit D completed and signed by the debtor is attached and made a part of this petition.

If this is a joint petition:

☐ Exhibit D also completed and signed by the joint debtor is attached and made a part of this petition.

### Information Regarding the Debtor - Venue
(Check any applicable box)

☑ Debtor has been domiciled or has had a residence, principal place of business, or principal assets in this District for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other District.

☐ There is a bankruptcy case concerning debtor's affiliate, general partner, or partnership pending in this District.

☐ Debtor is a debtor in a foreign proceeding and has its principal place of business or principal assets in the United States in this District, or has no principal place of business or assets in the United States but is a defendant in an action or proceeding [in a federal or state court] in this District, or the interests of the parties will be served in regard to the relief sought in this District.

### Certification by a Debtor Who Resides as a Tenant of Residential Property
(Check all applicable boxes)

☐ Landlord has a judgment against the debtor for possession of debtor's residence. (If box checked, complete the following.)

_____
(Name of landlord that obtained judgment)

_____
(Address of landlord)

☐ Debtor claims that under applicable nonbankruptcy law, there are circumstances under which the debtor would be permitted to cure the entire monetary default that gave rise to the judgment for possession, after the judgment for possession was entered, and

☐ Debtor has included with this petition the deposit with the court of any rent that would become due during the 30-day period after the filing of the petition.

☐ Debtor certifies that he/she has served the Landlord with this certification. (11 U.S.C. § 362(l)).

MT - 0278

B1 (Official Form 1)(04/13)                                                                                    Page 3

| **Voluntary Petition** | Name of Debtor(s): |
|---|---|
| *(This page must be completed and filed in every case)* | Pizzuti, Michele |

<div style="text-align:center">Signatures</div>

### Signature(s) of Debtor(s) (Individual/Joint)

I declare under penalty of perjury that the information provided in this petition is true and correct.
[If petitioner is an individual whose debts are primarily consumer debts and has chosen to file under chapter 7] I am aware that I may proceed under chapter 7, 11, 12, or 13 of title 11, United States Code, understand the relief available under each such chapter, and choose to proceed under chapter 7. [If no attorney represents me and no bankruptcy petition preparer signs the petition] I have obtained and read the notice required by 11 U.S.C. §342(b).

I request relief in accordance with the chapter of title 11, United States Code, specified in this petition.

X _____
Signature of Debtor  **Michele Pizzuti**

X _____
Signature of Joint Debtor

_____
Telephone Number (If not represented by attorney)

**3/11/15**
Date

### Signature of Attorney*

X _____
Signature of Attorney for Debtor(s)
Anne Penachio
Printed Name of Attorney for Debtor(s)
**Penachio Malara, LLP**
Firm Name
**235 Main Street, 6th Floor
White Plains, NY 10601**

_____
Address

Email: FMalara@PMLawLLP.com
**914-946-2889 Fax: 914-946-2882**
Telephone Number

_____
Date
*In a case in which § 707(b)(4)(D) applies, this signature also constitutes a certification that the attorney has no knowledge after an inquiry that the information in the schedules is incorrect.

### Signature of Debtor (Corporation/Partnership)

I declare under penalty of perjury that the information provided in this petition is true and correct, and that I have been authorized to file this petition on behalf of the debtor.

The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.

X _____
Signature of Authorized Individual

_____
Printed Name of Authorized Individual

_____
Title of Authorized Individual

_____
Date

### Signature of a Foreign Representative

I declare under penalty of perjury that the information provided in this petition is true and correct, that I am the foreign representative of a debtor in a foreign proceeding, and that I am authorized to file this petition.

(Check only one box.)

☐ I request relief in accordance with chapter 15 of title 11. United States Code. Certified copies of the documents required by 11 U.S.C. §1515 are attached.

☐ Pursuant to 11 U.S.C. §1511, I request relief in accordance with the chapter of title 11 specified in this petition. A certified copy of the order granting recognition of the foreign main proceeding is attached.

X _____
Signature of Foreign Representative

_____
Printed Name of Foreign Representative

_____
Date

### Signature of Non-Attorney Bankruptcy Petition Preparer

I declare under penalty of perjury that: (1) I am a bankruptcy petition preparer as defined in 11 U.S.C. § 110; (2) I prepared this document for compensation and have provided the debtor with a copy of this document and the notices and information required under 11 U.S.C. §§ 110(b), 110(h), and 342(b); and, (3) if rules or guidelines have been promulgated pursuant to 11 U.S.C. § 110(h) setting a maximum fee for services chargeable by bankruptcy petition preparers, I have given the debtor notice of the maximum amount before preparing any document for filing for a debtor or accepting any fee from the debtor, as required in that section. Official Form 19 is attached.

_____
Printed Name and title, if any, of Bankruptcy Petition Preparer

_____
Social-Security number (If the bankruptcy petition preparer is not an individual, state the Social-Security number of the officer, principal, responsible person or partner of the bankruptcy petition preparer.)(Required by 11 U.S.C. § 110.)

_____
Address

X _____

_____
Date

Signature of bankruptcy petition preparer or officer, principal, responsible person, or partner whose Social-Security number is provided above.

Names and Social-Security numbers of all other individuals who prepared or assisted in preparing this document unless the bankruptcy petition preparer is not an individual:

If more than one person prepared this document, attach additional sheets conforming to the appropriate official form for each person.

*A bankruptcy petition preparer's failure to comply with the provisions of title 11 and the Federal Rules of Bankruptcy Procedure may result in fines or imprisonment or both. 11 U.S.C. §110; 18 U.S.C. §156.*

MT - 0279

B 1D (Official Form 1, Exhibit D) (12/09)

## United States Bankruptcy Court
### Southern District of New York

In re   **Michele Pizzuti** _____   Case No. _____
          Debtor(s)                                   Chapter   **11**

# EXHIBIT D - INDIVIDUAL DEBTOR'S STATEMENT OF COMPLIANCE WITH
# CREDIT COUNSELING REQUIREMENT

**Warning: You must be able to check truthfully one of the five statements regarding credit counseling listed below. If you cannot do so, you are not eligible to file a bankruptcy case, and the court can dismiss any case you do file. If that happens, you will lose whatever filing fee you paid, and your creditors will be able to resume collection activities against you. If your case is dismissed and you file another bankruptcy case later, you may be required to pay a second filing fee and you may have to take extra steps to stop creditors' collection activities.**

*Every individual debtor must file this Exhibit D. If a joint petition is filed, each spouse must complete and file a separate Exhibit D. Check one of the five statements below and attach any documents as directed.*

☐ 1. Within the 180 days before the filing of my bankruptcy case, I received a briefing from a credit counseling agency approved by the United States trustee or bankruptcy administrator that outlined the opportunities for available credit counseling and assisted me in performing a related budget analysis, and I have a certificate from the agency describing the services provided to me. *Attach a copy of the certificate and a copy of any debt repayment plan developed through the agency.*

☐ 2. Within the 180 days before the filing of my bankruptcy case, I received a briefing from a credit counseling agency approved by the United States trustee or bankruptcy administrator that outlined the opportunities for available credit counseling and assisted me in performing a related budget analysis, but I do not have a certificate from the agency describing the services provided to me. *You must file a copy of a certificate from the agency describing the services provided to you and a copy of any debt repayment plan developed through the agency no later than 14 days after your bankruptcy case is filed.*

☐ 3. I certify that I requested credit counseling services from an approved agency but was unable to obtain the services during the seven days from the time I made my request, and the following exigent circumstances merit a temporary waiver of the credit counseling requirement so I can file my bankruptcy case now. *[Summarize exigent circumstances here.]* ____

If your certification is satisfactory to the court, you must still obtain the credit counseling briefing within the first 30 days after you file your bankruptcy petition and promptly file a certificate from the agency that provided the counseling, together with a copy of any debt management plan developed through the agency. Failure to fulfill these requirements may result in dismissal of your case. Any extension of the 30-day deadline can be granted only for cause and is limited to a maximum of 15 days. Your case may also be dismissed if the court is not satisfied with your reasons for filing your bankruptcy case without first receiving a credit counseling briefing.

■ 4. I am not required to receive a credit counseling briefing because of: *[Check the applicable statement.] [Must be accompanied by a motion for determination by the court.]*

Software Copyright (c) 1996-2014 Best Case, LLC - www.bestcase.com

Best Case Bankruptcy

B 1D (Official Form 1, Exhibit D) (12/09) - Cont.                                                                  Page 2

     ☐ Incapacity. (Defined in 11 U.S.C. § 109(h)(4) as impaired by reason of mental illness or mental deficiency so as to be incapable of realizing and making rational decisions with respect to financial responsibilities.);

     ■ Disability. (Defined in 11 U.S.C. § 109(h)(4) as physically impaired to the extent of being unable, after reasonable effort, to participate in a credit counseling briefing in person, by telephone, or through the Internet.);

     ☐ Active military duty in a military combat zone.

    ☐ 5. The United States trustee or bankruptcy administrator has determined that the credit counseling requirement of 11 U.S.C. § 109(h) does not apply in this district.

**I certify under penalty of perjury that the information provided above is true and correct.**

    Signature of Debtor: _____

                          Michele Pizzuti

    Date: 8/29/2014

B4 (Official Form 4) (12/07)

# United States Bankruptcy Court
## Southern District of New York

In re   Michele Pizzuti

Debtor(s)

Case No.

Chapter    11

## LIST OF CREDITORS HOLDING 20 LARGEST UNSECURED CLAIMS

Following is the list of the debtor's creditors holding the 20 largest unsecured claims. The list is prepared in accordance with Fed. R. Bankr. P. 1007(d) for filing in this chapter 11 [or chapter 9] case. The list does not include (1) persons who come within the definition of "insider" set forth in 11 U.S.C. § 101, or (2) secured creditors unless the value of the collateral is such that the unsecured deficiency places the creditor among the holders of the 20 largest unsecured claims. If a minor child is one of the creditors holding the 20 largest unsecured claims, state the child's initials and the name and address of the child's parent or guardian, such as "A.B., a minor child, by John Doe, guardian." Do not disclose the child's name. See 11 U.S.C. § 112; Fed. R. Bankr. P. 1007(m).

| (1)<br>Name of creditor and complete mailing address including zip code | (2)<br>Name, telephone number and complete mailing address, including zip code, of employee, agent, or department of creditor familiar with claim who may be contacted | (3)<br>Nature of claim (trade debt, bank loan, government contract, etc.) | (4)<br>Indicate if claim is contingent, unliquidated, disputed, or subject to setoff | (5)<br>Amount of claim [if secured, also state value of security] |
|---|---|---|---|---|
| BAC Home Loans Servicing, LP<br>PO Box 15227<br>Wilmington, DE 19886-5227 | BAC Home Loans Servicing, LP<br>PO Box 15227<br>Wilmington, DE 19886-5227 | 267 Dante Avenue, Eastchester NY - 2 family home | Contingent<br>Unliquidated<br>Disputed | 120,000.00<br>(900,000.00 secured)<br>(950,000.00 senior lien) |
| Chase Home Finance, LLC<br>1820 E. Sky Harbor Cir South<br>Phoenix, AZ 85034 | Chase Home Finance, LLC<br>1820 E. Sky Harbor Cir South<br>Phoenix, AZ 85034 | 46 Glen Road, Eastchester, NY - 2 family home | Unliquidated | 115,000.00<br>(800,000.00 secured)<br>(850,000.00 senior lien) |
| Chase Home Finance, LLC<br>1820 E. Sky Harbor Cir South<br>Phoenix, AZ 85034 | Chase Home Finance, LLC<br>1820 E. Sky Harbor Cir South<br>Phoenix, AZ 85034 | 46 Glen Road, Eastchester, NY - 2 family home | Unliquidated | 850,000.00<br><br>(800,000.00 secured) |
| IndyMac Federal Bank<br>7700 W. Parmer Lane<br>Building D<br>Austin, TX 78729 | IndyMac Federal Bank<br>7700 W. Parmer Lane Building D<br>Austin, TX 78729 | 267 Dante Avenue, Eastchester NY - 2 family home | Unliquidated<br>Disputed | 950,000.00<br><br>(900,000.00 secured) |
| Town of Eastchester<br>Receiver of Taxes<br>Mill Road<br>Eastchester, NY 10709 | Town of Eastchester<br>Receiver of Taxes<br>Mill Road<br>Eastchester, NY 10709 | 46 Glen Road, Eastchester, NY - 2 family home | Unliquidated | 12,000.00<br>(800,000.00 secured)<br>(965,000.00 senior lien) |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

B4 (Official Form 4) (12/07) - Cont.

In re  **Michele Pizzuti**                                             Case No. _____

                                      Debtor(s)

## LIST OF CREDITORS HOLDING 20 LARGEST UNSECURED CLAIMS
### (Continuation Sheet)

| (1)<br>*Name of creditor and complete mailing address including zip code* | (2)<br>*Name, telephone number and complete mailing address, including zip code, of employee, agent, or department of creditor familiar with claim who may be contacted* | (3)<br>*Nature of claim (trade debt, bank loan, government contract, etc.)* | (4)<br>*Indicate if claim is contingent, unliquidated, disputed, or subject to setoff* | (5)<br>*Amount of claim [if secured, also state value of security]* |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

## DECLARATION UNDER PENALTY OF PERJURY
## ON BEHALF OF A CORPORATION OR PARTNERSHIP

     I, Michele Pizzuti, the debtor in this case, declare under penalty of perjury that I have read the foregoing list and that it is true and correct to the best of my information and belief.

Date  **March 1, 2015** _____     Signature   *s/ Michele Pizzuti by AP*

                                        **Michele Pizzuti**
                                        Debtor

*Penalty for making a false statement or concealing property*: Fine of up to $500,000 or imprisonment for up to 5 years or both.
18 U.S.C. §§ 152 and 3571.

# EXHIBIT - 11

INMATE VISITING HISTORY

PIZZUTI, MICHAEL

VISITING HISTORY FOR INMATE: PIZZUTI, MICHAEL
REGISTER NUMBER: 51089-054
DATES: 03/01/2017 THRU 07/31/2017

| VISIT DATE | VISITOR NAME | RELATION TO INMATE | POINTS |
|------------|--------------|--------------------|--------|
| 03-04-2017 | PIZZUTI, LEONARDO | ADULT SON | |
| 03-04-2017 | PIZZUTI, GABRIELLA | ADULT DAUGHTER | |
| 03-25-2017 | PIZZUTI, LEONARDO | ADULT SON | 2 |
| 03-25-2017 | PIZZUTI, GABRIELLA | ADULT DAUGHTER | |
| 03-31-2017 | PENACHIO, ANNE | ATTORNEY | |
| 03-31-2017 | PIZZUTI, MICHELLE A. | WIFE | 1 |
| 04-08-2017 | VETRINI, VINCENT | FRIEND | 2 |
| 04-08-2017 | DELLA ROCCA, ANTHONY | FRIEND | |
| 04-10-2017 | PIZZUTI, MICHELLE A. | WIFE | |
| 04-10-2017 | PUNTILLO, STEFANO | IN-LAW BROTHER | 1 |
| 04-15-2017 | PIZZUTI, LEONARDO | ADULT SON | |
| 04-15-2017 | PIZZUTI, GABRIELLA | ADULT DAUGHTER | 2 |
| 05-13-2017 | PIZZUTI, GABRIELLA | ADULT DAUGHTER | 2 |
| 05-19-2017 | PIZZUTI, MICHELLE A. | WIFE | 1 |
| 05-19-2017 | VETRINI, VINCENT | FRIEND | |
| 05-29-2017 | FARIA, ADRIANA | MOTHER OF CHILDREN | 2 |
| 05-29-2017 | PIZZUTI, MICHAEL | ADULT SON | |
| 05-29-2017 | PIZZUTI, MICHELLE A. | WIFE | |
| 06-18-2017 | PIZZUTI, LEONARDO | ADULT SON | |
| 06-18-2017 | PUNTILLO, ROSARIA | IN-LAW MOTHER | |
| 06-18-2017 | PIZZUTI, MICHELLE A. | WIFE | |
| 06-18-2017 | PIZZUTI, GABRIELLA | ADULT DAUGHTER | 2 |
| 07-28-2017 | PIZZUTI, MICHELLE A. | WIFE | 1 |
| 07-30-2017 | PIZZUTI, LEONARDO | ADULT SON | |

TOTAL VISITS FOR THIS INMATE: 24

MP - 0275